*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 10-62-P-S** |
| | ) | |
| **MATTHEW G. CLARK,** | ) | |
| | ) | |
| **Defendant** | ) | |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

Matthew G. Clark, charged with two counts of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2), *see* Indictment (Docket No. 1), seeks to suppress all evidence seized from his residence in Somerville, Maine, pursuant to search warrants issued in January and February 2008, as well as all statements made to a Lincoln County Sheriff's Department detective, Robert McFetridge, on January 20, 2008. *See* Defendant's Motion To Suppress Evidence ("Motion") (Docket No. 23) at 13.

An evidentiary hearing was held before me on September 29, 2010, at which the defendant appeared with counsel. The government tendered three witnesses and offered 14 exhibits, two of which were admitted over objection and 12 without objection. The defendant tendered four witnesses and offered two exhibits, which were admitted without objection. After both sides rested, counsel for each argued orally. I now recommend that the following findings of fact be adopted and that the Motion be denied.

**I. Proposed Findings of Fact**

On January 19, 2008, five members of the Animal Welfare Program of the State of Maine Department of Agriculture (the "AWP"), including its director, Norma Worley, its veterinarian, Christine Fraser, DVM, and a secretary, Beth Somers, accompanied by law enforcement officers,

executed a warrant to search property owned by and/or resided in by Fern Clark and Matthew

Clark (the defendant) in Somerville, Maine, for evidence of the crime of cruelty to animals, in

violation of 17 M.R.S.A. § 1031, and the civil violation of operation of an unlicensed breeding

kennel, in violation of 7 M.R.S.A. § 3938. *See* Search Warrant [dated January 18, 2008] ("First

Warrant"), included in Gov't Exh. S1; Animal Seizure Identification Log [dated January 19,

2008], included in Gov't Exh. S1.

The warrant was issued on January 18, 2008, by Justice of the Peace Jonathan Hull on the

strength of an affidavit of Dr. Fraser of the same date. *See* [Affidavit of Dr. Christine Fraser]

("Fraser Aff."), included in Gov't Exh. S1. In her affidavit, Dr. Fraser stated that she had been

employed as the State Veterinarian for the AWP since May 2003 and also served as a Humane

Agent for that program, in which capacities one of her duties was to respond to reports of alleged

abuse and/or neglect of animals. *See id*. ¶¶ 2-3, 8. She added:

9.     Over the years, the Animal Welfare Program has received many
       complaints concerning a dog breeder named Fern Clark . . . in Somerville,
       Maine. The complaints were that the dogs and puppies had fleas and were
       diseased and living in filthy conditions, and that Ms. Clark was not
       providing medical care.

10.    In the early 1990's animals were seized from Ms. Clark as the[y] were
       being treated cruelly, but the case was lost, and Ms. Clark was not
       convicted of animal cruelty.

11.    Ms. Clark had a license to operate a Breeding Kennel from the AWP from
       the 1990's to 2005, when Ms. Clark reported that she did not sell 16
       puppies or dogs per year, which was then the definition of breeding
       kennel, and thus did not require a kennel license.

12.    I first went to the property in the spring of 2005 to investigate a complaint
       about dogs living in filthy conditions. Ms. Clark and her adult son
       (Matthew, I believe) would not allow me to investigate the complaint, and
       insisted that I leave. I then went back with the only Humane Agent that
       Ms. Clark would allow into her house, Tom Eddy. When I was with him,
       she did show me paperwork regarding the medical care of the dogs and

did allow me to enter the upstairs of the house, where the dogs were housed throughout.

13.     The majority of dogs, mostly Chihuahuas, were housed in small home made wooden crates, about 2' by 2' in size. Most of the cages were in one room and there were some in the hallway. The cages were being cleaned by another adult son named David, and the animals were being fed. Although there were no dogs outside at that time, Ms. Clark showed us an outdoor pen that she said the dogs were put out in several times per day. There was a minimal smell of feces at the time, with many of the cages still to be cleaned.

14.     That was the only time that I was allowed into the house. On every occasion after that time, Ms. Clark and her son Matthew would not allow me on the property, and immediately demanded that I leave unless I had a search warrant.

15.     On September 14, 2006, the AWP received another complaint, this time about sick cats. On November 1, 2006, Director Norma Worley and myself went to the property to investigate the complaint and to inform Ms. Clark that the Breeding Kennel definition had changed as of late September 2006, so that if a person had 5 or more dogs capable of breeding and . . . some or all of the offspring are sold or exchanged for value, they would need to obtain a state Breeding Kennel license and be inspected annually by the AWP.

16.     As soon as we entered the property Ms. Clark's son Matthew came to the door and asked what I wanted. I introduced myself and explained that we had received a complaint on a sick kitten that had been sold. Matthew got angry, and told us that they did not have any kittens and that the complaint was bogus. He went to get Ms. Clark then.

17.     Ms. Clark said, too, that they did not have any kittens this year, so the complaint was false. I told her that I needed to see th[e] cats to see if the complaint was true or not, and she refused to let me see them.

18.     She stated that the property was now owned by Matthew. When asked if she was still breeding dogs, she stated that she had not had any pups in over a year, although she did admit that she had a litter of 3 Shih Tzus that was an accident. I informed her of the change in the definition of Breeding Kennel, and gave her a copy of the new definition as well as a packet for getting licensed. She insisted that she had cut way back, although she admitted to still having about 50 dogs.

19.     Matthew then demanded that we leave the property immediately, and that we did not return unless we had a search warrant. I did inform Ms. Clark

that she needed to get licensed if she met the Breeding Kennel definition, and that if she did not get licensed and was found to be operating a kennel illegally, she could be charged and fined.

20. I then checked with the town ACO, Jesse Turner, and he stated that he had not been allowed inside the Clark residence for 2 years. However, the town of Somerville still had issued Ms. Clark a municipal kennel license. The town clerk stated that because Humane Agent Tom Eddy was allowed in and had inspected, she had issued the licenses.

21. On March 12, 2007, the AWP was contacted by a complainant who had purchased a puppy from Ms. Clark. The puppy had been matted with feces, had fleas, and had ear infections. She had not, however, been allowed in the house and did not see the conditions of the other dogs.

22. In early May, I finally was able to meet up with town ACO Jesse Turner when he was going to do his municipal kennel inspection, and I was going to try to investigate the complaint. Due to the blatant hostility shown to me by Matthew on my last visit, I felt I needed to be accompanied by another person for safety reasons.

23. Ms. Clark was instantly rude and hostile to me, and said she would allow ACO Turner to go in and inspect if he had protective clothing, which I provided him, but that she would not let me in no matter what. Her son Matthew then came to the door and was extremely hostile, and told me to leave. I gave Ms. Clark another copy of our breeder licensing packet and left.

24. ACO Turner was allowed to inspect, and though he had not done many inspections, thought that the kennel was borderline but ok, that the dogs all had water and it was clean.

25. On January 16, 2008, the Salem, New Hampshire Police Department received a complaint about numerous dogs locked in a car. They found the driver, an Amy Moolic of Dracut[,] Massachusetts, had 22 dogs in her car, 3 of which were dead. She stated that she had "rescued" 12 of them from a "puppy mill" in Somerville, Maine. The Salem PD obtained paperwork on the dogs indicating that they had come from a Fern Clark of Somerville, Me. When contacted by the AWP in the morning of January 18, 2008, they faxed the papers to the AWP.

26. The ACO of the Salem PD, Kelly Demers, stated that the dogs, Chihuahuas and Shih Tzus[,] were in filthy condition, with the long haired Shih Tzu dogs matted with feces[,] and all of the dogs had fleas. The dogs are undergoing further medical evaluation on the afternoon of January 18, 2008.

27. The driver of the car[] stated to officers of the Salem PD that the house that she rescued the dogs from was in filthy condition.

28. Agents of the Animal Welfare Program, including myself, have repeatedly been denied access to Ms. Fern Clark's kennel since March 2005. Due to the repeated complaints there with filthy conditions and lack of medical care, as well as the recent complaint from Salem, NH, concerning dogs . . . with the same issues, I have probable cause to believe that the animals remaining on the premises are being deprived of necessary medical care, proper shelter and humanely clean conditions.

*Id.* ¶¶ 9-28.

The warrant permitted a search of the Clark property, described as a white two-story house with an addition that did not appear to be finished, having plywood for siding, and with an entrance from the driveway through the basement of the house, with stairs leading up to the main living area. *See* First Warrant. The warrant also permitted the search of any other structures, including outbuildings, that might contain animals and/or evidence of cruelty to animals, and any vehicles belonging to Fern Clark or the defendant. *See id.* It permitted a search, *inter alia*, for paperwork regarding the purchase, sale, care, births, deaths, breeding, feeding, medical treatment, and ownership of the animals, as well as any computers on which such records were maintained. *See id.* In Dr. Fraser's experience, the AWP seeks to search cars when applying for a warrant because both live and dead animals, as well as records pertaining to them, can be kept therein.

When Dr. Fraser executed her affidavit, she believed that the Clark residence was a single-family residence and that its residents were Fern Clark and her adult sons, the defendant and David Clark. She believed that Fern Clark owned the house, although Fern Clark had told her in 2006 that the defendant actually owned it. During the one occasion on which Dr. Fraser had been allowed into the home, when accompanied by Eddy in 2005, she had entered through

the basement, where Fern Clark showed her some paperwork pertaining to the animals' medical care, after which she had walked up the stairs to the first floor. She was quickly shown some kennels on that floor and ushered out of the house. She did not walk up to the second floor or observe any computers during that brief visit.

No one informed Dr. Fraser, prior to January 18, 2008, that the house contained a separate apartment on the second floor in which the defendant resided. Neither Dr. Fraser nor Eddy recalls Eddy telling Dr. Fraser, during their 2005 visit to the Clark residence, that the defendant lived in a separate apartment on the second floor. Dr. Fraser denies that, during her brief conversation with the defendant in November 2006, he showed her that the house had two electrical meters or explained that he had a separate apartment.[1]

Both the defendant and Fern Clark were present on each of the four occasions prior to January 18, 2008, on which Dr. Fraser visited the Clark residence. The defendant had spoken and acted in a manner indicating that he had authority to exclude Dr. Fraser from the residence,

---

[1] Brenda Carpenter, a cousin of Fern Clark, testified that she was present at the Clark residence when Dr. Fraser and Worley visited in November 2006. She stated that, from a partly open double window in a first-floor bedroom above the garage, she saw and heard the defendant tell the "state ladies" that they were not allowed to be there and saw him point to a pole that had two separate power meters on it. She testified that she heard three people – the defendant, an individual named Arthur Giles who was living at the Clark residence at the time, and Fern Clark – all explain to Worley and Dr. Fraser that there were two separate apartments. However, she testified contradictorily both that the defendant pointed to a pole on the side of the road, out of view of the photograph marked as Gov't Exh. S4, and to two meters attached to the house, depicted in Gov't Exh. S4 but clearly not within the view of either the double window above the garage door or the driveway directly below that window. She further testified, on cross-examination, that this conversation transpired because the ladies presented a warrant, prompting the defendant to explain that the warrant covered only the house and not his apartment. I do not find this testimony credible. Carpenter was not clear whether the defendant was pointing to the meters depicted on the side of the house or meters that she stated were affixed to a pole on the side of the road, neither of which apparently was visible to her or presumably to persons below her on the driveway. Further, her explanation of the premise for the conversation rests on a faulty foundation: that Dr. Fraser and Worley presented a warrant in November 2006. They did not. David Clark, the defendant's brother, testified that he remembered Eddy coming to the house with two women in 2005 and telling the women that there was no need to go upstairs because the defendant lived in a separate part of the house up there, and there were no animals there. He said that this conversation occurred because the women asked his brother where in the house they could go. I do not find this testimony credible. Eddy and Dr. Fraser were not accompanied by a third person in 2005. It is unlikely that Dr. Fraser would have asked where in the house she could go. Both the defendant and Fern Clark initially refused to permit her access to the house and would not do so until she returned with Eddy. In the circumstances, she credibly testified that, when permitted in, she was quickly shown select areas on the first floor and ushered out.

stating, for example, in November 2006 that she could not enter without a search warrant. The defendant was not a licensee of the AWP, and no animal welfare complaints were lodged against him personally. However, Dr. Fraser was aware that one of Fern Clark's adult sons, David, helped with her business, and she believed that the defendant was involved because he had barred her from entering the residence and had made comments to the effect that various complaints that she was attempting to investigate were false or bogus.

Prior to January 18, 2008, Dr. Fraser was aware that Fern Clark possessed one document, a sales contract, that appeared to have been printed from a computer, although she did not know whether that document emanated from a computer operated by Fern Clark or from another computer. Nonetheless, in Dr. Fraser's experience, based on conducting inspections and searches on behalf of the AWP, most breeders keep kennel records and contracts on computers, and many engage in internet sales of animals.

There are two electric meters affixed to the outside of the Clark residence. *See* Gov't Exh. S4. However, Dr. Fraser did not notice them when she arrived to execute the search warrant. Neither she nor Worley observed anything on the exterior of the house in either November 2006 or January 2008 that led them to believe that it was anything other than a single-family home.

Fern Clark testified that she does not consider the defendant's rooms to be a separate apartment because the upstairs is unfinished, having only a toilet and no full bathroom. The defendant goes downstairs to use the shower. The defendant has never participated in his mother's kennel business, apart from feeding animals occasionally while she is away. Fern Clark has never used computers in her business.

Upon entering the Clark residence to execute the warrant, Dr. Fraser, Worley, and Somers initially performed a walk-through, which Somers videotaped. *See* Gov't Exh. S12 (DVD of walk-through). They entered the residence through the basement and, from there, walked up a flight of stairs to the first floor, which was separated from those stairs by a screen door. They observed screen doors on nearly all doorways on the first floor. Some animals were caged, and a large number were loose. A screen door also was placed in front of the stairs leading up to the second floor. At the top of those stairs was a small landing. *See* Gov't Exh. S5. Directly off of that landing opposite the stairs was a bathroom containing a toilet that did not appear to be functioning, and no sink. *See* Gov't Exhs. S3, S6. To the right of the landing was a combination kitchen/bedroom area, the defendant's bedroom. *See* Gov't Exhs. S3, S8-S10. The kitchen portion of this extended area consisted of a refrigerator, a microwave, and a sink in which dirty dishes were stacked. *See* Gov't Exh. S10. To the left of the landing was a second bedroom. *See* Gov't Exhs. S3, S11.

Both bedrooms and the bathroom had wooden interior doors. Neither Dr. Fraser nor Worley observed anything indicating that the second floor housed a separate apartment or dwelling unit; for example, they observed no signage, numbering, name plate, or mailbox. The door to the defendant's bedroom was closed but unlocked. There is a door leading from the defendant's bedroom to the exterior of the house. However, that door was obscured by laundry hanging from a clothes line, and Dr. Fraser did not observe it on January 19, 2008. The defendant admits that this exterior door was not operable at the time of the search. *See* Defendant's Reply to Government's Opposition to Defendant's Motion To Suppress ("Reply") (Docket No. 34) at [2].

One animal was found on the second floor, a dog that was located in the defendant's bedroom and was suffering from multiple medical conditions, most notably severe flea allergy dermatitis that caused him to scratch himself constantly. *See* Gov't Exh. S7. The dog was a terrier, a breed of dog that searchers found elsewhere in the Clark residence.[2]

During the walk-through, Worley, whose task it was to search for records alluding to a kennel operation, noted that the defendant's bedroom contained several older computers and two newer ones, one of which was turned on. In executing previous search warrants, Worley had found records relating to the breeding and sale of animals in or near computers. In the course of her subsequent search, Worley, accompanied by Somers, found a notepad buried among other papers near one of the computers and began looking through it. The notepad contained a handwritten list of web sites suggestive of child pornography, including one containing the word "Lolita" and many others containing the word "boy" or "boys," some combined with words such as "sex" and "love." At some point, Worley moved the two-page list to the bed, where she photographed it. *See* Gov't Exhs. S13-S14.

Upon discovering the list, Worley went downstairs to alert Lieutenant Maker of the Lincoln County Sheriff's Department, who was among the law enforcement officers assigned to assist the AWP team in executing the warrant. Maker instructed Worley to continue searching for animal-related evidence and to inform him if she found anything else of concern. Worley went back upstairs and continued searching, whereupon she found pictures of what appeared to be naked young boys. She alerted Maker, who went upstairs to the defendant's bedroom, looked around, and instructed Worley and Somers to leave and not take anything. He advised that he

---

[2] Defense counsel referred to this dog as the defendant's pet. However, no evidence was adduced at hearing establishing that fact. Dr. Fraser testified on cross-examination that Fern Clark was charged with cruelty to that dog, as well as others, but was found not guilty with respect to that dog.

would contact the detective on duty and that, if any animal-related evidence were found in connection with further investigation, it would be forwarded to the AWP. During the brief time that Worley searched the defendant's bedroom, she found no animal-related records. All kennel-related records found by Worley were retrieved from the first floor. She saw no computers on the first floor.

Lincoln County Sheriff's Department Detective Robert McFetridge responded to Maker's call. He went to the Clark residence, spoke to Maker, and went upstairs to the defendant's bedroom on the second floor. McFetridge, who arrived during daylight, saw nothing on the exterior of the house that would lead him to believe that it was other than a single-family residence, and nothing about the defendant's bedroom that led him to believe that it was anything other than a bedroom within the house. After viewing the materials that Worley had found, including the list and photographs, McFetridge drafted an affidavit in support of an application for a warrant to search and seize items related to child pornography as well as evidence of the crime of cruelty to animals. McFetridge did not personally observe evidence of animal welfare or cruelty issues in the defendant's bedroom. He included that category of evidence in his search warrant application in reliance on information provided to him by the AWP team, both because that team had halted its search prematurely and because, in his view, the original warrant had expressly authorized seizing, but not searching, computers.

On the strength of McFetridge's affidavit, Maine District Court Judge Michael Westcott issued the requested warrant (the "Second Warrant") on January 19, 2008. The Second Warrant authorized search of the residence of the defendant and Fern Clark, any outbuildings located on the property, and any and all computers. *See* Search Warrant, Dft's Exh. 2. It authorized the seizure and search not only of any and all computers and of photographs, slides, films,

videotapes, and written material depicting or describing children in sexually explicit or sexually suggestive situations but also, *inter alia*, of evidence of the crime of cruelty to animals, in violation of 17 M.R.S.A. § 1031, and the civil violation of operation of an unlicensed breeding kennel, in violation of 7 M.R.S.A. § 3938. *See id.* The warrant was executed the same day it was issued, and various items were seized, including three computers and a number of videotapes. *See* Motion at 4; Government's Objection to Defendant's Motion To Suppress Evidence ("Objection") (Docket No. 30) at 4.

McFetridge later sought a third warrant ("Third Warrant") seeking permission to inspect the computers seized pursuant to the Second Warrant. *See* Motion at 5; Objection at 4-5. The Third Warrant was not entered into evidence and, according to the defendant, its particulars are not in issue except as fruits of the poisonous tree. *See* Motion at 5.[3]

## II. Discussion

With respect to the First Warrant, the defendant argues that:

1.      The Fraser Affidavit did not supply probable cause for the issuance of a warrant to search *any part* of the Clark residence for evidence of the crime of animal cruelty. *See* Motion at 11-12; Reply at [2]-[3].

2.      In any event, the warrant was overbroad and/or lacking in particularity insofar as it encompassed search of the defendant's separate dwelling unit, including his computers. *See* Motion at 5-8; Reply at [3]-[4].[4]

---

[3] "Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).
[4] During oral argument, defense counsel added that the warrant was overbroad in that it permitted the search of vehicles.

3.     Even if those executing the search warrant did not initially realize that the Clark residence contained a separate dwelling unit, they should have known upon entering the defendant's bedroom area that it was a separate unit and/or that it had nothing to do with the kennel business.  *See* Motion at 7; Reply at [5].  They, therefore, should have ceased any search of that portion of the house.  *See id.*

4.     Dr. Fraser erroneously and recklessly asserted in her affidavit that the defendant and Fern Clark shared living quarters in one residence, despite her prior knowledge that the defendant occupied a separate apartment.  *See* Motion at 7-8.  Accordingly, the government cannot rely on the *Leon* good-faith exception to salvage the search and seizure in question.  *See id*. at 8; *see also United States v. Leon*, 468 U.S. 897, 923 (1984) (good-faith exception to exclusionary rule in cases in which officers rely on search warrant not available when, *inter alia*, "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth").[5]

5.     Items seized from his bedroom must be suppressed because they were neither within the scope of the First Warrant nor in plain view.  *See* Motion at 8-10; *see also, e.g., United States v. Schiavo*, 29 F.3d 6, 9 (1st Cir. 1994) ("[P]olice officers may seize an object in 'plain view' without a warrant if they have probable cause to believe it is contraband without conducting some further search of the object, i.e., if its incriminating character is immediately apparent.") (citation and internal quotation marks omitted).

---

[5] Dr. Fraser does not explicitly state in her affidavit that the defendant and his mother shared living quarters.  *See* Fraser Affidavit.  However, regardless of whether she is alleged to have made a material misstatement or a material omission (by failing to apprise Justice of the Peace Hull that the defendant occupied a separate living quarters), the result is the same.

With respect to the Second Warrant, the defendant argues that items seized pursuant thereto must be suppressed on two bases:

1.　　That, when illegally obtained information is expunged from the affidavit submitted in support of issuance of that warrant, probable cause is lacking. *See* Motion at 10-11.

2.　　That the warrant is overbroad insofar as it authorizes the search of the defendant's living quarters for evidence of the crime of animal cruelty and/or the search or seizure of computers.　　　　　　　　　　.

The defendant finally argues that evidence seized pursuant to the Third Warrant, as well as his statements to McFetridge, must be suppressed as fruit of the poisonous tree. *See* Motion at 5, 13.

For the reasons that follow, I conclude that:

1.　　The defendant fails to carry his burden of proving that the First Warrant was unsupported by probable cause or overbroad.

2.　　Even assuming *arguendo* that the First Warrant was unsupported by probable cause or overbroad, the government carries its burden of demonstrating that searchers relied in good faith on the decision of the justice of the peace to issue the warrant, thereby entitling it to rely on the *Leon* good-faith exception to the exclusionary rule, and the defendant fails to carry his burden of rebutting that presumption by demonstrating that an exclusion to the *Leon* exception applies.

3.　　The defendant fails to show that his bedroom constituted a separate dwelling unit for purposes of the Fourth Amendment. Even assuming *arguendo* that he made such a showing, the government demonstrates that nothing known to or observable to searchers reasonably would have put them on notice of that fact.

4.     The government carries its burden of proving that any seizure of asserted child-pornographic materials during the execution of the First Warrant was validly made pursuant to the plain-view exception to the warrant requirement.

5.     The defendant fails to carry his burden of proving that the Second Warrant was overbroad.

6.     In view of the foregoing conclusions, the defendant's bid to suppress, as fruit of the poisonous tree, evidence seized pursuant to the Third Warrant, as well as statements that he made to McFetridge, necessarily founders.

## A. Facial Challenges to First Warrant

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted). "In determining whether the nexus element is satisfied, a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 48-49 (citation and internal punctuation omitted). "Put differently, the application must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched." *Id.* at 49.

A defendant bears the burden of proving the illegality of a warrant; if he succeeds, the burden shifts to the government to prove entitlement to the *Leon* good-faith exception. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the

warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant.").

Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause, "[y]et such review cannot start from scratch." *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (citation and internal quotation marks omitted). "A reviewing court must give great deference to a magistrate's assessment of the facts and inferences supporting the affidavit . . ., reversing only if there is no substantial basis for concluding that probable cause existed." *United States v. Sawyer,* 144 F.3d 191, 193 (1st Cir. 1998), *abrogated on other grounds*, *United States v. Giggey*, 551 F.3d 27 (1st Cir. 2008) (citation and internal punctuation omitted).

### 1. Asserted Lack of Probable Cause To Search Any Portion of Clark Residence

The defendant argues, *inter alia*, that the Fraser Affidavit failed to convey probable cause to search any portion of the Clark residence for evidence of the crime of animal cruelty, let alone the portion of the house occupied by him. *See* Motion at 11-12; Reply at [2]-[3]. As the government rejoins, *see* Objection at 5, this is not the first time that a court has considered this very question. In connection with state animal cruelty charges brought against her subsequent to the January 19, 2008, search, Fern Clark made the same argument. *See* Order, *State v. Clark*, Docket No. LIN-CR-08-043 (Me. Super. Ct. July 17, 2008), Attach. B (Docket No. 30-5) to

Objection, at 1. Superior Court Justice A.M. Horton expressed doubt as to whether the Fraser Affidavit did convey the requisite probable cause given its (i) omission of the date when Moolic acquired the 22 dogs, (ii) lack of any indication that, during more recent inspections or attempted inspections, the Clark dogs had been found to be in a condition similar to that of the dogs found in the Moolic vehicle, (iii) lack of any indication that Moolic told Salem, New Hampshire, police that the dogs were in that condition when she acquired them, and (iv) lack of indication how or why three of the 22 dogs had died. *See id.* at 1-2.

However, after holding an evidentiary hearing pursuant to *Leon*, Justice Horton concluded that, even if the affidavit failed to convey probable cause, the *Leon* exception applied:

> There are sufficient indicia of probable cause in the Fraser affidavit – specifically, its recitation of an extended history of issues of neglect of animals at Defendant's kennel, coupled with the inference that some of the neglected animals in the Moolic vehicle were taken very recently from the Defendant's kennel – to render the subjective belief of Dr. Fraser and Lt. Baker [that the affidavit conveyed probable cause] objectively reasonable. For these reasons, the court finds that, even if the affidavit were found lacking in terms of probable cause, the State has proved to a probability that those involved in obtaining and executing the warrant actually believed that probable cause existed, and that their belief was objectively reasonable.

Order, *State v. Clark*, Docket No. LIN-CR-08-043 (Me. Super. Ct. Sept. 10, 2008), Attach. C (Docket No. 30-6) to Objection, at 3-4. Fern Clark appealed that decision to the Law Court, which held:

> Contrary to Clark's contention, the court properly denied her motion to suppress because the affidavit in support of the search warrant request established probable cause to justify the issuance of the warrant. Accordingly, we need not reach Clark's argument that the court erred in relying on the 'good faith' exception to the exclusionary rule.

Memorandum of Decision, *State v. Clark*, Docket No. Lin-09-375 (Me. May 18, 2010), Attach. D (Docket No. 30-7) to Objection (citations omitted).

With due deference to the justice of the peace's assessment of the facts and inferences supporting the Fraser Affidavit, I independently conclude that it supplied probable cause to believe that the crime of cruelty to animals had been committed and that evidence of that crime would be found at the Clark residence. While the Fraser Affidavit did not indicate when Moolic acquired the dogs, the justice of the peace could have drawn a reasonable inference that their acquisition had been recent: Moolic was found with 22 dogs in her car in January in Salem, New Hampshire, including 12 that she purported to have rescued from a puppy mill in Somerville, Maine.

The justice of the peace also could have drawn a reasonable inference that the dogs, Chihuahuas and Shih Tzus in filthy condition, all with fleas and some, the long-haired Shih Tzus, with feces-matted fur, were in the same condition as when obtained from Fern Clark. This was so not only because of the apparent recency of their acquisition but also because of the similarity between the condition of the animals found in the Moolic car and the condition of animals sold by Fern Clark as reported by complainants to the AWP. Notably, a complainant had reported on March 12, 2007, that a puppy purchased from Fern Clark had been matted with feces, had fleas, and had ear infections. Dr. Fraser disclosed in her affidavit that, in response to that complaint, an animal control officer, Jesse Turner, was permitted in May 2007 to inspect the Clark kennel and deemed it borderline but OK. However, Dr. Fraser also noted that Turner had not done many inspections, that the defendant and Fern Clark had a history of permitting only certain inspectors, such as Eddy, to conduct inspections, and that they barred Dr. Fraser in May 2007 from personally inspecting the premises, as they had previously.

While there was little indication in the Fraser Affidavit of Moolic's reliability as a witness, the justice of the peace properly could have taken into account Dr. Fraser's statement

that the Salem Police Department had obtained, and Dr. Fraser had reviewed, paperwork corroborating that dogs had been obtained from Fern Clark in Somerville, Maine, consistent with Moolic's report.

In sum, the Fraser Affidavit supplied a "substantial basis for concluding that probable cause existed." *Sawyer,* 144 F.3d at 193 (citation and internal punctuation omitted). There is accordingly no basis for disturbing the justice of the peace's assessment.

## 2. Asserted Overbreadth

In a second facial challenge to the First Warrant, the defendant argues that the warrant was overbroad in authorizing the search of his separate dwelling unit within the Clark residence despite the lack of any evidence that he personally committed the crime of cruelty to animals or even had any substantive involvement in his mother's kennel business. *See* Motion at 5-8; Reply at [3]-[5]. His counsel further contended, at oral argument, that the warrant was overbroad insofar as it authorized the search of vehicles.

"A warrant is valid under the Fourth Amendment only where it is based upon probable cause, supported by [o]ath or affirmation, and particularly describes the place to be searched, and the persons or things to be seized." *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) (citation and internal punctuation omitted). "Where a warrant fails to describe with particularity the place to be searched, it is void." *Id.* "[P]robable cause to search one apartment in a multi-unit building does not support a warrant authorizing a search of the entire building." *Id.* "Rather, when a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit." *Id.* (citations and internal quotation marks omitted).

As is the case with challenges to the validity of search warrants generally, a defendant bears the burden of showing that a search warrant is overbroad. *See, e.g., United States v.*

*Hazelrigg*, No. CR-08-50047, 2009 WL 1293565, at *14 (D.S.D. Feb. 2, 2009) (rec. dec., *aff'd* May 6, 2009).  The defendant falls short of doing so here.

The Fraser Affidavit, on its face, conveyed probable cause to search the entirety of the Clark residence.  Nothing in the affidavit indicated that the defendant occupied a separate unit within the residence.  To the contrary, the affidavit suggested that he exercised apparent authority with respect to the whole residence, meeting Dr. Fraser at the door on each of her visits and barring her from entry unless she obtained a search warrant, except on the occasion that she was accompanied by Eddy.  The affidavit also noted that, on at least one occasion, the defendant spoke on behalf of his mother and her kennel operation, characterizing a complaint regarding a sick kitten as bogus and denying that they had any kittens.

"A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of the house."  *United States v. Langford*, No. IP-01-0050-CRTF, 2001 WL 1946535, at *16 (S.D. Ind. Nov. 5, 2001), *aff'd*, 314 F.3d 892 (7th Cir. 2002) (citation and internal quotation marks omitted).  This so-called "community living unit rule" is rooted in the common-sense notion that "there is still the opportunity of access by one tenant to each occupant's room and the appearance of collective arrangements."  *Id*. (citation and internal quotation marks omitted).  "Concealment of evidence or frustration of purpose would result if a search warrant had to be artificially limited to an access extent less than that of the particular suspect."  *Id*. (citation and internal quotation marks omitted).[6]

---

[6] The defendant cites *Ybarra v. Illinois*, 444 U.S. 85 (1980), for the proposition that "a search or seizure of a person must be supported by probable cause particularized with respect to that person."  Motion at 5 (quoting *Ybarra*, 444 U.S. at 91).  However, the instant search was of a premises, not of the defendant personally.  During oral argument, defense counsel also cited *United States v. Widi*, 686 F. Supp.2d 107 (D. Me. 2010), for the proposition that the warrant was overbroad and lacking in particularity.  *Widi* is distinguishable.  In *Widi*, Judge Singal suppressed
*(continued on next page)*

Nor does the defendant succeed in showing that the warrant was overbroad insofar as it authorized the search and seizure of any vehicles. *See* First Warrant. A judge "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *United States v. Mykytiuk*, 402 F.3d 773, 778 (7th Cir. 2005) (citations and internal quotation marks omitted). As Dr. Fraser testified, and counsel for the government noted during oral argument, live or dead animals or records related to animals might have been housed in vehicles kept on the property. The warrant was not facially overbroad in authorizing such a search, given the nature of the crime alleged.

To the extent that the defendant argues that the Fraser Affidavit fails to convey probable cause as a result of a material misstatement or omission, he falls short of making a persuasive case that any such material misstatement or omission was made.

As the First Circuit has noted:

> A defendant is entitled to an evidentiary hearing under *Franks* [*v. Delaware*, 438 U.S. 154 (1978),] where the defendant makes a substantial preliminary showing that both (1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit and (2) the allegedly false statement is necessary to the finding of probable cause. Omission of a material fact from the affidavit supporting a warrant is sufficient to trigger a *Franks* hearing. In the case of an omission, suppression should be ordered only if the warrant application, clarified by disclosure of previously withheld material, no longer demonstrates probable cause.

*United States v. Reiner*, 500 F.3d 10, 14 (1st Cir. 2007) (citations and internal punctuation omitted).

I have recommended that the court find as a fact that no one informed Dr. Fraser prior to January 18, 2008, that the defendant occupied a separate dwelling unit within the Clark residence. Dr. Fraser could not reasonably have been expected to deduce, from either the

---

evidence seized from a van when the van was *not* included within the scope of the warrant and the government did not meet the standard for its warrantless seizure. *See Widi*, 686 F. Supp.2d at 114-15.

defendant's conduct or the physical appearance of the residence, that he claimed to occupy a separate apartment within it. On each occasion on which she had visited the residence, he had exercised apparent authority over the entire dwelling, meeting her and stating in no uncertain terms, on three of those occasions, that she would not be permitted in without a warrant. The defendant had also shown some knowledge of and concern for his mother's kennel operation, stating, for example, that a complaint of a sick kitten was false and that the kennel was not breeding cats. From the outside, the house appeared to be a single-family residence. While there were two electric meters, Dr. Fraser credibly testified that she did not observe them. On the single occasion on which she had been permitted briefly into the home, she observed nothing indicating that the upstairs housed a separate apartment. Although the stairs leading from the first floor to the second floor were covered by a screen door, that was true of other doors on the first floor. There was no indication either that the defendant was not permitted into other spaces within the residence or that his mother was not permitted into the upstairs.

In the circumstances, Dr. Fraser appropriately sought, and the justice of the peace lawfully issued, a warrant to search the entirety of the Clark residence.

### 3. *Leon* Good-Faith Exception

The foregoing analysis is dispositive of the defendant's facial challenges to the First Warrant. However, even assuming *arguendo* that the warrant was unsupported by the requisite probable cause and/or overbroad in certain respects, I would reach the same result based on application of the *Leon* good-faith exception. Pursuant to that exception, "[e]vidence seized in violation of the Fourth Amendment is admissible in court if the government placed an objectively reasonable reliance on a neutral and detached magistrate judge's incorrect probable cause determination." *United States v. Crosby,* 106 F. Supp.2d 53, 58 (D. Me. 2000), *aff'd,* 24

Fed. Appx. 7 (1st Cir. 2001) (citation and internal quotation marks omitted). "If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant." *Koerth*, 312 F.3d at 868. "An officer's decision to obtain a warrant is *prima facie* evidence that he or she was acting in good faith." *Id.* The defendant bears the burden of rebutting the government's good-faith showing by demonstrating that one or more of the *Leon* exclusions applies. *See, e.g., id.*

As the defendant suggests, *see* Motion at 8, the *Leon* exception is itself subject to exceptions:

> There are four exclusions to the *Leon* good-faith exception: (1) when the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient – i.e. in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid.

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999) (citation and internal punctuation omitted).

The government demonstrates that Dr. Fraser decided to and in fact did obtain a warrant from Justice of the Peace Hull. The defendant seeks to rebut the resulting *prima facie* showing of good faith by invoking the first of the *Leon* exclusions, suggesting that Dr. Fraser misled the justice of the peace by erroneously and recklessly asserting that the defendant and his mother shared living quarters in the residence. *See* Motion at 8. For the reasons discussed above, I find that Dr. Fraser had no prior knowledge that the defendant occupied a separate dwelling unit and, in any event, for the reasons discussed below, as a matter of law for Fourth Amendment

purposes, he did not.  Accordingly, even assuming *arguendo* the absence of probable cause to support the First Warrant or its overbreadth, the *Leon* good-faith exception applies.

### B.  Asserted Overbreadth of Search Pursuant to First Warrant

The defendant challenges not only the facial validity of the First Warrant but also the manner in which it was executed, asserting that searchers knew or developed reason to know during the execution of the warrant that he occupied a separate dwelling unit having no connection to his mother's kennel business.  *See* Motion at 7; Reply at [5].  For those reasons, he argues, searchers should have desisted from searching his dwelling unit.  *See id.*

"A search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence."  *United States v. Ayers,* 924 F.2d 1468, 1480 (9th Cir. 1991).  Conversely, "[w]hen a structure is divided into more than one residential unit[,] there must be [probable] cause to search each unit."  *United States v. Baldacchino*, 762 F.2d 170, 177 (1st Cir. 1985).  "A search covering an entire street address is authorized where probable cause exists as to one portion of a multiunit building only when the building is used as a single entity or the suspect is in control of the whole premises."  *Id*.

As the defendant acknowledges, *see* Motion at 5-6, "[t]he police can validly search a multi-unit dwelling even if the search warrant was only for a single-unit dwelling, provided the police reasonably believed that the dwelling contained only one unit[,]" *United States v. Mousli*, 511 F.3d 7, 12 (1st Cir. 2007).  The constitutionality of officers' conduct is judged "in light of the information available to them at the time they acted."  *Id*. (citation and internal quotation marks omitted).  *See also, e.g., United States v. Smith*, 531 F.3d 1261, 1266 (10th Cir. 2008) (assuming, for purposes of appeal, that warrant was overbroad, officers' failure to realize

overbreadth was objectively reasonable when nothing observed by the officers or said by individual on premises would have put them on notice that a garage apartment was a separate residence).

The defendant falls short of making a persuasive case that the Clark residence was in fact a multi-unit dwelling for Fourth Amendment purposes. In any event, even if it were, the government demonstrates that searchers executing the First Warrant on January 19, 2008, reasonably believed that the dwelling contained only one unit.

Defense counsel contended at oral argument, in line with Carpenter's and David Clark's testimony at hearing, that Dr. Fraser knew prior to January 18, 2008, that the defendant occupied a separate unit within the residence. He added that her knowledge was evidenced, *inter alia*, by the fact that she did not seek to inspect the second floor of the house when permitted entry in 2005. He further argued that searchers should have known in any event that his client's unit was separate and had nothing to do with the kennel operation when (i) both the kennel and kennel paperwork already had been found downstairs in Fern Clark's part of the house, (ii) no evidence had been found that Fern Clark used computers, (iii) his client's living space contained only one animal, a dog that he characterized as the defendant's personal pet and not the same breed as those Fern Clark bred for sale, and (iv) searchers should have noted indicia of the existence of a separate dwelling unit on the second floor, including the presence of two separate electric meters on the exterior of the house, the screen door covering the stairs leading to the second floor, and the existence of a separate door leading from the defendant's apartment to the outside of the house. *See also* Motion at 7; Reply at [5].

I am satisfied that the defendant's bedroom was not, as a matter of law, a separate dwelling within the Clark residence and that searchers acquired no information, before or during

the execution of the First Warrant on January 19, 2008, that should reasonably have placed them on notice that it was.

First, as discussed above, I have recommended that the court find as a fact that Dr. Fraser was not informed by Eddy, the defendant, or anyone else prior to the execution of her affidavit on January 18, 2008, that the defendant occupied a separate dwelling unit. Dr. Fraser's omission to inspect the second floor of the house in 2005 is more plausibly explained by the defendant's and Fern Clark's careful control over the manner in which she was permitted to inspect the premises than it is by her purported knowledge that the second floor had no role in the kennel business.

When searchers came to the house on January 19, 2008, nothing about its exterior apprised them that it consisted of multiple units. Neither Worley nor Dr. Fraser noticed the placement on the house's exterior of two separate electrical meters. In any event, even had they noticed or reasonably have been expected to notice the meters, that fact, standing alone, was not sufficient for Fourth Amendment purposes to apprise them that the house contained separate dwelling units.

Once searchers entered the home, nothing about its interior placed them on notice that the defendant occupied a separate dwelling unit. His room was accessed by way of an internal set of stairs leading from the first to the second floor. Those stairs were covered by a screen door, but so were a number of other doors on the first floor, in an apparent effort to contain loose animals. While each of the distinct spaces upstairs – the two bedrooms and the bathroom – was separated from the landing by a wooden door, none of those doors was marked in such a way as to indicate that any of those spaces separately or together constituted a private apartment. Although the defendant's bedroom contained a door leading to the exterior of the house, searchers' view of it

was obscured by hanging laundry and other clutter. In any event, the defendant concedes that this exterior door was not then operable. *See* Reply at [2].

Nor did the upstairs rooms, even collectively, appear to constitute a fully functional apartment. There was no shower or sink in the bathroom, and the toilet appeared to searchers to be non-functional. Fern Clark testified at hearing that she did not consider the upstairs an "apartment" because it had only a "flush" (a toilet) and that her son came downstairs to use her shower.

Finally, it was not reasonably apparent to searchers that the defendant's bedroom area had no connection whatsoever to the kennel operation. They found one dog in that bedroom that, according to Dr. Fraser, was a breed of dog found elsewhere in the residence and suffered from similar health conditions as the dogs found on the first floor, including flea-induced dermatitis. It was not self-evident that this dog was the defendant's pet. They also observed several computers and some paperwork that could have contained animal-related evidence. They had no reason to know that such evidence definitely would not be found therein.

In these circumstances, the defendant's bedroom did not constitute a separate dwelling for Fourth Amendment purposes, and nothing known to or observed by searchers as of the time of the search reasonably should have put them on notice that it was. *See United States v. Ferreras*, 192 F.3d 5, 11 (1st Cir. 1999) (district court's conclusion that third-floor attic and second floor constituted one apartment and that search warrant for second-floor apartment included the half story above it was "eminently reasonable and supported by the evidence" when "(1) the attic was open to the second floor, but not to the street or the first floor apartment; (2) the third floor was not equipped for independent living; and (3) the occupant of the third floor had access to the second floor kitchen and bathroom"); *Langford*, 2001 WL 1946535, at *15

(rejecting defendant's argument that his separate bedroom within residence constituted a separate subunit for Fourth Amendment purposes; noting, "Not every dwelling which houses two or more unrelated individuals constitutes a multi-unit dwelling for purposes of Fourth Amendment analysis, even if those individuals have separate and distinct bedrooms within the dwelling.  It is undisputed that all residents of 45 South Iris shared (or at least had equal access to) the same common areas, including the kitchen, living room and bathrooms.  . . .  The Defendant has not asserted that 45 South Iris had multiple mailboxes, telephone numbers, utility hook-ups, or any other indicia that the residence was a multi-unit dwelling.").

### C.  Application of "Plain View" Exception

The defendant finally argues, with respect to the First Warrant, that Worley lacked authorization to seize the web-site list and photographs found in his bedroom, which were neither within the scope of the First Warrant nor in plain view.  *See* Motion at 8-10.  Assuming *arguendo* that Worley "seized" those materials when she moved them to a different place within the bedroom, *see, e.g., Widi*, 686 F. Supp.2d at 114 ("The Supreme Court has held that moving an individual's belongings from one location to another constituted a substantial intrusion on the individual's possessory interests."), the government demonstrates that the seizure fit within the "plain view" exception to the warrant requirement.

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005) (citation and internal quotation marks omitted).  "[P]olice officers may seize an object in 'plain view' without a warrant if they have probable cause to believe it is contraband without conducting some further search of the object, i.e., if its incriminating character is immediately apparent."  *Schiavo*, 29 F.3d at 9 (citation and

internal quotation marks omitted); *see also, e.g., United States v. Friel*, 448 F. Supp.2d 222, 227 (D. Me. 2006) ("[O]nce law enforcement reached the head of defendant's bed pursuant to a search warrant that included the entire residence, they were entitled to seize the weapon in 'plain view,' because given the defendant's status as a felon, it was illegal for him to possess the firearm and, therefore, it was reasonable for them to believe that the gun was evidence of a crime."). The government bears the burden of proving entitlement to the plain-view exception to the warrant requirement. *See, e.g., Ribeiro*, 397 F.3d at 53 & n.8.

Although the web-site list and photographs were not visible upon walking into the defendant's bedroom, and Worley searched through some of his personal papers before finding them, they nonetheless were "in plain view" in the sense that Worley ran across them while conducting an authorized search for animal-related paperwork. Worley and later McFetridge reasonably concluded that these materials' incriminating character was immediately apparent, given references to web sites containing terms such as "Lolita" and "boys" and the presence of photographs of apparently nude boys.

Any seizure of these materials was lawful as a plain-view seizure.

### D. Evidence Seized Pursuant to Second, Third Warrants; Statements

The defendant's bid for suppression of evidence seized pursuant to the Second and Third warrants, as well as for suppression of statements made to McFetridge, hinges primarily on the success of one or more of his arguments that evidence was obtained illegally pursuant to the First Warrant. *See* Motion at 5, 10-11, 13. To the extent that the court agrees that those arguments fail, suppression of the derivative evidence must be denied, as well.

Defense counsel clarified, at oral argument, that the defendant also moves to suppress evidence seized pursuant to the Second Warrant on an independent basis: that the warrant was

overbroad insofar as it authorized (i) the search for and seizure of animal cruelty evidence when searchers, prior to halting the search, had developed no evidence whatsoever linking him to that crime, and (ii) the search for and seizure of computers containing animal cruelty records when it should have been apparent, as of the time of McFetridge's application for the Second Warrant, that Fern Clark used no computers in her kennel business.

The defendant falls short of carrying his burden of demonstrating that the Second Warrant was overbroad in the respects claimed. McFetridge explained that he incorporated requests to search and seize animal-cruelty-related evidence into the Second Warrant, including any such evidence contained on computers, in part because the AWP team had not completed its search of the Clark residence at the time of Worley's discovery of apparent child pornographic materials.

As noted above, the Fraser Affidavit conveyed probable cause to search the entire Clark residence, which was a single dwelling unit for purposes of the Fourth Amendment, for evidence of the crime of cruelty to animals. In those circumstances, the fact that there was little or no evidence of the defendant's involvement in the kennel business or his commission of the crime of cruelty to animals was irrelevant. While searchers had found no computers on the first floor and no animal-related records in the defendant's bedroom during the brief time that they searched that area, they could not then have been certain that no computerized information existed and that, if it did, Fern Clark did not keep it on the defendant's computers. As of that time, Dr. Fraser knew that kennel and animal-related records typically are kept on computers and that Fern Clark had possessed one document, a sales contract, that appeared to have been printed from a computer, although she did not know whose. She also had reason to believe that the defendant had at least some minimal involvement in the kennel business, given his repeated

statements that she was not permitted to enter without a warrant and his comments to the effect that one or more complaints regarding the kennel had been false. While Fern Clark, a woman in her late 70s, testified in no uncertain terms at hearing that she never had and never would use a computer and that the defendant had nothing to do with her business apart from occasionally feeding animals at her request, that information was not known to Dr. Fraser and other AWP searchers or to McFetridge on January 19, 2008.

The defendant has failed to demonstrate that the Second Warrant was overbroad in its inclusion of the defendant's bedroom and computers among items to be searched for evidence of the crime of cruelty to animals.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 27th day of October, 2010.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge