1           UNITED STATES DISTRICT COURT

2               DISTRICT OF MAINE

3    _____

4    UNITED STATES OF AMERICA,          CRIMINAL ACTION

5              Plaintiff          Docket No:  10-62-P-S

6

7         -versus-

8

9    MATTHEW G. CLARK,

10             Defendant
     _____
11              Transcript of Proceedings

12

13   Pursuant to notice, the above-entitled matter came on
     for **SUPPRESSION HEARING** held before **THE HONORABLE JOHN
14   H. RICH III,** United States Magistrate, in the United
     States District Court, Edward T. Gignoux Courthouse,
15   156 Federal Street, Portland, Maine on the 29th day of
     September, 2010 at 8:52 AM as follows:

16

17   Appearances:

18   For the Government: Richard W. Murphy, Esquire
                         Assistant United States Attorney
19
     For the Defendant:  Theodore G. Fletcher, Esquire
20

21

22

23             Dennis R. Ford
            Official Court Reporter
24
        (Prepared from manual stenography and
25          computer aided transcription)

**I N D E X**

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| Christine Fraser | 4 | 32 | 56 | |
| Norma Worley | 58 | 71 | | |
| Robert McFetridge | 83 | 87 | 99 | 99 |
| Thomas Eddy | 102 | | | |
| Brenda Carpenter | 109 | 119 | 127 | |
| Fern Clark | 130 | 135 | | |
| David Clark | 136 | 139 | 142 | |

**E X H I B I T S**

| Number | Description | Page/Admit |
|--------|-------------|------------|
| S1 | Affidavit/Warrant | 7,56,85/8 |
| S2 | Sketch | 14/15 |
| S3 | Sketch | 16,63,85/18 |
| S4 | Photograph | 75,112,121/21 |
| S5 | Photograph | 22,41,138/23 |
| S6 | Photograph | 23/24 |
| S7 | Photograph | 24,45/25 |
| S8 | Photograph | 25,34/26 |
| S9 | Photograph | 26,34/27 |
| S10 | Photograph | 27/29 |
| S11 | Photograph | 29/30 |
| S12 | Video DVD | 60/61 |
| S13 | Photograph | 65,72/66 |
| S14 | Photograph | 66,72/67 |
| | | |
| D1 | Report | 77/79 |
| D2 | Search Warrant | 96/96 |

**SIDEBAR CONFERENCES**

**CHAMBERS CONFERENCES**

```
 1              (OPEN COURT. DEFENDANT PRESENT)

 2         THE COURT:  Good morning, counsel.

 3         MR. MURPHY:  Good morning, Your Honor.

 4         THE COURT:  Mr. Murphy, please call the

 5   Government's next matter.

 6         MR. MURPHY:  Thank you.  Your Honor, the

 7   matter on for hearing this morning is United States of

 8   America versus Matthew Clark which is criminal docket

 9   number 10-62-P-S.  The matter is before Your Honor this

10   morning for hearing on the defendant's motion to

11   suppress evidence.

12         The defendant Matthew Clark is present with

13   counsel, Theodore Fletcher, and the Government is

14   prepared to proceed.

15         THE COURT:  Thank you, Mr. Murphy, and good

16   morning, Mr. Fletcher.  Are counsel prepared to proceed

17   at this time?

18         MR. FLETCHER:  We are, Your Honor.

19         MR. MURPHY:  Yes, Your Honor.

20         THE COURT:  Very well.  In that case, the

21   Government may call its first witness.

22         MR. MURPHY:  Thank you, Your Honor.  The

23   Government calls Dr. Christine Fraser.

24         THE CLERK:  Please raise your right hand.  Do

25   you solemnly swear that the testimony you will give in
```

1    the cause now in hearing will be the truth, the whole

2    truth, and nothing but the truth, so help you God?

3              THE WITNESS:  I do.

4              THE CLERK:  Please be seated.  Please speak

5    directly into the microphone.  State your name and

6    spell your last for the record.

7              THE WITNESS:  Christine Fraser,

8    C-h-r-i-s-t-i-n-e F-r-a-s-e-r.

9              MR. MURPHY: Thank you, Your Honor.

10                   DIRECT EXAMINATION

11   BY MR. MURPHY:

12   Q    Dr. Fraser, how are you employed?

13   A    I'm employed by the State of Maine, Department of

14   Agriculture within the Animal Welfare Program.

15   Q    And what are your duties there?

16   A    My duties, I administer the Animal Welfare

17   Program.  It entails conducting investigations into

18   animals as well as facility licensing issues, kennels

19   and pet shops.

20   Q    Can you briefly tell the Court what your

21   educational background is?

22   A    Yes.  I graduated from the University of

23   Tennessee, College of Veterinary Medicine in 1993.  I

24   was employed for several years in a private racetrack

25   veterinary practice.  I then moved to Maine.  I worked

Fraser-Direct/Murphy

1    for the Harness Racing Commission and began working for

2    the Animal Welfare Program in May of 2003.

3    Q    Have you received any training in law enforcement

4    methods or techniques?

5    A    I have.  I have completed three levels of cruelty

6    investigation, animal cruelty investigation training

7    with the National Cruelty Investigation School, which

8    is run by the University of Missouri Law School in

9    conjunction with the Humane Society and associates.  I

10   also completed an equine seminar and I'm a certified

11   equine investigator, as well as completing the 100-hour

12   prelaw enforcement -- pre 100 hour course.

13   Q    Thank you.

14        THE COURT:  Dr. Fraser, maybe if you can speak

15   a little bit more slowly just to help the court

16   reporter.

17        MR. MURPHY:  That's what I was going to ask

18   you to do and make sure you speak right into the

19   microphone so we can all hear.

20   BY MR. MURPHY:

21   Q    During your course of duties with the Animal

22   Welfare Program as you described them, did you have

23   occasion to interact with a woman named Fern Clark?

24   A    Yes, I did.

25   Q    And where did Ms. Clark live?

Fraser-Direct/Murphy

1   A    On Hewett Road off of Route 17 in Somerville,

2   Maine.

3   Q    At some point in early 2008, did you request the

4   issuance of a search warrant for the residence in which

5   Ms. Clark resided?

6   A    I did.

7   Q    And was that on January 18th of 2008?

8   A    Yes.

9   Q    From whom did you request the search warrant?

10  A    I brought the search warrant that I drafted and

11  had been approved by the attorney, District Attorney's

12  Office, to a Justice of the Peace, Jonathan Hull, of

13  Damariscotta, Maine.

14  Q    You're saying that the affidavit you drafted had

15  been reviewed by an Assistant District Attorney?

16  A    Yes, it had.

17  Q    Who was that?

18  A    Lisa Bogue who was the ADA at that time.

19  Q    How did you ask Ms. Bogue to review your warrant?

20  A    I had a phone conversation with her and then I

21  e-mailed my finished affidavit and search warrant to

22  her for review.

23           THE COURT:  Is that B-o-w?

24           THE WITNESS:  Bogue, I'm sorry.

25           THE COURT:  How do you spell that?

1        THE WITNEES:  B-o-g-u-e, I believe.

2        THE COURT:  Thank you.

3        MR. MURPHY:  I believe that's correct.

4   BY MR. MURPHY:

5   Q    Did Ms. Bogue indicate to you during the course of

6   your preparation of the warrant and before you

7   presented it to the Justice of the Peace, did she

8   indicate it appeared to her to be accurate?

9   A    Yes, she did.

10       MR. MURPHY:  Your Honor, I'm going to tender

11  Government's exhibits during the course of the hearing

12  and what I have done is I have an original of each

13  exhibit with the exhibit sticker on it and then I have

14  three identical copies.

15       I'll represent to the Court they are true and

16  accurate copies, and I thought that what I would do is

17  to provide the original to be admitted, and then there

18  will be a copy -- the original for you, of course, and

19  then there would be a copy for counsel and for the

20  witness, if that's okay.

21       THE COURT:  That's fine.

22  BY MR. MURPHY:

23  Q    I'm going to hand you what's been marked as

24  Government's Exhibit S, that's capital S, 1.  Do you

25  recognize that document?

Fraser-Direct/Murphy

1    A      Yes, I do.

2    Q      And what is that?

3    A      This is the search warrant and affidavit --  um,

4    the affidavit that I wrote to obtain the search

5    warrant.  There are several things here as well.  An

6    inventory of animals that was seized.  The execution of

7    the warrant.

8    Q    So that is the executed warrant, your application

9    for the warrant and your supporting affidavit, as well

10   as the inventory that was created after the warrant was

11   executed; is that correct?

12   A     That's correct.

13             MR. MURPHY:  Your Honor, I move for admission

14   of Government's Exhibits S1.

15             THE COURT:  Any objection?

16             MR. FLETCHER:  No, Your Honor.

17             THE COURT:  Government's Exhibit S1 is

18   admitted without objection.

19             MR. MURPHY:  I'll tender that to you, Your

20   Honor.

21             THE COURT:  Thank you.

22   BY MR. MURPHY:

23   Q     Were the facts that you recited in your affidavit,

24   which is part of Exhibit S1, true and correct to the

25   best of your knowledge and belief when you prepared

1    that affidavit and presented it to Justice of the Peace

2    Hull?

3    A    Yes, they were.

4         MR. MURPHY:  I'm going to provide a copy of

5    that S1 to you in case we need to reference it.

6    BY MR. MURPHY:

7    Q    Dr. Fraser, at the time you prepared that

8    affidavit, did you believe that the structure at Hewett

9    Road in Somerville, Maine, was a single family

10   residence?

11   A    Yes, I did.

12   Q    Had you been inside the residence on the Hewett

13   Road prior to the execution of that search warrant?

14   A    I had.

15   Q    And on what day and on what occasion had you been

16   inside the house?

17   A    I attempted to, just in the course of

18   investigating the complaint in March of 2005, I believe

19   March 23rd, I did -- was allowed entry into the

20   residence with Humane Agent Tom Eddy for a very brief

21   look at some of the kennel areas on the main floor of

22   the house.

23   Q    And that was in 2005?

24   A    That's correct.

25   Q    When you entered --  we will get back to that in a

Fraser-Direct/Murphy

1    little more detail, but when you entered that house on

2    that occasion, did you proceed beyond the first floor

3    to the second floor or did you remain on the first

4    floor?

5    A     By the "first floor," you mean the main floor.

6    The kitchen and dog kennel area, that was the only area

7    I was at.

8    Q     By way of clarification to the Court, the house

9    consists of a basement area?

10   A     Correct.

11   Q     And then a first main living floor area?

12   A     Right.

13   Q     And then a second living floor area, the second

14   floor; is that correct?

15   A     That's correct.

16   Q     Did you tell anyone, prior to the execution of the

17   search warrant on January 19th --  I'm sorry, strike

18   that and let me rephrase that.

19        Did anyone tell you, prior to the execution of

20   the search warrant on January 19th, 2008, that that

21   house contained a separate apartment on the second

22   floor in which Matthew Clark resided?

23   A     No, they did not tell me that, no.

24   Q     Who did you believe lived in the house on the day

25   that you executed the warrant?

1   A     I believed Fern Clark and her two sons, David and

2   Matthew Clark, resided there inside the residence.

3   Q     What did you base that belief on?

4   A     Um, based upon my visits and attempts to

5   investigate complaints that the department received

6   occasioned in 2005, 2006 and 2007.

7   Q     Who do you believe owned the house on the day you

8   executed the warrant on January 19th of 2008?

9   A     I believed Fern Clark owned the house.  I was told

10  in November of 2006 by Fern that Matthew actually owned

11  the house and I was not 100 percent sure.  I knew both

12  resided in the residence.

13         MR. FLETCHER:  Objection, Your Honor.  I

14  don't -- what's the relevance here, the relevance to

15  ownership?

16         MR. MURPHY:  Your Honor, I think I pointed out

17  in the various arguments I've made in our brief to the

18  Court that there is an argument that the scope of the

19  warrant was exceeded when executed, and the warrant

20  does allow or did allow for the search of the entire

21  home.

22      I want to establish what her belief was as to who

23  owned and resided in the residence as justification for

24  the scope of the search that she requested.

25         THE COURT:  Objection overruled.

Fraser-Direct/Murphy

1    BY MR. MURPHY:

2    Q    Do you know a man by the name of Thomas Eddy?

3    A    I do.

4    Q    Did you work with Mr. Eddy?

5    A    I did.

6    Q    Is Mr. Eddy currently, to your knowledge, retired?

7    A    Yes.

8    Q    When did you work with him and in what capacity?

9    A    He was an agent of the department up until 2006, I

10   believe he retired, and I was -- he had been with the

11   program basically to backup and do field supervisory of

12   the main agents.

13   Q    Now, you testified a little bit ago that you and

14   Mr. Eddy had gone to the Clark residence back in 2005;

15   is that correct?

16   A    That's correct.

17   Q    As a matter of fact, if you look at your copy of

18   the exhibit S1, I believe that you did explain to the

19   magistrate or described the visit that you had made to

20   the home in your affidavit; is that correct?

21   A    Yes.

22   Q    And that is in paragraph 12; is that correct?

23   A    Yes.

24   Q    Was that the only occasion that you went to the

25   Clark residence with Mr. Eddy?

Fraser-Direct/Murphy

1  A     Yes, it was.

2  Q     While you were at the Clark residence with Mr.

3  Eddy on this one occasion, do you recall Mr. Eddy ever

4  making any remark to you regarding the existence of an

5  apartment, a separate apartment within the Clark

6  residence?

7  A     No.  No, I do not.

8  Q     Do you remember any discussion by Mr. Eddy with

9  you regarding the location of Mr. Matthew Clark's

10  living space within the house?

11  A     No, I do not.

12  Q     Did you intentionally mislead Justice of the Peace

13  Hull as to the existence of the separate and discreet

14  apartment as declared by Matthew Clark on the second

15  floor at that house when you applied for a search

16  warrant application?

17  A     No, I did not.

18  Q     Who was present during the execution of the search

19  warrant on January 19th of 2008?

20  A     It was Lieutenant Rand Maker with the county

21  sheriff's office as well as, I believe, there were two

22  deputies with him.  From my department, it was myself,

23  Director Norma Worley, Elizabeth Summers, Maine agent

24  Rayann Malcolm and also part-time Maine agent Heidi

25  Nelson as well as, I'm sorry, private practitioner,

Fraser-Direct/Murphy

1    veterinary practitioner Dr. Mooney Cramer.

2    Q    Who entered -- who served the warrant and entered

3    the home first?

4    A    Lieutenant Maker.

5    Q    And he is with?

6    A    Lincoln County Sheriff's Department.

7              THE COURT:  Is that M-a-k-e-r?

8              THE WITNESS:  Yes.

9    BY MR. MURPHY:

10   Q    I'm going to hand you what's been marked for

11   identification as Government's Exhibit S2.  Could you

12   please describe to the Court what that is?

13   A    This is a sketch of the basic layout of the main

14   floor of the Clark residence on Hewett Road.

15   Q    Did you make that sketch?

16   A    I did.

17   Q    And did you make it at or about the time or

18   shortly following execution of the search warrant?

19   A    Yes, I did.

20   Q    And to the best of your recollection today, does

21   this sketch accurately depict, if not exactly, the

22   scale, roughly the scale, the layout of the first floor

23   of the house?

24   A    Yes, it does.

25              MR. MURPHY:  I move for admission of

 1     Government's Exhibits S2, Your Honor.

 2              THE COURT:  Any objection?

 3              MR. FLETCHER:  One moment.

 4              (Discussion off the record between defendant

 5     and his counsel)

 6              It's okay, but it's not to scale.

 7              THE COURT:  I beg your pardon?

 8              MR. FLETCHER:  It's not to scale, but it's

 9     okay.  It represents the relationship to the buildings,

10     the rooms within the building.

11              THE COURT:  Government's Exhibit S2 is

12     admitted without objection.

13              MR. MURPHY:  Thank you, Your Honor.

14     BY MR. MURPHY:

15     Q    On the first floor of the home as set out in S2,

16     were there doors separating any of the rooms?

17     A    Yes.  Actually there were doors separating

18     virtually every bedroom or separate room in the

19     residence.  There was a group of loose dogs when we

20     entered.  Actually there was a screen door at the very

21     top of the basement stairs and then there was a group

22     of dogs that was in the house and the screen door

23     seemed to serve to prevent them from entering separate

24     rooms.

25     Q    Just to backup and clarify for the Court, you

Fraser-Direct/Murphy

```
 1    entered the home originally through the basement?

 2    A    That's correct.

 3    Q    And on to the first floor?

 4    A    Right.  We basically went up through the two set

 5    of stairs.

 6    Q    So as looking at S2 between several of these

 7    rooms, there were screen doors of some sort?

 8    A    Yes.

 9    Q    Now, did you proceed to the second floor?

10    A    Um, after -- when I initially entered, we did a

11    walk through and I did walk the entire house, yes.

12    Q    As an initial matter before you got down to the

13    details of searching?

14    A    Yeah.  Before we did video of it, just to

15    understand the layout and identify what animals were

16    where.

17    Q    And did you complete a sketch of your recollection

18    of the layout of the second floor at some point?

19    A    Yes, I did.

20    Q    I'm going to hand you what's been marked as

21    Government's Exhibit S3 and that bears initials at the

22    bottom "CBF;" those are your initials?

23    A    Yes they are.

24    Q    And the date 7/27?

25    A    Yes.
```

Fraser-Direct/Murphy

1   Q    Did you complete this sketch on July 27th of this

2   year?

3   A    Yes, I did.

4   Q    And --

5        THE COURT:  I think it's fine, Mr. Murphy.  We

6   had audio trouble yesterday and we will deal with it

7   after the hearing.

8        MR. MURPHY:  I just wanted to make sure I

9   wasn't setting it off.

10       THE COURT:  I think it actually may be my mic.

11  BY MR. MURPHY:

12  Q    Back to S3, Dr. Fraser, does that rough drawing

13  depict, to the best of your recollection, the layout of

14  the second floor of the Clark residence as it appeared

15  to you on January 19th of 2008?

16  A    Yes, it does.

17       MR. MURPHY:  Your Honor, I move for admission

18  of Government's Exhibits S3.

19       MR. FLETCHER:  I would object, Your Honor.

20       THE COURT:  No objection?

21       MR. FLETCHER:  On this particular drawing,

22  there is a substantial portion of the upstairs that's

23  missing.  Mr. Clark was -- from his own, drawing which

24  we would be willing to admit during our case-in-chief

25  or now, but this particular exhibit, I think you'll

Fraser-Direct/Murphy

1   find that there's more to it than the actual structure

2   that's shown.

3          THE COURT:  I'm going to overrule the

4   objection.  The witness testified that her testimony is

5   that it's an accurate sketch.  The objection goes to

6   the weight, and obviously she can be cross-examined.

7   I'll allow it in over objection.

8          MR. MURPHY:  Thank you, Your Honor.  I'll

9   tender the original of this through to the Court, Your

10  Honor.  Thank you.

11  BY MR. MURPHY:

12  Q    What types of items and objects did you understand

13  the search warrant allowed you to seize?

14  A    Um, basically all animals, live, dead and unborn,

15  any paperwork pertaining to the care, medical needs,

16  any -- you know, any paper containing ownership, sales,

17  medical records for the animals, video and photographs

18  of the animals and their living environment, as well as

19  any computers that maintain records of the kennel

20  population.

21  Q    What did you --  I'm sorry, did you see --  was

22  there a computer on the second floor?

23  A    Yes, there was.

24  Q    And where was that computer located, if you could

25  reference Government's Exhibit S3.

Fraser-Direct/Murphy

1    A    Um, when I went to the top of the stairs and took

2    a right, so we have the stairs closest to you, to the

3    right there was a bedroom.  Opened the door, there was

4    kind of an extended area, kitchen/bedroom area and it

5    was within what I would call the bedroom area, very

6    close to where the bed is.

7    Q    Would that be the area that on your drawing you

8    have designated as "Matthew bedroom"?

9    A    Yes.

10   Q    And you said you opened the door to go into the

11   room.  Was there a door closed, a closed door between

12   the hallway and this bedroom that you entered?

13   A    Yes, there was a bedroom door.

14   Q    And that was closed through the hall before you

15   entered?

16   A    I believe it was.  I know the sheriff's department

17   did a walk through, but I believe --  well, it was

18   closed because there was a dog in there.

19   Q    There was a dog in the second floor room that is

20   designated as "Matthew bedroom"?

21   A    Yes, there was.

22   Q    On the second floor, did you observe anywhere

23   there any -- oh, any signage, any numbering, any

24   nameplates, any mailbox, anything that indicated to you

25   that there was a separate apartment, separate dwelling

Fraser-Direct/Murphy

1   unit on that floor?

2   A     No, I did not.

3   Q     And turning to Government's Exhibit S3 and your

4   sketch, you are indicating that there was -- that there

5   were two bedrooms and a bathroom on that floor?

6   A     That's correct.

7   Q     And those are the only rooms that you recall on

8   that floor?

9   A     Yes.  The bedroom on the right was kind of an

10  extension with kind of a small kitchen area and

11  refrigerator and there was a bedroom area and there was

12  a long extended -- and it is cut off on this picture as

13  far as it extends further back as to when I did this

14  drawing.  I didn't have the full extension so it is

15  longer than -- but otherwise those were the only rooms.

16  Q     So this is not to scale; is that correct?

17  A     No, it's not.

18  Q     Did you take photographs during the execution of

19  the search warrant on January 19th of 2008?

20  A     I did.

21  Q     Did you observe anyone else taking photographs

22  during that time?

23  A     Um, my director, Norma Worley, took some pictures

24  as well.

25  Q     And have you reviewed both your photographs and

Fraser-Direct/Murphy

1    the photographs that Director Worley took during the

2    course of the search warrant execution?

3    A    Yes, I have.

4    Q    And do those photos that you took and the photos

5    that Ms. Worley took accurately depict various rooms,

6    locations, objects within the house on Hewett Road on

7    January 19th of 2008?

8    A    Yes, they do.

9    Q    I'm going to show you what has been marked as

10   Government's Exhibit S4.  Could you take a look at that

11   and tell the Court what that photograph depicts?

12   A    This is a photograph of the exterior of the Hewett

13   Road residence.

14            MR. MURPHY:  I move for admission of

15   Government's Exhibit S4, Your Honor.

16            MR. FLETCHER:  No objection.

17            THE COURT:  Government's Exhibit S4 is

18   admitted without objection.

19   BY MR. MURPHY:

20   Q    Dr. Fraser, do you see on that photograph -- if

21   you look at the portion of the house that's in white

22   and do you see what would be on the very small

23   photograph electrical meters on the outside of the

24   house?

25   A    I do.

Fraser-Direct/Murphy

1   Q    Did you notice those or observe those or pay any

2   attention to those meters when you arrived to execute

3   the warrant on January 19th of 2008?

4   A    No, I did not.

5   Q    I'm going to show you what's been marked as

6   Government's Exhibit S5.  Could you please describe to

7   the Court what this photograph depicts?

8   A    This is a picture of -- coming from the main floor

9   of the house shooting up the stairs toward the second

10  floor with the two bedrooms and the bathroom.

11  Q    And does that accurately represent the access to

12  the second floor as it existed on the day of the

13  search?

14  A    Yes, it does.  This was after actually coming to a

15  screen door on the base of the stairs.

16  Q    A screen door.  Was that similar to the other

17  screen doors you saw down on the first floor?

18  A    Right, yes.

19  Q    What is immediately at the top of the stairs as

20  you are looking at this photograph?

21  A    Um, there are -- straight ahead was a bathroom.

22  It was off to the side.

23          MR. MURPHY:  Excuse me for interrupting.  I

24  should ask for admission of this while you are

25  describing it.  I move for the admission of S6.

1          MR. FLETCHER:  No objection.

2          MR. MURPHY:  I mean S5.  Sorry, Your Honor.

3          THE COURT:  Government's Exhibit S5 is

4    admitted without objection.

5    BY MR. MURPHY:

6    Q    I'm sorry.  At the top of the stairs was what?

7    A    There was a bathroom.  Basically straight ahead,

8    immediately to the left was a bedroom.  It was

9    basically a landing, a bathroom straight ahead, bedroom

10   to the left with an a couple twin beds and then a

11   bedroom to the right.

12   Q    Okay.  I'm going to show you now what's been

13   marked as Government's Exhibit S6.  Could you please

14   tell the Court what room that photograph depicts?

15   A    This was the bathroom at the top of the stairs.

16   Q    Did that toilet appear to be functioning?

17   A    It did not.

18          MR. FLETCHER:  Objection, Your Honor.  What's

19   the relevance?  It appears to be -- other than it's

20   disgusting, it seems to me it doesn't seem probative of

21   the situation we are at.

22          MR. MURPHY:  The relevance, Your Honor, is

23   that supposedly there was a separate, distinct,

24   self-contained apartment on the second floor with a

25   bathroom.  We are trying to establish, number one, that

Fraser-Direct/Murphy

 1    the bathroom was outside the bedroom area, and number

 2    two, the bathroom did not appear to be functional.

 3              THE COURT:  Objection overruled.

 4              MR. MURPHY:  I move for admission of

 5    Government's Exhibit S6, Your Honor.

 6              THE COURT:  That's the photograph?

 7              MR. MURPHY:  Correct.

 8              THE COURT:  Any objection?

 9              MR. FLETCHER:  Objection to relevance.

10              THE COURT:  Objection overruled.  Government's

11    Exhibit S6 is admitted over objection.

12    BY MR. MURPHY:

13    Q    Next I'm going to show you a photograph which is

14    labeled as Government's Exhibit S7.  Would you please

15    describe to the Court what that photograph depicts?

16    A    This is an ID picture of the dog that was found in

17    the upstairs bedroom.  That would be the room to the

18    right at the top of the stairs.

19    Q    The one you designated on the scale as "Matthew

20    bedroom"?

21    A    That's correct and this was the dog that was found

22    in there and just depicting his skin condition.

23    Q    Was that dog suffering, in your opinion, from any

24    sort of disease or malady?

25    A    He was.  He had multiple problems, but the most

1    evident was the skin, severe bleeding, skin dermatitis

2    causing the loss of hair and extreme itchiness

3    spreading.  He was scratching pretty much the whole

4    time we were there.

5              MR. MURPHY:  Move for the admission of

6    Government's Exhibit S7, Your Honor.

7              MR. FLETCHER:  No objection.

8              THE COURT:  Government's Exhibit S7 is

9    admitted without objection.

10   BY MR. MURPHY:

11   Q    So that dog was actually found in the area you've

12   designated as "Matthew bedroom;" is that correct?

13   A    He was, yes.

14   Q    Was that dog taken into custody as evidence?

15   A    He was.

16   Q    I'm next showing you what I've marked as

17   Government's Exhibit S8.  Would you please tell the

18   Court what that depicts?

19   A    This is a picture after entering the bedroom on

20   the right.  If I turned to the right, this would be the

21   view I would have after entering the room.

22   Q    And this is entering the room that you've

23   designated as "Matthew's bedroom"?

24   A    That's correct.

25             MR. MURPHY:  I move for admission of

Fraser-Direct/Murphy

1    Government's Exhibit S8, Your Honor.

2              MR. FLETCHER:  No objection.

3              THE COURT:  Government's Exhibit S8 is

4    admitted without objection.

5    BY MR. MURPHY:

6    Q    Now, I want to show you a second photograph that

7    is essentially of the same view.

8              MR. MURPHY:  I'm going to proffer to the Court

9    that this photograph was taken by Detective McFetridge.

10   If necessary, he can confirm that upon his testimony.

11   It is essentially the same view.  It just happens to be

12   better light and one can better discern what is present

13   in the room from this photograph.

14   BY MR. MURPHY:

15   Q    So I'm going to tender that to the witness and ask

16   whether that appears to you to be an identical shot of

17   the room as depicted in S8, just with better lighting?

18   A    Yes, it is.

19   Q    And does that accurately depict, even though you

20   did not take the photograph, the appearance of

21   Matthew's bedroom as it was on the day you executed the

22   search warrant?

23   A    Yes, it does.

24             THE COURT:  And where is this photo, where is

25   S8 and this is S9, I assume.

Fraser-Direct/Murphy

1          MR. MURPHY:  Yes.  S8 I did move to admit that

2     Your Honor, and I'll give that to you now.

3          THE COURT:  Where was S8 and S9 taken from,

4     the entrance to the bedroom?

5     A    As I stepped within the bedroom and turned

6     directly to my right, that would be the shot.

7          THE COURT:  I see.  Okay, thank you.

8          MR. MURPHY:  So I'm moving now for S9 which is

9     an identical shot in a better light.

10         THE COURT:  Any objection?  Exhibit S9 is

11    offered, any objection?

12         MR. FLETCHER:  No objection.

13         THE COURT:  Admitted without objection.

14         MR. MURPHY:  Sorry for that confusion, Your

15    Honor.

16    BY MR. MURPHY:

17    Q    Dr. Fraser, when you entered the area depicted as

18    "Matthew's bedroom" in your photograph, did you see any

19    appliances or things you normally find in a kitchen

20    within that apartment, within that --  I'm sorry,

21    within that bedroom?

22    A    There was a refrigerator and a microwave, I

23    believe, and I believe there was a sink with a bunch of

24    dishes stacked there.

25    Q    I'm going to show you what's been marked as

Fraser-Direct/Murphy

1    Government's Exhibit S10 and ask whether that's a

2    photograph of those appliances and the sink that you

3    described?

4    A    Yes, it is.

5    Q    And as you entered Matthew's bedroom, where

6    would -- through the door as depicted on the sketch in

7    S3, I believe, where would you see this scene?

8    A    Basically directly upon opening the door and

9    stepping in.  This is straight ahead.

10   Q    And then beyond this would be what is depicted in

11   S8 and S9 in the bedroom area; right?

12   A    If I was standing there and turned to the right,

13   then that would be the line of sight I would have.

14         MR. MURPHY:  Thank you. Your Honor, I move for

15   the admission of Government's Exhibit S10.

16         MR. FLETCHER:  Objection on foundational

17   grounds.  Did Ms. Worley take this or did Mr.

18   McFetridge?

19         MR. MURPHY:  I'll represent to the Court that

20   this was taken by Ms. Worley, but I'll lay a further

21   foundation.

22   BY MR. MURPHY:

23   Q    -- and ask you, Dr. Fraser, whether Government's

24   Exhibit S10 accurately --  do you have that in front of

25   you?

Fraser-Direct/Murphy

1    A    I don't.

2    Q    I'll give it back to you.  Does Government's

3    Exhibit S10, that photograph, accurately depict a

4    portion of the room on the second floor you had

5    designated as "Matthew's bedroom" as it appeared on

6    January 19, 2008.

7    A    Yes, it does.

8              MR. FLETCHER:  No objection.

9              THE COURT:  Any objection?  Government's

10   Exhibit S10 is admitted then without objection.

11   BY MR. MURPHY:

12   Q    Dr. Fraser, did you observe any other means of

13   entry or exit from the Matthew's bedroom area other

14   than coming up the stairs from the living room and then

15   entering through the door to the right of the stairs?

16   A    No, I did not observe any other entry.

17   Q    You indicated in respect that there was a

18   bathroom, Matthew's bedroom, but then another bedroom

19   off to the left; is that correct?

20   A    That's correct.

21   Q    I'm going to show you what has been marked as

22   Government's Exhibit S11.  Could you tell the Court

23   what that photograph depicts?

24   A    This was the room at the landing at the top the

25   stairs.  If I turned to the left, the door would lead

Fraser-Direct/Murphy

1    to this bedroom.  It seemed to be an extra bedroom.

2    Q    So that would be the other bedroom that you had

3    sketched out on what's previously been admitted as

4    Government's Exhibit S3; is that correct?

5    A    Yes.  Um, yes.

6    Q    The one to the left?

7    A    Correct.  With the two beds, yes.

8              MR. MURPHY:  Move the admission of

9    Government's Exhibit S11, Your Honor.

10             MR. FLETCHER:  No objection, Your Honor.

11             THE COURT:  Government's Exhibit S11 is

12   admitted without objection.

13   BY MR. MURPHY:

14   Q    Okay.  We're going to wrap it up here shortly, Dr.

15   Fraser.  Prior to the issuance and execution of the

16   search warrant, you had been to the Clark residence on

17   how many occasions?

18   A    Um, twice in March of 2005, once in November of

19   2006, and once in May of 2007.  So four previous

20   occasions prior to getting the search warrant.

21   Q    And those are set forth in your affidavit; is that

22   correct?

23   A    Yes.

24   Q    Was Matthew Clark present at the home on each

25   occasion?

1    A    Yes, he was.

2    Q    On each occasion, did he interact and speak with

3    you?

4    A    Yes.

5    Q    Did he direct you to leave the premises on each

6    occasion?

7    A    Um, on -- I believe the time in 2005 with Tom Eddy

8    he did not, but the November 2006 visit and the

9    May 2007, he made it perfectly clear that I needed to

10   leave immediately.

11   Q    Did the defendant act and speak and interact with

12   you in a manner indicating that he had authority to

13   exclude you from the house and property all together?

14   A    Yes, he did.  He made a statement in the November

15   of 2006 visit that I couldn't come in the house without

16   a search warrant.

17   Q    Did the defendant himself ever mention anything to

18   you during any of your interactions with him about

19   having a separate residence or apartment in the

20   structure?

21   A    No, he did not.

22   Q    Did you observe anything on or about the exterior

23   of the house indicating that it contained a separate

24   apartment or a dwelling?

25   A    I did not.  It was a very disjointed house from

1    the outside.  Someone made an addition, but to me it

2    looked like it was one residence from what I could see

3    from my visit in 2005.

4          MR. MURPHY:  Your Honor, those are all of the

5    questions I have at this time.  Thank you.

6          THE COURT:  Very well.  Cross-examination, Mr.

7    Fletcher.

8                    CROSS EXAMINATION

9    BY MR. FLETCHER:

10   Q    Good morning.

11   A    Good morning.

12   Q    You stated that that you made four visits, two in

13   March 2005, November of 2006 and May of 2007; is that

14   correct?

15   A    Yes.

16   Q    Was Fern Clark present in all those visits?

17   A    Yes, she was.

18   Q    And did Fern come out first on those two visits?

19   A    On some occasions, yes.

20   Q    And isn't it true that Fern Clark told you to

21   leave on at least two of those visits?

22   A    If you want me to go one-by-one, she -- the first

23   occasion I had in March of 2005, she did ask us to

24   leave.  She only allowed Tom Eddy to enter the house so

25   I went back with him a couple days later and she did

1    allow us -- at the time she did allow us in the house

2    and she -- the next two times, I was asked to leave by

3    Matthew, I believe, 2006 and 2007.  Um --

4    Q    Isn't it true that Fern also told you to leave in

5    November of 2006 --  2007, I'm sorry.

6    A    I know in 2007, she had --  she had initially

7    appeared and she asked us -- asked me to leave as well

8    as the Animal Control Officer, yes.

9    Q    Isn't it true that you were persistent in trying

10   to get into the house?

11   A    I requested permission to investigate the

12   complaints, which would involve getting in the house

13   and seeing the animals.

14   Q    Right, and so your interactions with Fern in

15   November of 2006 and May of 2007, you were persistent

16   in trying to get in and Matthew, isn't it true that

17   Matthew asked you, after your persistence, told you to

18   leave; is that true?

19   A    I simply wanted to speak to Mrs. Clark long enough

20   to explain that and read that the breeding kennel

21   definition had changed to include her facility again.

22   She had become unlicensed in 2005, but legally the

23   definition changed in September of 2006, so I wanted

24   the opportunity to hand her a breeder's package and

25   definition so she would understand that that --  but

Fraser-Cross/Fletcher

1    I --

2    Q    You've answered the question.  I'm going to show

3    you State's --  excuse me, Government's Exhibit S8 and

4    S9.  Looking at that photograph, do you see the window

5    in the door?

6    A    I don't see a door.  I see a little blip of light

7    which may be --

8    Q    Right, and do you see the door up there?

9    A    I do not see a door.  I mean there is an entrance

10   to a second room which, as I recall, there was --

11   Q    The door led into a porch.

12   A    I don't recall seeing a door, no.  That side of

13   the room was rather cluttered and I don't even remember

14   looking at it carefully.

15   Q    Based on this photograph, you can look at it

16   again, would you agree that that is a door?

17   A    I can't say that.  I did not observe a door at

18   that time and I don't recall seeing a door.  It appears

19   there is a window there, but I don't even recall seeing

20   that.

21        THE COURT:  What part of the exhibit are you

22   referring to?

23        MR. FLETCHER:  Right over the clothesline on

24   S8, there is a window and underneath, it may be

25   obscured by the hanging, it looks like lumber, there is

1    a doorknob and the door to the porch that had a

2    staircase allowing for outside access.

3    BY MR. FLETCHER:

4    Q    You stated that you had made four visits before

5    2008 to the Clark residence?

6    A    I believe so, yes.

7    Q    Starting in 2005 when you returned with Animal

8    Welfare Officer Tom Eddy, you stated in your testimony

9    that you were eventually able to convince Fern Clark to

10   allow you up to what was the first floor, the main

11   floor; is that correct?

12   A    Yes.  Mr. Eddy talked to Fern and explained that

13   he was retiring and that I needed to be able to see

14   what was going on to investigate the matter, so we were

15   able to --

16   Q    Did you actually see the top floor, the third

17   floor?

18   A    I believe so.  Not on the top floor, I'm sorry,

19   the main floor where the animals were.  I wanted to see

20   the animals to investigate the complaint.

21   Q    I understand that.  Isn't it true that Mr. Eddy

22   told you that there was no need to go to the top floor,

23   that that was a separate apartment?

24   A    I didn't even know there was a top floor at that

25   time.  I think we got a very expedient tour through the

1   two large kennel rooms and that's all I got to see of

2   the residence that day.

3   Q    Is it your testimony that you didn't see the cage

4   door, the door with the screening on it leading to the

5   second set of stairs?

6   A    I don't recall seeing -- I recall seeing screen

7   doors on most of the rooms.  I didn't know where most

8   of them led.  I was only allowed into the two kennel

9   areas and the hallway with the animals.

10  Q    And you just stated that you saw an access to the

11  second floor, and now you're saying you're not aware of

12  the second floor?

13  A    Discussing the visit of March 23rd, 2005, I was

14  given a very rapid tour through the -- basically went

15  into the kitchen.  To the left there was what we later

16  referred to as Room D or the kennel room.  There was

17  another kennel room, Room C, and there was a hallway

18  that had a dog and that's basically the area I was

19  shown that day very quickly and I was ushered right

20  out.  So it served my purposes because I only was

21  interested in seeing the animals.

22  Q    Mrs. Clark, Fern Clark, showed you medical records

23  at that time; is that correct?

24  A    Yes, she did.

25  Q    And she brought those out of her bedroom; is that

1    correct?

2    A     No, she did not.  We started in the basement area

3    when we initially got there.  Mr. Eddy talked to Fern,

4    and she either brought some paperwork downstairs to

5    review the sales contracts and that sort of thing and

6    the rabies shots and I believe at that time, Mr.

7    Matthew Clark joined us.

8    Q     You didn't see any computers or anything like that

9    on that 2005 visit; did you?

10   A     No, I did not.  I again saw a very small part of

11   the house.

12   Q     And, in fact, you didn't see any computers until

13   2008; is that correct?

14   A     Until the search warrant in 2008, yes.

15   Q     And you didn't see any records that indicated use

16   of the computers?

17   A     I saw a sales contract and from my experience in

18   searching or inspecting kennel facilities, most

19   breeders keep kennel records.  A lot of them do

20   Internet sales, but nowadays, everybody keeps contracts

21   and those sorts of things on their computers so they

22   can print them out.

23   Q     Okay.  You've answered the question, but point of

24   fact, there is nothing with Fern Clark's business that

25   you had affirmative knowledge, actual knowledge of her

1   use of the computer; is that correct?

2   A    Again, I saw a printed contract and this was --

3   Q    The printed contract could have been written the

4   other way; correct?

5   A    Right.  Other than that that was my impression and

6   my experience that most people keep records in that

7   manner.

8   Q    And, in fact, the only computerized records were

9   the records of her vet, veterinarian; isn't that

10  correct?

11  A    I don't --  I saw, you know, a contract and

12  others -- if records came from the veterinarian, I

13  don't know.

14  Q    In your affidavit and in your search warrant for

15  January 19th or 18th, excuse me, for the search on

16  January 19th, you included the car; is that correct?

17  A    That's correct.

18  Q    And there was no basis for including a car; isn't

19  that correct?

20  A    No.  In my experience --

21          MR. MURPHY:  I would object to the relevance.

22          THE COURT:  Just one second.

23          MR. MURPHY:  I would object to the relevance

24  of that, Your Honor.

25          THE COURT:  Overruled.  You can answer.

1    A    In my experience, when we do a warrant, we do

2    outbuildings, cars.  Animals can be kept in cars, sales

3    records can be kept in cars, so that's why vehicles are

4    included.

5    BY MR. FLETCHER:

6    Q    Wouldn't it be true that this is January and if

7    you looked in the car, I'm sure that animals would

8    be -- why would you include a car for a January search?

9    A    Because if an animal was kept in a car, there was

10   paperwork relevant to the care, sales, medical

11   treatment of the animal, we would want to --

12   Q    Well --

13        THE COURT:  Just a second, let her finish.

14   A    We would want to obtain that information.

15   BY MR. FLETCHER:

16   Q    Your assertion is that the cars -- the Clarks were

17   keeping business records in their car; is that correct?

18   A    My experience is that many people do, so we

19   include those.

20   Q    Do you remember Matthew Clark -- yes or no

21   question, do you remember Matthew Clark showing you two

22   electrical meters in your visit in November of 2006?

23   A    No, I do not.

24   Q    Do you remember him explaining to you that he had

25   a separate apartment?

1    A    No, I do not.  We didn't have a very long

2    conversation.

3    Q    You stated in your prior testimony that the only

4    people present were Lieutenant Baker, yourself, Brenda

5    or Norma Worley, Ms. Summers, Heidi Nelson.  Isn't it

6    true that Matthew Clark was also there?

7    A    I said those were the people who helped us execute

8    the warrant.  Matthew Clark was present that day, yes.

9    Q    And where was he detained?

10   A    Lieutenant Baker served the warrant, served it to

11   Matthew.  He was quite upset and angry and Lieutenant

12   Baker kept him out of the area, but I didn't have an

13   interaction with him that day.

14   Q    Your testimony is that when you went upstairs to

15   the second floor, what we are terming the second floor

16   where Matthew Clark has an apartment, which you state

17   was the bedroom, that there was a door there; is that

18   correct?

19   A    You're referring to the January of 2008 execution?

20   Yes.

21   Q    And that door is quite different than the

22   downstairs door; correct?

23   A    It was the same as all the upstairs bedrooms.  It

24   was an interior door.  To me like any bedroom door of

25   any house.

Fraser-Cross/Fletcher

1    Q     But it didn't have any screening on it; did it?

2    A     No.  The screen doors were like homemade,

3    handcrafted things that were on every room in the

4    house, so no, it was different from the screen door at

5    the bottom.

6    Q     And that would be -- definitely be the case in a

7    separate part of the structure; wouldn't it?

8    A     No.  It was the same as any bedroom door or

9    interior door.  It was like any --

10   Q     Yes or no question.  It is and was different than

11   the other doors down on the main floor?

12   A     Um, yes.  Most of those had taken -- had taken the

13   traditional doors off and put screen doors so they were

14   different.

15               THE COURT:  Let me ask, what's this door at

16   the top of Government's Exhibit S5?  Is that a door at

17   the top of the stairs?

18               MR. FLETCHER:  That's correct, Your Honor.

19               THE COURT:  Well, let me ask the witness.

20               MR. FLETCHER:  I'm sorry.

21               THE COURT:  One second.

22   A     Um --

23               THE COURT:  Do you have Government's Exhibit

24   S5, the photograph of the stairway?

25   A     Yes.

1        THE COURT:  Is that a door at the top of the

2   stairs?

3   A    It is, but I believe it's the door to the bedroom

4   on the left.  It could be the bathroom door.  Like I

5   said, they were all the same so it wouldn't -- they all

6   had brass colored knobs.  It's obviously on the left so

7   it's either the bedroom or bathroom door.

8        THE COURT:  I'm just trying to understand.  If

9   I look at your sketch, Government's Exhibit S3 --

10  A    Yes.

11       THE COURT:  -- the door to the bedroom, there

12  is a line that's drawn just to the right and slightly

13  below the word "bedroom" at the far left of that

14  sketch.

15  A    Right.

16       THE COURT:  Is that line that's just above and

17  to the right of the two rectangles, is that the door to

18  the bedroom?

19  A    Yes.  The lines on those indicate all the doors.

20  It's not to scale.  There is a landing area and my

21  recollection is those were basically across from each

22  other.  Does that answer your question?

23       THE COURT:  Well, if I look at the sketch, it

24  appears that the door to the bedroom would be a few

25  feet to the left of the top of the stairs.  This door

1    looks to be immediately to the top of the stairs and it

2    appears to be -- maybe it's just an optical illusion,

3    but it appears to be right at the top of the stairs.

4    Is that what your recollection is of where that door

5    was located?

6    A    My recollection is -- this drawing, unfortunately,

7    is not very artistic, but there is a landing area that

8    I recall being, you know, whatever, five by five or

9    something and then both my recollection is the two

10   bedroom doors would have been directly opposite each

11   other and then the bathroom.

12          THE COURT:  So you do not recollect a door at

13   the top of the stairs?

14   A    No.  It's not directly at the top of the stairs

15   that I recall, no.

16          THE COURT:  All right, thank you.  Go ahead,

17   Mr. Fletcher.

18   BY MR. FLETCHER:

19   Q    You had no -- you had no indication that Mr. Clark

20   was involved in Fern's business; isn't that correct?

21   A    I actually thought he had -- he was involved in

22   the business because on every visit, he was there and

23   he was asserting his right to, you know, evict me and

24   his interest in the animals, so I had every reason to

25   believe that he may well be part of the operation.  I

Fraser-Cross/Fletcher

1   knew the other son also helped, so my belief was

2   everybody  --

3   Q    Dr. Fraser, there was no licensing -- Matthew

4   Clark had no licensing; is that correct, yes or no?

5   A    He had not obtained a license by the department,

6   no.

7   Q    And you had no complaints against Matthew Clark

8   for selling dogs or for animal cruelty; correct?

9   A    Correct.

10  Q    And you had -- in preparing the affidavit for the

11  warrant on January 19th, there was no indication from

12  the sale of these dogs that Matthew Clark was involved?

13  A    All the paperwork was from Fern Clark.  She ran

14  the kennel, had the license at the kennel facility.

15  Q    So it's your testimony that the only basis for you

16  believing that Matthew Clark was involved in the

17  business was his presence when you showed up; is that

18  correct?

19  A    Also, you know, Tom Eddy had indicated that both

20  sons lived there and, you know, at least one of them

21  helped with the business.  I was not sure exactly what

22  Matthew's role was there, but I do know he seemed to be

23  actively interested in the business.

24  Q    He didn't give you any indication on the animals,

25  besides his presence at that house; is that correct?

Fraser-Cross/Fletcher

1    A     I'm sorry, could you repeat the question?

2    Q     Aside from telling you not to enter the house,

3    there is no indication that he had had any particular

4    business selling animals or raising animals or the

5    kennel business or anything like that?

6    A     He made several statements about the conditions of

7    the animals, that they didn't have any kittens, that

8    they were fine.  So he seemed to have some knowledge of

9    the animals that we were inquiring about.

10   Q     Aside from the comment about kittens, which is

11   contained in your affidavit, there are no other times

12   that he indicated subsequent knowledge about the

13   operation of the kennel?

14   A     Again, I believe on every inquiry that I

15   interacted with him, which would be the 2007 one as

16   well, he indicated the animals -- that the complaints

17   were bogus, the animals were fine, that sort of thing.

18   So that's my recollection of 2006 and 2007.

19   Q     I'm going to show you Government's Exhibit S7.

20   This is Matthew's dog Baldy; is that correct?

21             THE COURT:  Dog what?

22             MR. FLETCHER:  Baldy, B-a-l-d-y.

23   A     He was the dog found in the upstairs bedroom.

24   BY MR. FLETCHER:

25   Q     And that dog was a different breed than the dogs

Fraser-Cross/Fletcher

1   that Fern was breeding; is that correct?

2   A    Not to my knowledge.  It was a Terrier and there

3   was other types of Terriers in the building and this

4   animal is in the same condition as several other

5   animals.

6   Q    That dog was alone in an upstairs apartment

7   bedroom and wasn't in any way related to the animals

8   that were downstairs; isn't that correct?

9   A    He was -- not as far as I could tell.  He was

10  related certainly by medical condition and treatment

11  and environment so he appeared to be part of -- you

12  know, he was there.  He was in similar condition to the

13  other animals.

14  Q    You've answered the question, thank you.  You

15  would agree with me that that's an old dog?

16  A    Um, define "old"?

17  Q    13, 14 years old?

18  A    I can't recall his exact age.  There were several

19  older animals in that house.

20  Q    And you would agree with me that it's not uncommon

21  for old dogs to have dental problems and also problems

22  with toenails bleeding?

23  A    I would agree that yeah, they need care for their

24  dental problems and other medical issues, yes.

25  Q    And you would agree with me that fleas are not

Fraser-Cross/Fletcher

1    uncommon on dogs?

2    A     They are actually not.  They should not be there.

3    They are parasites.  They cause problems with animals

4    and they should be treated.

5    Q     I'm not disputing they are problems, I'm just

6    simply saying they are common on dogs; is that correct?

7    A     They can be, yes, if left untreated.

8    Q     And you would agree with me that if every dog

9    owner had fleas on their dog and was subject to an

10   animal neglect or abuse allegation, you would be a very

11   busy person; wouldn't you?

12            MR. MURPHY:  Objection.

13            THE COURT:  Sustained.

14   BY MR. FLETCHER:

15   Q     Turning for a moment to the allegation that comes

16   from the sale in New Hampshire, the only indication

17   that you had that it might be Fern Clark's was that it

18   was from Somerville, Maine; is that correct?

19   A     No, that's not correct.  There was paperwork that

20   was recovered by the Animal Control Officer in Salem

21   that indicated where it was from.

22   Q     But initially you put together your affidavit

23   before that information; is that correct?

24   A     Not before having a conversation with the Animal

25   Control Officer indicating what paperwork he did have

1    there.

2    Q    You had seen that paperwork; is that correct?

3    A    Before -- I certainly saw it before I completed my

4    affidavit.

5    Q    You had no indication of the reliability of the

6    complaint; is that correct?

7         MR. MURPHY:  Your Honor, I'm going to object.

8    I'm not sure what this is -- what the relevance of this

9    is.  If there is probable cause, it's going to be

10   determined on the four corners of the affidavit.

11        There has been no allegation or preliminary

12   showing of any misstatement or omission along these

13   lines.  There has with respect, supposedly, to the

14   department, but I don't think this is relevant nor is

15   there a preliminary showing of any omission or

16   misstatement along these lines.

17        THE COURT:  What's the relevance, Mr.

18   Fletcher?  We talked about this a little bit at the

19   conference of counsel.

20        MR. FLETCHER:  Your Honor, the warrant

21   affidavit needs to assert the reliability of the

22   informant, in this case a Ms. Moolic is the primary

23   informant, that she got the dogs from Somerville, Maine

24   and so I'm trying to establish from this witness that,

25   in fact, she had limited information and didn't have

1    information about the reliability of the person

2    asserting this.

3           MR. MURPHY:  But the reliability would have to

4    be put into the four corners of the warrant.  We

5    concede that that's not addressed in the warrant so,

6    again, I don't understand --

7           MR. FLETCHER:  I think I'm going --

8           THE COURT:  It's not addressed at all; is it?

9           MR. FLETCHER:  That's correct and I'm raising

10   that, but we will move on.

11          THE COURT:  Okay.

12   BY MR. FLETCHER:

13   Q    Very briefly, Fern Clark was able to get her past

14   inspections, the one in 2005 and 2006?

15   A    There was no inspections after 2005.  My

16   recollection is Tom Eddy last was in the facility in

17   February of 2005 and did an inspection.  I believe at

18   that time she -- because the definition of "breeding

19   kennel" basically stated that you had to sell 16

20   puppies in a year and he -- she told him that she was

21   not doing that and she wouldn't need to be licensed and

22   she did not get licensed after that so it did not get

23   inspected after that.

24   Q    The original question, was there any indication

25   prior to 2008 that she has sold more than 16 puppies in

1    a year?

2    A    Prior to 2008?

3    Q    Correct.

4    A    At some point in time, she certainly did.  I

5    don't --

6    Q    Well, that's the grounds for the search, the 22

7    puppies, whatever it is, that was sold to Moolic, but

8    beyond that, there is no indication that she appeared

9    to be licensed?

10   A    I don't know what your question is.  I'm sorry.

11        THE COURT:  Are you talking about from '05 to

12   '08?

13        MR. FLETCHER:  Correct.  In other words, there

14   is no need for her to get a license because she wasn't

15   selling the proper amount of puppies.

16        THE COURT:  Do you want to rephrase the

17   question then?

18        MR. FLETCHER:  Sure.

19   BY MR. FLETCHER:

20   Q    You don't have any affirmative information of

21   sales, yearly sales between 2005 and 2008 that would

22   give rise to a requirement that she have a kennel

23   license?

24   A    Well, the requirements changed for licensing to

25   the number of adult animals.  If you five or more and

1    selling any puppies, so because that definition changed

2    in September of 2006, in my opinion she was required to

3    be licensed.

4    Q    Animal Control Officer Jeffrey Turner is the

5    Animal Control Officer for Somerville at that time; is

6    that correct?

7    A    Yes.

8    Q    And he was able to go in and see her kennel

9    operation after 2005; is that correct?

10   A    He was allowed in in May, I believe May 2nd, 2007,

11   I believe.

12   Q    And in fact, the Town of Somerville issued her a

13   license; is that correct?

14   A    I believe so.

15   Q    Now, in executing your search, and this may be a

16   question for Norma Worley, but in point of fact, you

17   did find some records and they are all on the main

18   floor; is that correct?

19   A    I'm sorry.  I can't understand you.

20        MR. FLETCHER:  I'm sorry, maybe I will not use

21   the microphone.

22   BY MR. FLETCHER:

23   Q    In seizing these animals and seizing the animal

24   records, all of the business records were on the main

25   floor; isn't that correct?

1    A    I'm not sure.  I think the majority certainly were

2    found in what is in the room -- we just designated as

3    Room E.

4    Q    Well, rephrasing the question, you didn't find any

5    business records upstairs on the second floor bedroom;

6    did you?

7    A    I was not responsible for the paper search, so I

8    believe Norma Worley probably -- she did the search so.

9    Q    Isn't it correct that the only possible

10   connection, nexus, between Matthew's apartment and/or

11   Matthew's bedrooms, if you insist, the only possible

12   nexus would be the dog; isn't that correct?

13   A    I'm not sure what you mean "possible nexus."

14   Q    Well, there are no business records that you're

15   looking for.  There's no business records in the car.

16   There's no business records upstairs in this apartment

17   and yet you are looking for business records.

18          MR. MURPHY:  Your Honor, I object to that

19   question.  It's --

20          THE COURT:  Are you talking about

21   retroactively, with hindsight it turns out that there

22   were no records there; is that your question?

23          MR. FLETCHER:  Correct.

24          MR. MURPHY:  That's irrelevant.

25          THE COURT:  Objection sustained as to that.

```
1              MR. FLETCHER:  Okay.  Let me consult with my
2    client to see if there are further questions.
3              THE COURT:  Sure.
4              (Discussion off the record between the
5    defendant and his counsel)
6    BY MR. FLETCHER:
7    Q    You didn't seize Matthew's dog; is that correct?
8    A    You're referring to January of 2008?
9    Q    Yes.
10   A    We did see the dog in the upstairs bedroom, yes.
11             THE COURT:  Did you say "see" or "seize"?
12             MR. FLETCHER:  Seize.
13   A    Oh, seize it, yes.
14   BY MR. FLETCHER:
15   Q    You took this dog.
16   A    Yes.
17   Q    And in point of fact, he was not charged with
18   animal cruelty; is that correct?
19   A    Yes, that's true.
20   Q    Or abuse or neglect or anything?
21   A    He was not, no.  Fern Clark was charged for that
22   dog.
23   Q    Fern Clark was charged for that dog?
24   A    That was how the charges were brought by the
25   District Attorney.
```

1            THE COURT:  About Mr. Clark's dog or about

2    others?

3    A     About that particular animal.

4            MR. MURPHY:  Your Honor, I'm not sure this has

5    been established as Mr. Clark's dog.  It was a dog

6    found in Mr. Clark's bedroom.  I don't think there has

7    been any testimony about who owned the dog.

8            MR. FLETCHER:  Okay.

9            THE COURT:  Just so I'm clear on the

10   testimony, Mrs. Clark, Fern Clark, was eventually

11   charged with animal cruelty pertaining to the dog shown

12   in Exhibit S7.

13   A     Correct.  That's the one in the bedroom.

14   BY MR. FLETCHER:

15   Q     There were no other dogs in that upstairs bedroom

16   or apartment; correct?

17   A     Not at that time.

18   Q     There were no other pets?

19   A     Not that we found, no.

20   Q     That was different from the rest of the house, is

21   that correct, where there are multiple beds and

22   multiple rooms?

23   A     There were rooms without dogs and there were rooms

24   with dogs.  Most of the rooms contained some sort of

25   animal, yes.

1    Q    And any number of those dogs or cats were in

2    cages; is that correct?

3    A    Not all of them, no.  There was a large group that

4    were loose in the house.

5            (Discussion off the record between the

6    defendant and his counsel)

7    BY MR. FLETCHER:

8    Q    One final question.  With reference to dogs, I

9    believe S7, the one -- the one Baldy, the one with the

10   fleas and dermatitis, Fern Clark was not found guilty

11   of cruelty to that dog; is that correct?

12           MR. MURPHY:  Objection, Your Honor.  It has no

13   relevance.

14           MR. FLETCHER:  It is relevant.

15           THE COURT:  Wait a second.  Objection

16   overruled, you can ask it.

17   A    No.  On that count, she was not found guilty.

18   BY MR. FLETCHER:

19   Q    That's correct, and she was not found guilty of

20   that dog because Judge Horton found that Matthew had

21   custody of that dog?

22   A    I think there was -- the ownership was unclear.

23   The possession of the dog was unclear.  I don't think

24   it was ever determined that it was, indeed, Matthew's

25   dog, but it was unclear enough for the Judge to rule

1    that that dog was -- possession was by Fern.

2    Q    And that was not relevant to the case in Lincoln

3    County; correct?

4    A    I'm sorry?

5    Q    Matthew Clark was not a party to this case?

6         MR. MURPHY:  We will stipulate to that, Judge.

7    A    He was not charged.

8         MR. FLETCHER:  No further questions.

9         THE COURT:  All right, thank you, Mr.

10   Fletcher.  Redirect, Mr. Murphy.

11        MR. MURPHY:  I think I just have two

12   questions, Your Honor.

13                  REDIRECT EXAMINATION

14   BY MR. MURPHY:

15   Q    Could you turn to Government's Exhibit S1, please,

16   Dr. Fraser.  That's your affidavit and turn to

17   paragraph 16.  That's just a couple of sentences.

18   A    Okay.

19   Q    Could you read that, please.

20   A    "As soon as we entered the property, Mrs. Clark's

21   son Matthew came to the door and asked what I wanted.

22   I introduced myself and explained that we received a

23   complaint on a sick kitten who had been sold.  Matthew

24   got angry and told us he did not have any kittens, that

25   the complaint was bogus.  He went to get Mrs. Clark."

1  Q    Did you find any deceased dogs in the Clark

2  household?

3  A    We did.

4  Q    Where?

5  A    They were in a freezer in the kitchen area.

6  Q    Was one of the reasons that you looked in the car,

7  was one of the things that you might be looking for the

8  presence of dead animals?

9  A    Yes.  We were looking for any live, dead or

10 unborn.

11          MR. MURPHY:  No further questions, Your Honor.

12          THE COURT:  Any further cross?

13          MR. FLETCHER:  No further questions.

14          THE COURT:  All right, very well.  You may

15 step down, thank you.

16          MR. FLETCHER:  If this witness may be kept a

17 little bit in case we have some rebuttal.  Well, that's

18 up to Mr. Murphy, but we have rebuttal evidence on this

19 witness.

20          MR. MURPHY:  Um, does defense perhaps want to

21 recall her as part of the defense case?

22          MR. FLETCHER:  I'm just not certain right now.

23 I -- probably not, but just raising the possibility.

24          MR. MURPHY:  We will have Dr. Fraser remain

25 for some period of time.  I know she has a commitment

1    this afternoon, but I will see how things go and we

2    will consult on this.

3              THE COURT:  All right, very well.  Maybe we

4    can take a break and during the break, counsel can

5    confer as well on it.

6              MR. MURPHY:  Alright.

7              THE COURT:  Dr. Fraser if you can just stick

8    around then, but you may step down.  Government's next

9    witness.

10             MR. FLETCHER:  Can I just get my exhibits?  I

11   believe I gave her some of them.

12             MR. MURPHY:  Norma Worley.

13             THE CLERK:  Please raise your right hand.  Do

14   you solemnly swear that the testimony you will give in

15   the cause now in hearing will be the truth, the whole

16   truth, and nothing but the truth, so help you God?

17             THE WITNESS:  Yes.

18             THE CLERK:  Please be seated.  Speak directly

19   into the microphone.  State your name and spell your

20   last for the record.

21             THE WITNESS:  Norma J. Worley, W-o-r-l-e-y

22             THE COURT:  Mr. Murphy.

23             MR. MURPHY:  Thank you, Your Honor.

24                  DIRECT EXAMINATION

25   BY MR. MURPHY:

Worley-Direct/Murphy

1   Q      How are you employed, Ms. Worley?

2   A      I'm employed by the State of Maine, Department of

3   Agriculture.   I'm the director of the Animal Welfare

4   Program.

5   Q      How long have you held that position?

6   A      I've held that position seven and a half years.

7   Q      Do you supervise Dr. Christine Fraser?

8   A      I do.

9   Q      Were you part of the team that executed the search

10  warrant at the Clark residence on Hewett Road in

11  Somerville in January of 2008?

12  A      Yes.

13  Q      Was there anyone else from the Animal Welfare

14  Program that was present there besides you and Dr.

15  Fraser?

16  A      Yes.   There was Humane Agent Rayann Malcolm was

17  her name at the time, now it's Dumas, and there was a

18  part-time Humane Agent, Heidi Nelson, who was also

19  present.

20  Q      Was there a Beth Summers present?

21  A      Yes, she was.

22  Q      And who is she?

23  A      She was the secretary associate for the program.

24  Q      Did Beth Summers make a video of the portion of

25  the search?

Worley-Direct/Murphy

1    A    Yes, she did.

2    Q    And I'm going to hand you what's been marked as

Government's Exhibit S12 and I'll represent that's a

3    DVD --  I'll represent that's a DVD and what does that

4    say on the front?  Not all of it, the case.

5    A    United States versus Matthew Clark, 10-62-GZS,

6    recording of search of Clark residence on January 19,

7    2009.

8    Q    Did you have an opportunity to view this DVD

9    before coming in to testify here today?

10

11   A    Yes, I did.

12   Q    And were you present at or near Beth Summers

13   during the time that she was shooting the DVD of the

14   search?

15   A    Yes.

16   Q    And would you say that this DVD, the contents of

17   the DVD accurately depict the interior and exterior of

18   the Clark residence as it appeared on the day of the

19   search on January 19th of 2008?

20   A    It does.

21        MR. MURPHY:  Your Honor, I would admit -- I

22   don't propose to play at this time -- this DVD marked

23   as Government's Exhibits S12 for the Court's

24   consideration.

25        THE COURT:  Government's Exhibit S12 is

Worley-Direct/Murphy

1    offered.  Any objection?

2            MR. FLETCHER:  No objection.  I have some

3    foundational questions, but I'll ask later.

4            THE COURT:  All right.  There is no objection

5    at this point pending the foundational questions?  All

6    right, Government's Exhibit S12 then is admitted

7    without objection.

8            MR. MURPHY:  Thank you, Your Honor.  I will

9    represent to the Court that the DVD is approximately

10   49 minutes long, although at 43 minutes, the visible

11   images -- and I'll also represent that roughly

12   speaking, the video of the second floor as depicted

13   will be found between minute 34 and minute 39 and a

14   half.  I'm not suggesting the Court limit its view to

15   any particular portion, but I'll just give you that for

16   your assistance.

17           THE COURT:  All right, very well.  Thank you.

18   BY MR. MURPHY:

19   Q    Ms. Worley, had you been to the Clark residence

20   anytime prior to the execution of the search warrant?

21   A    Yes.

22   Q    And on how many occasions?

23   A    I believe just once.

24   Q    Do you recall roughly when that was?

25   A    It was in November, I'm going to say 2006.

Worley-Direct/Murphy

1    Q    Who did you go to the residence with, if anybody?

2    A    Dr. Fraser.

3    Q    When you were there in November of 2006, did you

4    enter the residence?

5    A    I did not.

6    Q    Did Dr. Fraser enter the residence as far as you

7    can tell?

8    A    She did not.

9    Q    Did you see or observe anything on the exterior of

10   the residence at that time that led you to believe that

11   that residence was anything other than a single family

12   home?

13   A    No.

14   Q    When you arrived at the residence on January 19th

15   of 2008 for execution of the search warrant, did you

16   see or observe or hear anything when you were on the

17   outside of the Clark residence on that day that led you

18   to believe that the structure was anything other than a

19   single family residence?

20   A    No.

21   Q    Did you enter the first floor, the first main

22   living floor of the residence when the search warrant

23   was executed?

24   A    Yes.

25   Q    On that first main floor, were there doors

Worley-Direct/Murphy

1    separating various rooms?

2    A    Yes.

3    Q    What type of doors were those?

4    A    There were, I believe, five or six screen doors

5    leading into the other rooms.

6    Q    Did they have any apparent purpose from your

7    observation?

8    A    My observation was to separate animals.

9    Q    Did you go up to the second floor?

10   A    Yes, I did.

11   Q    And how did you access the second floor?

12   A    We opened the screen door that is at the bottom of

13   the stairwell and then went up the stairs.

14   Q    Let me show you what's been previously admitted as

15   Government's Exhibit S3, or an identical copy thereof,

16   and ask whether, roughly speaking and not to scale,

17   that drawing roughly depicts the layout of the second

18   floor?

19   A    Yes.

20   Q    When you were on that second floor, did you

21   observe other means of entry into or exit from the

22   floor other than the stairs that you accessed from the

23   living room?

24   A    No, I didn't.

25   Q    Were there any animals on the floor?

1    A    There was, yes.

2    Q    And where was that animal located?

3    A    That was located in the bedroom that was later

4    identified as the son's.

5    Q    And was that a dog?

6    A    Yes.

7    Q    What was your primary function or purpose or

8    assignment during the execution of the search warrant?

9    A    There were two.  One was to do a walk through with

10   Dr. Fraser to take pictures of the various rooms and

11   the animals.  The second was my responsibility was to

12   look for records eluding to a kennel operation.

13   Q    When you walked through initially in the execution

14   of the warrant, did you observe any computers in the

15   home?

16   A    I did.

17   Q    And where --  how many and where were they

18   located?

19   A    There were several older computers and two

20   somewhat newer ones that we -- I saw in the upstairs

21   bedroom.

22   Q    Would that be the bedroom designated as "Matthew

23   bedroom" on Exhibit S3?

24   A    Yes.

25   Q    Was one of those computers turned on?

1    A    Yes, it was.

2    Q    Was it just one computer that was on?

3    A    I believe it was just one.

4    Q    Did you search, conduct a search in the area

5    designated as "Matthew's bedroom" on S3?

6    A    Yes, I did.

7    Q    And what were you looking for there?

8    A    Again, any records that would indicate the

9    existence of a kennel, medical records on the dogs,

10   sales records, any communication dealing with the dogs.

11   Q    Had you been involved in the execution of search

12   warrants in your position as director of the AWP prior

13   to this time?

14   A    Yes.

15   Q    And during the execution of those searches, were

16   you also looking for records?

17   A    Yes.

18   Q    Had you ever found records in past searches

19   located on or near computers?

20   A    Yes.

21   Q    When you were looking for records in Matthew

22   Clark's bedroom as designated on S3, did you come

23   across what appeared to be various Websites?

24   A    I did.

25   Q    I'm going to show you what's been marked as

1    Government's Exhibit S13.  You took photographs, you

2    testified, I believe, during the course of the search;

3    is that correct?

4    A    Yes.

5    Q    Did you take this photograph, S13?

6    A    I did.

7    Q    What about that record or that notepad did you

8    find of interest?

9    A    Well, when I started looking through this notepad,

10   the first thing that caught my eye was --

11          MR. MUPRHY:  I'm sorry, I should move for

12   admission of S13 at this time so you can take a look at

13   it.

14          THE COURT:  Government's Exhibit S13 is

15   offered, any objection?

16          MR. FLETCHER:  No objection.

17          THE COURT:  Government's Exhibit S13 is

18   admitted without objection.

19   BY MR. MURPHY:

20   Q    Similarly, before we proceed, S14 I'm going to

21   tender to you.  Is that another photograph that you

22   took?

23   A    Yes.

24   Q    Is that of essentially the second page on the same

25   notepad?

1    A      Yes.

2    Q      And where did you find that notepad?

3    A      This was, as I recall, was on the desk.

4    Q      The desk where?

5    A      The desk that also contained a computer that was

6    turned on.

7    Q      And this was in the Matthew Clark bedroom area?

8    A      Yes.

9          MR. MURPHY:  I move for admission of S14 also,

10   Your Honor.

11         THE COURT:  Any objection?

12         MR. FLETCHER:  No objection.

13         THE COURT:  S14 is also admitted without

14   objection.

15         MR. MURPHY:  Your Honor, I'll tender those to

16   the Court.

17   BY MR. MURPHY:

18   Q    I'm sorry, I interrupted you when asking a

19   question.  Let me ask you again.  What did you find of

20   interest or note with respect to these pages?

21   A      The first thing that I noticed was in the larger

22   print and it looked like red ink, as I recall it was

23   lolita.nudes.org.

24   Q      That's on Government's Exhibit S13?

25   A      Yes.

Worley-Direct/Murphy

1  Q    And after noticing that, were there any other

2  writings on these pieces of paper that caused your

3  interest or further interest?

4  A    There were.  As I glanced up and down the list of

5  the two sheets of paper, there was the word "boy"

6  appeared numerous times.

7  Q    Did you take any action or consult anybody else

8  searching once you discovered these sheets of paper?

9  A    I did.

10  Q    By the way, were you by yourself in the room or

11  someone else with you?

12  A    Beth Summers was with me.

13  Q    Who actually saw or observed these pages first?

14  A    Yes.

15  Q    You or Beth?

16  A    I observed them first.

17  Q    Okay.  So I'm sorry, you then consulted with whom?

18  A    Um, when I discovered these, I went downstairs to

19  Lieutenant Maker and told him what I had found.

20  Q    And what did Lieutenant Maker instruct you to do

21  at that time?

22  A    He told me to return to the bedroom and to

23  continue looking for animal related evidence, but if I

24  found anything else that concerned me, to go back

25  downstairs and get him.

1   Q    Did you later find other materials that concerned

2   you?

3   A    Yes.

4   Q    And just generally speaking, what were those

5   materials?

6   A    Um, pictures of young boys that were naked.

7   Q    And did you then go back and talk to Lieutenant

8   Maker when you found those items?

9   A    I did.

10  Q    And what were you instructed to do at that time?

11  A    He told --  he actually went upstairs with me at

12  that point and went into the bedroom.  As I recall, he

13  looked around and then told Beth and I to leave and not

14  take anything, that he would be calling, I believe, the

15  detective on duty and they would continue the

16  investigation and if they found more animal related

17  information, they would forward it to us.

18  Q    And so you actually didn't seize the items

19  depicted in S13, S14 or any other items from that

20  bedroom; is that correct?

21  A    That's correct.

22  Q    Did you observe anything in the second floor of

23  the Clark residence that led you to conclude or believe

24  that it was a separate and distinct apartment or

25  dwelling on that floor, separate and apart from the

1    rest of the house?

2    A    No.

3    Q    There was a bathroom on the second floor; is that

4    correct?

5    A    Yes.

6    Q    Was the bathroom separate from the area depicted

7    as Matthew Clark's bedroom or was it within that

8    bedroom area?

9    A    It was separate.

10   Q    Did the toilet in that -- did you observe the

11   toilet area in that bathroom?

12   A    I did.

13   Q    Did it appear to be functional or non-functional

14   to you?

15   A    I would say it was non-functional.

16   Q    When you were on the first floor, were you

17   searching for records in Mrs. Clark's, Fern Clark's

18   bedroom area?

19   A    I did.

20   Q    And did you see any e-mail correspondence down

21   there?

22   A    I did.

23   Q    You've since reviewed that e-mail correspondence;

24   correct, since it was seized?

25   A    Yes.

1    Q      And would you agree with me that that e-mail

2    correspondence does not appear to have been sent to

3    Fern Clark or sent by Fern Clark; is that correct?

4    A      It did not appear to be sent by Fern Clark.

5    Q      Did you believe on January 19th of 2008 that a

6    computer may have been used in connection with the

7    business?

8    A      Yes.

9           MR. MURPHY:  Your Honor, that's all the

10   questions I have.  I just want to consult with defense

11   counsel with the Court's permission for one moment.

12          THE COURT:  You may.

13          (Discussion off the record between counsel)

14          MR. MURPHY:  That's all of the questions, Your

15   Honor.  Thank you.

16          THE COURT:  Cross-examination, Mr. Fletcher.

17                  CROSS EXAMINATION

18   BY MR. FLETCHER:

19   Q      Um, you didn't -- there is an e-mail that you saw

20   after, after you executed the search or before the

21   search?

22   A      After we executed the search warrant and entered

23   the premises --

24   Q      Thank you and if you know, this is addressed to

25   Ruth Ann; is that correct?

Worley-Cross/Fletcher

```
 1    A     I remember seeing the name "Ruth."

 2    Q     Right and it was also to Ruth -- there is to Ruth,

 3    to and from; is that correct?

 4    A     I believe so, yes.

 5    Q     So there was no indication on the e-mail that Fern

 6    received it?

 7    A     Other than I found it in her room, no.

 8    Q     You found it in her room.  There is no indication

 9    the computer was used from her.  The e-mail address was

10    not related to her and the -- both e-mails were

11    addressed to Ruth and said "hi Fern;" is that correct?

12    A     It did say "Fern."

13    Q     In the body of the text it said "Fern"?

14    A     Yes.

15    Q     Did you find an envelope in there?

16    A     I did not, no.

17    Q     All the business records for Fern's kennel

18    business you found near where that e-mail was; isn't

19    that correct?

20    A     Yes.

21    Q     So you didn't find any business records upstairs;

22    correct?

23    A     Um, in the short time I was there, no.

24    Q     Now, turning to S14 and 13, those photographs are

25    taken when the list is not on the desk; is that
```

Worley-Cross/Fletcher

```
 1    correct?

 2    A     Yeah.  I believe I had moved it over to the bed

 3    area.

 4    Q     And, in fact, you found the list amongst other

 5    papers; is that correct?

 6    A     On the desk, yes.

 7    Q     It was buried among other papers; isn't that

 8    correct?

 9    A     I believe so.

10    Q     So in order to find the list, you had to dig

11    through a lot of other papers; correct?  I mean you had

12    to dig into the papers; correct?

13    A     Yes, I was looking for the animal records.

14    Q     Okay, and there was no real basis for expecting

15    animal records because you already found animal records

16    downstairs; correct?

17    A     No, I had found also --

18    Q     No would be sufficient, thank you.  Now, turning

19    briefly to the DVD, the foundational issue that I

20    wanted to address, there is a gap in the DVD; correct?

21    When you look at the DVD, it stops and then it begins

22    again.

23    A     Yes, that --

24    Q     So it's not a continuous DVD?

25              THE COURT:  Counsel, let's not try to talk
```

1    over each other.  Did you finish your answer?

2    A    It was continuous.  It was all taken on that date

3    in that house.

4    BY MR. FLETCHER:

5    Q    I understand that, but Beth Summers who took the

6    DVD while you were there would stop the camera and then

7    start; correct?

8    A    Correct.

9    Q    So in point of fact, just before you get to minute

10   34 to enter into Matthew's apartment, there is some

11   disjunction there; in other words, you're not walking

12   up the stairs; isn't that correct?

13   A    That's true.

14   Q    So at minute 34, all you find yourself in is

15   another part of the house in Matthew's apartment

16   upstairs?

17   A    I'm not sure of the exact minute.  I know we show

18   going up the stairs from the bottom and then being

19   upstairs.

20   Q    And, in fact, there is a dog there?

21   A    Yes.

22   Q    A very friendly dog; correct?

23   A    Yes.

24   Q    The dog wasn't indisposed or sick, obviously sick,

25   except for fleas on the back?

 1   A     Yes.  The dermatitis was very, very obvious.

 2   Q     You had been at the house before in November of

 3   2006?

 4   A     The property.

 5   Q     I want to show you exhibits -- the outside photo,

 6   here we go, S4.  When you were there in November of

 7   2006, did you walk around the house?

 8   A     No, I did not.

 9   Q     Had Dr. Fraser walked around the house?

10   A     No.

11   Q     Do you see the two electrical meters just to the

12   right of the porch?  Two large electrical meters.

13   A     Yes.

14   Q     Those are easily observed, would you agree, from

15   that photograph?

16   A     I didn't see them that morning, if that's what

17   you're asking.

18   Q     I'm not asking that.  I'm asking if you can

19   observe them from the photograph.

20   A     Um, as you point it out to me, yes.

21   Q     And that photograph is about where you were

22   standing when you went there in 2006?

23   A     No.  We were a little further up towards where the

24   police car was.  We were by that door.

25   Q     You did drive into the driveway?

1    A    Yes.

2             MR. FLETCHER:  I'm going to just check my

3    notes.

4    BY MR. FLETCHER:

5    Q    You didn't have occasion to look at the Websites

6    to determine if they were more than what was listed on

7    the paper; did you?

8    A    No, I did not.

9    Q    And you didn't look at any videotapes; is that

10   correct?  Look at the case of the videotapes?

11   A    No, I did not.

12   Q    And you had no other visits aside from

13   November 2006 and then January of 2008?

14   A    Not that I recall.

15   Q    Now, before going upstairs, you knew that that was

16   Matthew's bedroom; is that correct?

17   A    I'm sorry?

18   Q    Isn't it true that when you went upstairs with

19   Beth Summers or maybe, I guess, Christine Fraser, the

20   initial walk through, you knew the upstairs to the

21   right was Matthew's bedroom?

22   A    I did not know that.

23   Q    Turning to your police --  your report of 2000 --

24            MR. FLETCHER:  I guess I'll need an evidence

25   sticker.  I'm sorry.  Do you have an evidence sticker?

1    Thank you.  Can I consult with counsel?

2            THE COURT:  You may.

3            (Discussion off the record between counsel)

4            MR. FLETCHER:  May I approach?

5            THE COURT:  You may.

6            MR. FLETCHER:  I'm going to mark this exhibit

7    as Exhibit 1 for defendant.

8    BY MR. FLETCHER:

9    Q    This is part of your police report from -- dated

10   January 28, 2008 and it's date stamped February 8, 2008

11   and I'll be happy to show you the whole report, but

12   turning now to item number 37, it says "it appeared to

13   be Matthew's apartment;" is that correct?

14   A    "Where it appeared that Matthew Clark" --

15   Q    Would you just read out --

16   A    "At the top of the stairs was a door immediately

17   to the right which was where it appeared that Matthew

18   Clark lived.  Inside there was a small utility kitchen

19   area with a microwave and refrigerator.  Upon entering

20   the room, I saw a bed and an area with several

21   televisions, some of which were very old, and several

22   computers, two of which appeared very old and one of

23   which was on a desk and was turned on.  There was a box

24   of floppy discs, several CDs and some paperwork and

25   notebooks on the desk that the computer was on.  There

1   were also all types of electrical wiring hanging

2   throughout the room.  Also, the ceiling was collapsing

3   with water stained insulation hanging down in several

4   areas."

5          MR. FLETCHER:  I move admission of --  let me

6   do a little foundational work here.

7   BY MR. FLETCHER:

8   Q    You agree this is your report?

9   A    Yes.

10         MR. FLETCHER:  I move admission --

11         THE COURT:  It's one page from the report?

12         MR. FLETCHER:  One page of the report.  I'll

13   be happy to make -- admit the whole report, but this is

14   the report --

15         THE COURT:  Defendant's Exhibit 1 is offered.

16   Any objection?

17         MR. MURPHY:  Just by way of inquiry, what's it

18   being offered for?  She just read into the record what

19   the report said.

20         MR. FLETCHER:  It allows the Court to have it

21   in the record if you need it as part of the record

22   later on.

23         MR. MURPHY:  I have no objection to the one

24   page, Your Honor.

25         THE COURT:  All right.  Defendant's Exhibit 1

1   is --

2           MR. FLETCHER:  I'm going to admit the whole

3   report.

4           THE COURT:  I beg your pardon?

5           MR. FLETCHER:  We are willing to admit the

6   whole report for purposes of evidence.

7           THE COURT:  But you're just offering the one

8   page?

9           MR. FLETCHER:  Yes.  Just the one page.

10          THE COURT:  And there is no objection?

11          MR. MURPHY:  No objection.

12          THE COURT:  So Defendant's Exhibits 1 is

13  admitted without objection.

14  BY MR. FLETCHER:

15  Q    Now, you said "it appeared."  How could it have

16  appeared if it was all one house?  What distinguished

17  it as Matthew's?

18  A    I think the fact that I knew he lived there and in

19  '06, he told me that he owned the house.  The bedroom

20  downstairs was more feminine and the upstairs was

21  rather stark, except for a lot of clutter.

22  Q    So there is a distinction, difference between

23  different parts of the house; is that correct?

24  A    As I would say any house there are differences.

25  Q    And there was no indication as you went through

1    the house that there was a kennel operation upstairs;

2    was there?

3    A    Kennel operation?

4    Q    In other words, there was no cages, there was no

5    feeding stations, there was none of the other things

6    that were on the main floor did you find upstairs,

7    aside from one dog?

8    A    Like I said, there was some indication that that

9    dog stayed in that bedroom.

10   Q    I'm not disputing the fact that Matthew had a dog.

11   I'm asking you, there was a distinct part of the house;

12   correct?

13   A    It was --

14          MR. MURPHY:  Object, Your Honor, to the term

15   "distinct."  I think that's confusing.

16          THE COURT:  Overruled.  She can answer if she

17   can.

18   A    It was another room in the house that had a dog

19   and until I searched the room, I had no idea what was

20   in there.

21   BY MR. FLETCHER:

22   Q    And there were no screen door on the doors;

23   correct?

24   A    Not except for the one that was downstairs in the

25   stairwell, correct.

1    Q    So one --  okay.  I'll leave it there.

2         MR. FLETCHER:  Let me refer to my notes.

3    BY MR. FLETCHER:

4    Q    You don't know whether the toilet was functional

5    or not; is that correct?

6    A    I'm sorry?

7    Q    You don't know if the toilet were functional or

8    not; do you?

9    A    No and I wasn't going to find out.

10   Q    I would imagine you wouldn't.  You didn't find any

11   computers or anything downstairs, did you, on the main

12   floor?

13   A    I did not.

14   Q    You didn't see any indication that Fern used the

15   computer in her business; did you?

16   A    I have no idea.

17   Q    In going through the business records, did you

18   find any computer printouts, any computerized receipts,

19   anything like that?

20   A    I don't know.  I don't believe I did.

21   Q    And you didn't find any computer kennel records

22   upstairs; did you?

23   A    In the short time I was there, I did not.

24        MR. FLETCHER:  May I speak to my client for

25   any other questions?

1              (Discussion off the record between defendant

2     and his counsel)

3     BY MR. FLETCHER:

4     Q    One final question, when you visited in November

5     of 2006, were there other people associated with the

6     house besides Matthew and Fern?

7     A    There was a gentleman that was there, but I don't

8     know who he was.

9     Q    Did you know that his name was Arthur Giles?

10    A    That name is not familiar to me.

11    Q    Okay, and was there anybody else there besides Mr.

12    Giles or this gentleman?

13    A    Dr. Fraser.

14    Q    Dr. Fraser for this case.  So were there any other

15    people associated with the house?

16    A    I don't remember any.

17              MR. FLETCHER:  Okay.  No further questions.

18              THE COURT:  Redirect?

19              MR. MURPHY:  No, Your Honor.

20              THE COURT:  All right, very well.  May Ms.

21    Worley be excused?

22              MR. FLETCHER:  I think she may be excused for

23    my purposes.

24              MR. MURPHY:  Finally excused.

25              THE COURT:  Very well.  Thank you.  You may

1    step down and you're excused.

2          MR. MURPHY:  Your Honor, I have just Detective

3    McFetridge to put on for just a couple of minutes.  So

4    if you want to maybe get him on prior to a break,

5    that's obviously the Court's call.  I just want to let

6    the Court know that's the final witness before Mr.

7    Eddy, which we're going to put on, either I or Mr.

8    Fletcher.

9          THE COURT:  So he is not your last witness?

10         MR. MURPHY:  He may well be.  What I'm

11   suggesting is perhaps we put him on and then we can

12   break and discuss the situation with Mr. Fletcher and

13   we may be ready to rest.

14         THE COURT:  All right, so he may not.  Very

15   well.  Why don't we do that.  We will go ahead and hear

16   from Detective McFetridge.

17         THE CLERK:  Please raise your right hand.  Do

18   you solemnly swear that the testimony you will give in

19   the cause now in hearing will be the truth, the whole

20   truth, and nothing but the truth, so help you God?

21         THE WITNESS:  I do.

22         THE CLERK:  Thank you.  Please be seated.

23   State your name and spell your last name for the

24   record.

25         THE WITNESS:  My name is Robert McFetridge.

1    M-c-F-e-t-r-i-d-g-e

2                    DIRECT EXAMINATION

3    BY MR. MURPHY:

4    Q    Detective McFetridge, who are you employed by?

5    A    I'm employed by the Lincoln County Sheriff's

6    Department.

7    Q    And how long have you worked for them?

8    A    Seven years.

9    Q    How long have you been a law enforcement officer?

10   A    Almost 30 years.

11   Q    Did you go to the Clark residence on Hewett Road

12   in Somerville, Maine on January 19th of 2008?

13   A    Yes, sir.

14   Q    And was that a Saturday?

15   A    I believe it was, yes, sir.

16   Q    Why did you go to the residence on that day?

17   A    I received a call from our communications center

18   requesting me to go to that residence.

19   Q    Were there other members of the Lincoln County

20   Sheriff's Department at the residence when you arrived?

21   A    There were.

22   Q    And was one of those Lieutenant Maker?

23   A    Yes, sir.

24   Q    Did you speak with him about what was going on at

25   the residence?

McFetridge-Direct/Murphy

1    A      I did.

2    Q      And what did he tell you?

3    A      He told me that the State of Maine Animal Welfare

4    Program was there conducting a search and that he was

5    there assisting them with security and in the course of

6    that search, they had found some items they believed

7    possibly were child porn.

8    Q      And were you told where those items were located?

9    A      I was.

10   Q      And what floor in the house were those located?

11   A      Um, the floor -- the house is separated.  You go

12   into the basement, what I would call the first floor or

13   the main floor and the items were located on the second

14   floor.

15   Q      Now, had you seen the sketch of the second floor,

16   which I believe is Exhibit S1?

17   A      Yes, sir.

18   Q      Were these items that you were directed to found

19   in the area depicted as "Matthew's bedroom"?

20   A      Yes, sir.

21          THE COURT:  S3.

22          MR. MURPHY:  I'm sorry, S3.  You're right,

23   Your Honor.  I'm sorry, S3.  I misidentified that.

24   BY MR. MURPHY:

25   Q      So on S3, the area identified as "Matthew

1    bedroom"?

2    A    Yes.

3    Q    That's where you proceeded to?

4    A    Yes.

5    Q    Did you arrive during daylight?

6    A    I did.

7    Q    Did you see anything on the outside of the house

8    that would lead you to believe that it was anything

9    other than a single family residence?

10   A    No, sir.

11   Q    Had you been to that home before, to your

12   knowledge?

13   A    Not prior to that date.

14   Q    When you arrived up on the second floor to go into

15   this area to look at these items, did you notice

16   anything as you proceeded to the second floor and got

17   to the second floor that indicated to you that the area

18   you were entering was anything other than a bedroom in

19   the house?

20   A    No, sir.

21   Q    Following your arrival at the house, did you

22   sometime later that day apply for and obtain a search

23   warrant for the seizure of items related to child

24   pornography?

25   A    Yes, sir, I did.

McFetridge-Cross/Fletcher

1    Q    Who issued that warrant?

2    A    It was Judge Wescott.

3    Q    And that was a state District Court Judge?

4    A    Yes.

5    Q    Issuing a state warrant; is that correct?

6    A    Yes.

7    Q    And did you seize, among other things, some VHS

8    tapes and some computer equipment?

9    A    I did.

10   Q    As well as some hard copies of photographs?

11   A    Yes, sir.

12        MR. MURPHY:  That's all of the questions I

13   have, Your Honor.  Thank you.

14        THE COURT:  Thank you.  Cross-examination.

15             CROSS EXAMINATION

16   BY MR. FLETCHER:

17   Q    You testified that you went to the house before

18   drafting the affidavit for the --

19   A    Yes, sir.

20   Q    Okay.  You didn't see any evidence of animal

21   welfare issues or cruelty, did you, in the upstairs

22   second apartment?

23   A    No, sir.

24   Q    And yet on item five of your warrant, you seek

25   evidence of crimes of cruelty to animals, including but

1    not limited to any live, dead or unborn animals.

2         Was there any -- certainly at that point, was

3    there any prior probable cause or inherent probable

4    cause for that item?

5         MR. MURPHY:  Your Honor, I think he is asking

6    for a legal conclusion whether there is probable cause.

7    I don't think the witness is qualified.

8         THE COURT:  Sustained.

9    BY MR. FLETCHER:

10   Q    Did you have any factual basis for believing that

11   Matthew Clark was, on the top floor of this building,

12   involved --  that would give rise to a claim as a

13   police officer?  Did you have any reason to believe

14   that?

15   A    At that time, I was relying on the information

16   provided by -- to me by the Animal Welfare Agency.

17   Q    Did you get any specifics as to what that would

18   be?

19   A    She provided me a copy of the search warrant.

20   Q    Wouldn't it be true that you are, in fact,

21   buttressing the first warrant by including that item in

22   the second warrant?

23        MR. MURPHY:  I'm going to object to that

24   question.

25        THE COURT:  You mean it the other way around;

1    don't you?

2             MR. FLETCHER:  Yes.  That's exactly what I

3    mean.

4    BY MR. FLETCHER:

5    Q    Buttressing the first warrant with the second

6    warrant.  In other words, there is no nexus of animal

7    cruelty with Matthew or animal cruelty with Matthew,

8    and yet you have a warrant here that is backward

9    looking to make up certain deficiencies in the first

10   warrant?

11   A    I recall doing it on my warrant to search

12   computers.

13   Q    Correct.

14   A    And because the original warrant was to seize

15   those computers for records and I was getting --

16   drafting a warrant to search the computers for the

17   evidence.

18   Q    But they were already searching computers; weren't

19   they?

20   A    They needed a separate warrant to actually search

21   the computers.  They had a warrant to seize the

22   computers.  You also needed a warrant to search the

23   computers.

24   Q    But there wasn't any basis at that point to think

25   that there were computer records on the computers; were

1    there?

2         MR. MURPHY:  Objection, computer records for

3    what?

4    BY MR. FLETCHER:

5    Q    Of animal cruelty.  Thank you.

6         THE COURT:  Objection overruled with that

7    qualification.

8    A    Again, as I stated, on that affidavit that was the

9    information that was provided to me by the Animal

10   Welfare Agents.

11   Q    Now, you signed this affidavit on your own

12   personal belief; is that correct?

13        THE COURT:  Has the witness's affidavit been

14   marked at this point?

15        MR. FLETCHER:  It's in the pleadings, Your

16   Honor.

17        MR. MURPHY:  It's attached, I believe --

18        THE COURT:  I understand it's attached to the

19   pleadings, but for purposes of this record, if he is

20   going to be examined, I think it should be marked.

21        MR. FLETCHER:  Thank you.  If I may have a

22   moment, I'll get it for you.

23        MR. MURPHY:  Your Honor, I guess while we are

24   doing that, I would question the relevance of the line

25   of questioning.  I don't think that there is an issue

1    with respect to the seizure of the items under the

2    second warrant and just as far as what's before the

3    Court with regard to the defendant's motion, I'm not

4    sure what the relevance of this line of questioning is.

5            THE COURT:  That was my understanding as well,

6    Mr. Fletcher.  I thought that the second warrant rose

7    or fell on the validity of the first warrant.  Are you

8    making a challenge to the second warrant?

9            MR. FLETCHER:  I'm challenging the second

10   warrant in that there is no animal welfare basis for

11   this and, in fact, it's to create a nexus that doesn't

12   exist there in the first place.

13           MR. MURPHY:  But there is nothing seized of an

14   animal welfare nature under that second warrant in any

15   event.

16           MR. FLETCHER:  But it's included within the

17   warrant.

18           MR. MURPHY:  I don't see how that's relevant

19   to what we are talking about here.

20           THE COURT:  Where are you going with this, Mr.

21   Fletcher?

22           MR. FLETCHER:  I'm trying to show that he

23   buttressed -- that he relied on information that --

24   they exceeded the scope of the warrant.  That's the

25   argument that you're going to hear.  That they exceeded

1    the scope of the argument (sic) and the way that they

2    dealt with that was to try to, on the second warrant,

3    make up for what was absent in the first warrant.  Does

4    that make sense?

5            THE COURT:  You already asked that question of

6    the witness.  He already answered that question.

7            MR. FLETCHER:  Well, I will move on to the

8    next line of questioning then and if I can find the

9    particular document, I'll deal with that.

10   BY MR. FLETCHER:

11   Q    And the issue of the list, did you examine --  did

12   you look at the list?

13   A    Yes, sir, I did.

14   Q    And you would agree with me that --  are you

15   familiar with pornographic Websites, not as a personal

16   thing, but in investigating them?

17   A    Yes, sir.

18   Q    And so the mere appearance of boys or girls in the

19   naming of a Website wouldn't necessarily indicate child

20   pornography; wouldn't that be correct?

21           MR. MURPHY:  Your Honor, again I'm not sure

22   what this line of questioning are -- the relevance to

23   this line of questioning.

24           MR. FLETCHER:  Probable cause.  Probable

25   cause.

1   BY MR. FLETCHER:

2   Q    In other words, the list itself, the list of

3   names --

4          THE COURT:  I'll overruled the objection.  Go

5   ahead.

6   A    In itself, no, sir.

7   BY MR. FLETCHER:

8   Q    So the probable cause comes from the other items

9   that Ms. Worley discovered; is that correct?

10          MR. MURPHY:  Your Honor, that calls for a

11   legal conclusion.

12          THE COURT:  I sustain the objection on that

13   basis.  If you want to rephrase, Mr. Fletcher, you can.

14   BY MR. FLETCHER:

15   Q    Okay.  So you get this call from Lieutenant Maker?

16   A    Yes, sir.

17   Q    Who says they discovered these things on the

18   second floor, bedroom or apartment, and among those

19   things is a list, and we agree that the list itself

20   is -- does not establish probable cause.  There are

21   also pictures; correct?

22          MR. MURPHY:  I think that's a

23   mischaracterization.  I don't believe we agree as to

24   what establishes probable cause.

25          THE COURT:  I hear the concern.  Go ahead, you

1   can continue.

2   BY MR. FLETCHER:

3   Q     Correct, there were also pictures?

4   A     Yes, sir.

5   Q     And those pictures appeared to be of underage

6   children?

7   A     Yes, sir.

8   Q     And some of those pictures have boys with clothes

9   on; correct?

10  A     That is correct.

11  Q     And that in itself does not necessarily give --

12  from your point of view as a law enforcement officer,

13  give as a factual matter -- does not establish probable

14  cause; correct?

15  A     That is correct.

16  Q     Before going out on that day on January 19, 2008,

17  you were aware that Mr. Clark was a registered sex

18  offender; is that correct?

19  A     Prior to that day?  No, sir.

20  Q     So you had no prior information on that?

21  A     That's correct.

22  Q     Before getting a warrant, what kind of search did

23  you conduct upstairs in the third floor, briefly?

24         MR. MURPHY:  I'm sorry to be technical here,

25  Judge.  I guess I don't understand what this line of

1    questioning has to do with --

2          MR. FLETCHER:  I'll break it down for Mr.

3    Murphy and for the Court.

4    BY MR. FLETCHER:

5    Q    You get a call from Mr. --  Lieutenant Maker and

6    you go out and observe the situation out on Hewett Road

7    in Somerville; is that correct?

8    A    That is correct.

9    Q    And based on your observations out there, you

10   determine you need to get a warrant; is that correct?

11   A    That is correct.

12   Q    And the basis for that were your own personal

13   observations; correct?

14   A    Correct.

15   Q    And what you've been told by the animal welfare

16   people; correct?

17   A    Correct.

18   Q    And what Lieutenant Maker had told you; correct?

19   A    That is correct.

20   Q    And so those -- it was what had been told by

21   animal welfare people and Maker rather than your own

22   observations that served as the basis for the

23   affidavit; correct?

24   A    And my own observations.

25   Q    And did your observations include going to the

1    third --  second floor where Matthew lived in the

2    house?

3    A    Yes.

4    Q    Did you have a chance to observe any of the

5    photographs or probably not videotape, but any of the

6    photographs that Beth Summers or Norma Worley had

7    taken?

8    A    Yes.

9    Q    And that's before obtaining the warrant?

10   A    Yes, sir.

11        MR. FLETCHER:  I'm going to ask that the

12   search warrant be admitted.  This is the second search

13   warrant, the search warrant that Mr. McFetridge applied

14   for.  Is there a stapler?  I'll mark this as

15   Defendant's Exhibit 2.

16        THE COURT:  Any objection?

17        MR. MURPHY:  No objection, Your Honor.  I

18   have -- that's the record just for the warrant itself

19   and not, I believe, the application.

20   BY MR. FLETCHER:

21   Q    And as part of that -- I'll show it to the

22   witness.  As part of that, items five and six ask for

23   animal welfare issues; correct?

24   A    They do.

25        MR. FLETCHER:  May I approach?

1          THE COURT:  You may and by the way, for the

2    record, Defendant's Exhibits 2 is admitted.  I don't

3    think I stated that.

4          MR. FLETCHER:  Okay.

5    BY MR. FLETCHER:

6    Q    And for the record, the purpose of this warrant

7    arose out of the list of names, list of Websites;

8    correct?

9    A    Correct.

10   Q    And the photographs; correct?

11   A    Correct.

12   Q    And it did not have to do with evidence related to

13   animal welfare; correct?

14   A    The reason why I got that warrant, that's correct,

15   yes, sir.

16   Q    So in point of fact, there is no animal welfare

17   issues upstairs in Matthew's apartment; correct?

18          MR. MURPHY:  I'll object.  I'm not sure --

19   I'll ask for clarification, there was no animal welfare

20   issues?

21          MR. FLETCHER:  Aside from the fact --

22          THE COURT:  Wait a second, please.  The

23   objection is overruled.  If you can answer the

24   question, please answer the question pending.

25   A    I discussed it with the District Attorney.  The

1    reason that was put into my warrant, animal welfare had

2    stopped their search because of the other items they

3    had found.  We were going to continue our search and

4    include the items that they had been looking for in

5    their search.

6    BY MR. FLETCHER:

7    Q    At the point that you asked for the warrant, there

8    is no probable cause at that point --  there is no

9    indication, no factual predicate for finding animal

10   welfare issues, aside from this one dog?

11   A    That I was aware of?  No, sir.  I was relying on

12   the information that animal welfare had on their

13   original warrant.

14   Q    And in fact, when you did your inventory, -- I can

15   show you if you wish -- you did not find any inventory

16   from that search -- you didn't find any animal welfare

17   records; correct?

18   A    That is correct, sir.

19            (Discussion off the record between defendant

20   and his counsel)

21            MR. FLETCHER:  No further questions.

22            THE COURT:  Any redirect?

23            BY MR. MURPHY:  I just want to clarify and

24   make sure there is not a misstatement on the record,

25   Your Honor.

1              REDIRECT EXAMINATION

2    BY MR. MURPHY:

3    Q    Detective McFetridge, I believe you were asked by

4    Mr. Fletcher, if I heard correctly, whether you had

5    reviewed or observed any of the photographs taken by

6    Worley or Fraser that day.  In fact, you didn't

7    actually view any photographs that they had taken, that

8    they had taken that day; did you?

9    A    I didn't review any photographs they had taken as

10   --  actually taken pictures?

11   Q    Right.

12   A    When I said that, I was referring to the

13   photographs they had found and set aside.

14   Q    Right.  The photographs they found, not the

15   photographs they had taken?

16   A    That is correct.

17            MR. MURPHY:  Okay.  I just want to clarify

18   that.  Thank you.

19            THE COURT:  Thank you.  Anything further?

20            MR. FLETCHER:  If I may.

21                RECROSS EXAMINATION

22   BY MR. FLETCHER:

23   Q    That's a substantial difference in your testimony,

24   Detective McFetridge, so I just want to clarify that.

25            I asked you before if you observed the

1    photographs that Norma Worley and Beth Summers had

2    taken, not the ones that they had set aside.

3    A    I misunderstood you, sir, because when you said

4    "taken," those two people were the ones who were

5    upstairs.  When you say "taken," I thought you meant --

6              THE COURT:  You meant took possession of.

7              MR. FLETCHER:  That's correct.

8    A    That's correct, Your Honor.

9              THE COURT:  As opposed to personally took.

10   BY MR. FLETCHER:

11   Q    So are you asserting they seized these photographs

12   before you arrived there?

13   A    They had found them.  They had taken them, set

14   them aside as well as the list.

15             MR. FLETCHER:  Okay.  I have no further

16   questions.

17             THE COURT:  Anything further?

18             MR. MURPHY:  No, Your Honor.

19             THE COURT:  All right.  May the witness step

20   down?  He is going to stay, I assume.

21             MR. MURPHY:  He is going to stay.

22             THE COURT:  You may step down, thank you.  Is

23   this a good time for a break?

24             MR. MURPHY:  Yes, Your Honor.

25             MR. FLETCHER:  I'm wondering if we can do Tom

1    Eddy and get him out of here.

2            THE COURT:  I thought you were going to talk

3    and we are holding on to the faint hope that Mr. Eddy

4    might not be called.

5            MR. MURPHY:  At this point, the Government

6    will rest and allow Mr. Fletcher, if you wish now, or

7    if he wishes to call Mr. Eddy in.

8            MR. FLETCHER:  My client would like to use a

9    break.

10           THE COURT:  I would as well.

11           MR. MURPHY:  And you already have Mr. Eddy in

12   here and we'll be ready to go after the break.

13           THE COURT:  We will come back at five after so

14   we can keep this thing moving.  Is there any hope we're

15   going to be done by noon?

16           MR. FLETCHER:  I would hope so.

17           THE COURT:  All right, very well.

18           (RECESS CALLED)

19           THE COURT:  Hello, counsel.  Mr. Murphy, the

20   Government has rested?

21           MR. MURPHY:  We have, Your Honor.

22           THE COURT:  Very well.  The defense may call

23   its first witness.

24           MR. FLETCHER:  I'm going to call Mr. Thomas

25   Eddy.  Please state your name for the record.

1    THE COURT:  Wait, he hasn't been sworn yet.

2    THE CLERK:  Please raise your right hand.  Do

3  you solemnly swear that the testimony you will give in

4  the cause now in hearing will be the truth, the whole

5  truth, and nothing but the truth, so help you God?

6    THE WITNESS:  I do.

7    THE CLERK:  Thank you.  Please be seated.

8  Please speak directly into the microphone.  State your

9  name and spell your last for the record.

10    THE WITNESS:  Thomas Eddy, E-d-d-y.

11    THE COURT:  Mr. Fletcher.

12    DIRECT EXAMINATION

13  BY MR. FLETCHER:

14  Q    Good morning, Mr. Eddy.  You are -- you work for

15  the Animal Welfare Department for the state; is that

16  correct?

17  A    Yes, I do.

18  Q    When did you start there?

19  A    The date that I started there?

20  Q    Well, approximate date.

21  A    18 years ago.  I don't know the exact date.

22  Q    Okay.  And when did you retire?

23  A    About five years ago, sir.

24  Q    And please describe briefly your -- what it

25  involved?

1  A    Well, at first I was an investigator.   I

2  investigated cruelty cases and inspected kennels and I

3  had lung cancer and I had a lung removed so they put me

4  on a lighter schedule and I inspected all of the

5  facilities in the state.

6  Q    Do you recall visiting a home owned by or lived in

7  by Fern Clark?

8  A    Yes.

9  Q    And when was the first time you visited there?

10  A    I don't know.

11  Q    Okay.

12  A    I don't know.

13  Q    Did you visit a woman named Marty Fox there?

14  A    There?

15  Q    Yes.

16  A    I know Marty Fox, but I don't know if I met her

17  there.

18  Q    Do you remember visiting her in an upstairs

19  apartment or upstairs bedroom at Fern's home?

20  A    No, I don't.

21  Q    And would it be fair to say that Marty raised

22  cats?

23  A    I guess it could be fair.

24  Q    And that was her job?  Um, okay, and you visited

25  with Fern Clark, obviously.

1   A     Yes.

2   Q     And do you recall when you first visited her?

3   A     No, I don't.

4   Q     But was it in the 1980's?

5   A     I would say no.  I would say in the '90's

6   somewhere.  I don't have no idea what date it was.

7   Q     You went through the whole house?

8   A     No.

9   Q     You don't recall paying a visit on Marty Fox on

10  the second floor or first floor of this house?

11        THE COURT:  Do you have a date to suggest to

12  the witness, Mr. Fletcher?  That might help him.

13        (Discussion off the record between defendant

14  and his counsel)

15  BY MR. FLETCHER:

16  Q     In the very late '80's.  September of 1989, 1991?

17  A     No, I don't.

18  Q     Okay.  You, in fact, also testified at a hearing

19  in Wiscasset; is that correct?

20  A     Yes, sir.

21  Q     Do you remember testifying that you told Christine

22  Fraser that Matthew had --  there was a separate

23  apartment upstairs and that you told her that in 2005

24  when you went up there together?

25  A     I don't really.  I really and truly don't remember

1    that.

2    Q    Do you recall visiting Fern Clark's house with

3    Christine Fraser in 2000?

4    A    Yes.

5    Q    And describe briefly coming into the house.

6    A    The problem was that Fern Clark would not let Dr.

7    Fraser into that house.  I was called in off the road,

8    met Dr. Fraser, brought her over to the shelt --  to

9    the kennel and we went upstairs into the kitchen.  Dr.

10   Fraser and Fern Clark went on their inspection, I

11   guess, and I left.  I went back downstairs.

12   Q    Did you get up to the main floor of the house?

13   A    If that's the kitchen area, yes.

14   Q    And did you introduce Christine Fraser to the

15   house?

16   A    Only to the kennel.

17   Q    Only to the kennel.

18   A    That's the kitchen area.  The whole kitchen area

19   was the kennel part.

20   Q    And so you were not aware of any other part of the

21   house that was being used as a kennel?

22   A    No, I wasn't aware of it, but if it was, they were

23   advised that they would be arrested if we found out

24   that they were housing animals some place else in the

25   house.  No, I didn't go through the whole house.

1   Q     Were you generally familiar with the house when
2   you showed Dr. Fraser the house?
3   A     Only the kitchen area where the kennel is.
4   Q     Was that the most recent time you had been to that
5   house, 2005?
6   A     Yes.
7   Q     And you had been there before?
8   A     Yes.
9   Q     Why do you think that Fern trusted you and not Dr.
10  Fraser?
11  A     Ask her.  I don't know.  I really don't.
12  Q     You would agree she specifically asked for you?
13  A     All I can tell you is I was told to come off the
14  road and take Dr. Fraser over to the kennel because
15  Fern would not let her into the house.
16  Q     But she let you in the house?
17  A     Yes.
18  Q     Was she happy to see you?
19  A     I don't know if she was happy to see me, but she
20  said hello.
21  Q     In fact, she was friendly to you.  She was
22  friendlier to you than Dr. Fraser?
23  A     I guess so.  I'm not sure.  I don't know what
24  happened after I left.
25  Q     How long were you there before you left?

Eddy-Direct/Fletcher

1  A    I was in the kitchen area for about two or three

2  minutes and went downstairs.

3  Q    Did you do any part of the inspection?

4  A    No, sir.

5  Q    Did she show you any medical records?

6  A    No, sir.

7         MR. FLETCHER:  Let me consult my client for

8  one moment.

9         (Discussion off the record between defendant

10  and his counsel)

11  BY MR. FLETCHER:

12  Q    Do you remember returning later in 2005, November

13  of 2005?

14  A    To their house?

15  Q    Yes.

16  A    No.

17  Q    Do you remember DHSS being concerned about David

18  being there, the son who was disabled?

19  A    I don't even know what you're talking about.  All

20  I know is David all of a sudden disappeared.  That's

21  all I know.

22  Q    So it's your testimony that you were not part of

23  an effort for DHS to get a warrant in 2005?

24  A    I don't believe so, no.

25         MR. FLETCHER:  Okay.

Eddy-Direct/Fletcher

1              (Discussion off the record between defendant

2      and his counsel)

3      BY MR. FLETCHER:

4      Q    Did you fill out any inspection reports?

5      A    Every time I made an inspection, I made out a

6      report.

7              THE DEFENDANT:  In November of 2005 -- I'm

8      sorry, Your Honor, I wasn't expecting this to be here.

9              THE COURT:  That's all right.  Just let your

10     lawyer speak.

11             (Discussion off the record between defendant

12     and his counsel)

13             MR. FLETCHER:  I have no further questions.

14             THE COURT:  Cross-examination.

15             MR. MURPHY:  No questions, Your Honor.

16             THE COURT:  All right.  Do you want a break,

17     Mr. Fletcher, to find that document?

18             MR. FLETCHER:  Um, two seconds.

19             THE COURT:  Would you like a break to try to

20     find that?

21             MR. FLETCHER:  No.  The witness can be

22     excused.

23             THE COURT:  All right.  Very well.  Thank you.

24     You may step down.  Can Mr. Eddy be excused finally?

25             MR. FLETCHER:  Yes.

1          MR. MURPHY:  He can, Your Honor.

2          THE COURT:  Thank you, sir.  You are excused.

3          MR. FLETCHER:  I was going to call Brenda

4    Carpenter.

5          THE COURT:  Very well.

6          THE CLERK:  Please raise your right hand.  Do

7    you solemnly swear that the testimony you will give in

8    the cause now in hearing will be the truth, the whole

9    truth, and nothing but the truth, so help you God?

10         THE WITNESS:  Yes.

11         THE CLERK:  Thank you.  Please be seated.

12   Please speak directly into the microphone.  State your

13   name and spell your last for the record.

14         THE WITNESS:  Yes.  It's Brenda Lee Carpenter.

15   C-a-r-p-e-n-t-e-r

16              DIRECT EXAMINATION

17   BY MR. FLETCHER:

18   Q    Good morning, Ms. Carpenter.  Where do you live?

19   A    I live in Waldoboro.

20   Q    And are you familiar with the home of Fern Clark?

21   A    Yes.

22   Q    Okay, and what is your -- what's the basis for

23   your familiarity with Fern Clark?

24   A    Um, she is technically my cousin.  She is my

25   mother's cousin.

1   Q     Okay, and do you have any dealings with Fern

2   through her business?

3   A     Yes.

4   Q     And what are those dealings?

5   A     I -- I dealt with Fern on many occasions with her

6   dogs and with other things that she has to do with her

7   home.  I take care of her.

8   Q     Okay, and so how long have you been doing this?

9   A     I've been doing this now for about five or six

10  years.

11  Q     So you have been helping her with --  you were

12  helping her with her kennel business until she no

13  longer had a kennel business?

14  A     Yes.

15  Q     Is that fair?  And did you ever live there?

16  A     Did I live there?

17  Q     Live at her house.

18  A     I did not live there, no.  I was like staying

19  there off and on, but I was never a resident there.

20  Q     Would you briefly describe the house?  How many

21  floors are there?

22  A     There is three.

23  Q     Okay.  Describe the three floors.

24  A     There is a basement and then you have a middle

25  floor, which is the living room, the kitchen, the

1    bedrooms and then you have the upstairs which is three

2    bedrooms and then you have Matthew's apartment.

3    Q    Did you have occasion to go in Matthew's

4    apartment?

5    A    Excuse me?

6    Q    Did you go into Matthew's apartment?

7    A    I had only been in his apartment once or twice.

8    Q    Okay.  So Fern lived downstairs.  Did she have a

9    separate kitchen?

10   A    Yes.

11   Q    Separate bath?

12   A    Yes.

13   Q    Did you ever have occasion to use the upstairs

14   toilet?

15   A    Um, maybe once or twice.

16   Q    Did it function?

17   A    Yes.

18   Q    Turning now to November of 2006, do you remember

19   staying there, November of 2006?

20   A    Yes.

21   Q    Okay, and you were there when --  were you there

22   when Christine Fraser and maybe somebody else from --

23   animal control officer came by?

24   A    Yes, I was there.

25   Q    And where were you when they came?

1    A    I was in the bedroom on the second floor which

2    is --

3    Q    I'm going to show you what's marked as State's

4    Exhibit --  excuse me, Government's Exhibit S4.  Would

5    you indicate on there where you were staying?

6    A    Yes.  I was in this bedroom right here

7    (indicating).

8    Q    That bedroom right there?

9            THE COURT:  Just for the record, you're

10   showing the first -- I guess is that the first floor,

11   second floor?

12   A    It's the second floor because she had a basement

13   and then there is stairs that go up to the first floor.

14           THE COURT:  Is the basement the level that has

15   what looks like the garage door?

16   A    Yes.

17           THE COURT:  So you were pointing to the double

18   window?

19   A    Right, which is the bedroom.

20           THE COURT:  But isn't that the first floor,

21   the kitchen level?

22   A    Yeah.  It could be the first level, yeah.

23           THE COURT:  And you were in the bedroom on the

24   second floor?

25   A    Yes.  Right there.

1           MR. FLETCHER:  What we are calling the first

2    floor.

3           THE COURT:  You were in the bedroom on the

4    first floor, on the kitchen level floor?

5    A    Yes.

6           THE COURT:  And you are pointing on the

7    exhibit to the double window to the right on that wall.

8    A    Yes.

9           THE COURT:  Okay.  Thank you.

10          MR. MURPHY:  Your Honor, may I see?  I kind of

11   had my back to all that.

12          MR. FLETCHER:  She is saying she was right

13   here (indicating).

14   BY MR. FLETCHER:

15   Q    Basically southeast window on the middle floor or

16   what we have termed the first floor.  Okay, I'm just

17   going to leave that for you for the moment.

18          Was the window opened?

19   A    Yes, it is.  It was opened about a crack.  About,

20   I don't know, three inches maybe up.

21   Q    Was it a warm morning or afternoon?

22   A    Yeah, it was.

23   Q    Okay, and what did you observe?

24   A    Um, I was in that window and I observed the state

25   ladies come out to the home.  They got out of their

1    vehicles and all I heard Matthew say was that they

2    weren't allowed to be there and he pointed to a pole

3    that had two separate meters on it for the power.

4    Q    Okay.  Looking at the photograph, is there any

5    part of it on there that you can indicate?  Try to

6    describe what you're seeing in the photograph.

7    A    No, I don't see the pole.  I don't see the pole.

8    The pole is more like over here.

9    Q    Okay.  Did you observe any two wires coming down?

10   A    Yes, I do.

11   Q    Okay, and do you observe two meters on the east

12   side of the house?

13   A    Yes, there was.

14   Q    So let me just take that from you.  Now, it's your

15   testimony that you observed Matthew taking Christine

16   Fraser and showing her those?

17   A    Yes.

18   Q    Then did he show anybody else those?

19   A    Everybody that was outside at that point.  They

20   all saw it.

21   Q    You were helping Fern with her business.  Was

22   Matthew involved in the business at that time?

23   A    No.  He really wasn't involved, no.

24   Q    So when you were taking care of the animals,

25   Matthew had no part of the business?

 1    A     No.  Not really, no.

 2    Q     Did you help Fern with any of the business of

 3    billing records or anything like that?

 4    A     No, I did not.

 5    Q     So your role in Fern's kennel business was to try

 6    to feed --

 7    A     Yeah, just to maintain.

 8    Q     Maintain.  Was this after David, her son, and your

 9    cousin was involved?

10    A     Yes, this was.

11    Q     And was David living there at that time?

12    A     No, he was not.

13          MR. FLETCHER:  One moment.  Let me just check

14    here.

15          (Discussion off the record between defendant

16    and his counsel)

17    BY MR. FLETCHER:

18    Q     So one final question.  You were -- was Arthur

19    Giles there when you were there?

20    A     Yes, he was.

21    Q     And Arthur Giles, was he living there?

22    A     Yes.

23    Q     And he was -- was he present when with you --

24    when you saw the animal control people come?

25    A     Yes, he was.

1    Q    Did you hear Arthur Giles explain to the animal

2    control people that there are two separate apartments?

3    A    Yes.

4    Q    You did, and did you hear the beginning part of

5    that conversation when there might have been an

6    explanation for that?  I mean it doesn't come out of

7    the blue.  What preceded that?

8    A    Well, what came --  what do you mean by that?

9    Q    Well, did Christine Fraser, Norma Worley or one of

10   the animal control officers ask questions that

11   generated this?

12   A    Yes because they wanted to come in the house.

13   Q    Okay, and what did they ask?

14   A    They asked if they could come in and look at

15   things and Matthew said no, no, not without a warrant.

16   Q    How do we get from there to the issue of the

17   electrical meters?

18   A    Because Matthew had told her that because they

19   wanted to go up to Matthew's apartment and Matthew said

20   no because he said that her house, his mother's house

21   and his apartment was totally separate.

22   Q    Was Fern present at this time?

23   A    Yes, she was.

24   Q    And did Fern also say -- or I can call her in lieu

25   of an objection -- did Fern also explain that they were

1    separate?

2    A    Yes.

3    Q    Did you have any direct interaction with either

4    Christine Fraser or --

5    A    No.

6    Q    -- or whoever she was with?

7    A    No.

8    Q    Did they actually make entry into the house?

9    A    No, they didn't.

10   Q    So what you heard was that they -- faced with the

11   fact they had to have a warrant, they left; is that

12   correct?

13   A    Yes.

14   Q    One last question.  Did Fern tell them to leave?

15   A    Yes, she did.

16   Q    And did she tell them to leave before Matthew did?

17   A    I don't remember.

18   Q    You don't remember.

19   A    I don't.

20   Q    Was there a lot of back and forth?

21   A    Yes, there was.

22   Q    And so was Dr. Fraser persistent in trying to gain

23   entry?

24   A    Yes, she was.

25   Q    How long did this go on for?

Carpenter-Direct/Fletcher

 1   A     Oh, I'm going to say probably 15, 20 minutes.

 2   Q     15, 20 minutes of back and forth?

 3   A     Just back and forth of --

 4   Q     And did Dr. Fraser try to leave materials back --

 5   on kennel licensing at that time?

 6   A     I don't --

 7   Q     You didn't know.  You didn't observe that?

 8   A     I didn't.

 9             MR. FLETCHER:  No further questions.

10             THE COURT:  Let me just ask before

11   cross-examination, Ms. Carpenter, for what period of

12   time were you at that residence?  You were living there

13   in November of '06; is that right?

14   A     I was staying there.  I was not living there.  I

15   was just staying there temporarily to help her out with

16   her animals.

17             THE COURT:  Okay, and then do you remember

18   approximately what time period --

19   A     I was there for about two months off and on.

20             THE COURT:  In the November 2006 time period?

21   A     Yes.

22             THE COURT:  And the conversation that you

23   testified to that you overheard of Mr. Giles --

24   A     Yes.

25             THE COURT:  Was -- took place at the same time

 1    as the conversation that you also overheard of Mr.

 2    Clark?

 3    A    Yes.

 4          THE COURT:  Mr. Clark pointed out the meters?

 5    A    Yes.

 6          THE COURT:  And Mr. Giles showed him that he

 7    had a third floor apartment?

 8    A    Yes.

 9          THE COURT:  Third floor apartment.

10    A    Yes.

11          THE COURT:  All right.  Cross-examination.

12          MR. MURPHY:  Thank you.

13          THE COURT:  Well, first of all, Mr. Fletcher,

14    do you want to do any further direct based on that?

15          MR. FLETCHER:  No.

16          THE COURT:  Cross.

17               CROSS EXAMINATION

18    BY MR. MURPHY:

19    Q    Ms. Carpenter, where were you living or staying

20    inside the house?

21    A    I was staying on the second floor in the --  I was

22    actually staying up on the third floor in the third

23    bedroom because Arthur Giles, he had the bedroom that I

24    was looking out of down outside, so I was staying

25    actually in the third floor bedroom upstairs.

1    Q    So you were up on the third floor?

2    A    Yes.

3    Q    So in those two months you were there, you would

4    access, go up and down the stairs from the living room

5    up to the third floor?

6    A    Yes.  Yes, I would.

7    Q    And that was the way that you got back and forth;

8    correct?

9    A    Yes.

10    Q    And that's the way Matthew Clark got back and

11    forth to his room up there?

12    A    Yup.

13    Q    Okay, and that's the way Fern would go up and

14    down, if she needed to get up there?

15    A    Yup, yes.

16    Q    All right.  Now, you would agree with me that

17    there was nothing on the --  at the house or on the

18    house that indicated that there were two separate

19    dwellings in the house?

20         There weren't two separate mailboxes there;

21    right?

22    A    No, there weren't two separate mailboxes.

23    Q    There wasn't two separate house numbers on the

24    house?

25    A    No, no.

1    Q    There weren't -- there wasn't any direction or

2    anything indicating that there was a separate apartment

3    up on the top floor; correct?

4    A    No, except for the power boxes.

5    Q    And when you were inside the house, if I walked in

6    there for the first time, just standing there in the

7    living room looking around, there would be no

8    indication there on that floor that there was a

9    separate apartment upstairs; correct?

10   A    No.

11   Q    Okay.  Now, you said that you did use the bathroom

12   on the second floor or the third floor?

13   A    Yes.

14   Q    Top floor.

15   A    Yes.

16   Q    And you were using that back in November of 2006?

17   A    Yes.  Couple of times, yes.

18   Q    Okay.  Well, you were there for a couple of

19   months, so I imagine --

20   A    Yes, but I also used the bathroom downstairs.

21   Q    It would be a matter of convenience you would use

22   the bathroom?

23   A    Right.  At night or something.

24   Q    Okay.  Now, I want to draw your attention to

25   Government's Exhibit S4.  Let's see if we can get you a

1    copy and I can have a copy too so we can talk at the

2    same time.

3              MR. MURPHY:  Does the Court have its copy of

4    S4?

5              THE COURT:  I do, thank you.

6    BY MR. MURPHY:

7    Q    Now, if I understand it, you indicated that you

8    were in this window right here (indicating)?

9    A    Yes.

10   Q    And you were listening to this conversation?

11   A    Yes.

12             THE COURT:  Just for the record, Mr. Murphy,

13   if you could indicate --

14             MR. MURPHY:  I'm sorry.  I'm referring, Your

15   Honor, to a double window that appears to be right over

16   what appears to be the garage door in the main entry to

17   the house.

18   BY MR. MURPHY:

19   Q    And you would agree with me that that door, it

20   looks like a screen door with a sign on the front at

21   the bottom floor, is the main way to get in and out of

22   the house, Ms. Carpenter?

23   A    Yes.

24   Q    So you were in that window looking down and you

25   saw Matthew Clark point to the electrical meters?

1    A    Yes, I did.

2    Q    Can you locate where the electrical meters are?

3    A    Somewhere over here.

4    Q    Okay.  So that would be actually all the way on

5    the other side of the house.  I just don't understand

6    how looking out of the house this way you could see

7    Matthew Clark pointing to the electric meters that are

8    on the other side of the house, tucked up around that

9    addition.

10   A    No because they are on the side the house.

11   Q    I can see that from the photograph.  So where

12   exactly, looking at that photograph, where did you

13   observe Matthew Clark pointing to the meters?

14   A    Over this way (indicating).

15   Q    This way.  So you're saying -- and I'm referring

16   way over to the side?

17   A    Yes.  Over in this area.

18   Q    So you said he walked over to that area; is that

19   what you're saying?

20   A    No.  He was just standing right here and he was

21   pointing over and I was hearing him talk.

22        THE COURT:  Was he pointing to the meters, Ms.

23   Carpenter?

24   A    Yes.

25        THE COURT:  Because you said originally that

1    he was pointing to a pole.

2    A    Yeah.   There is meters on that pole.

3         THE COURT:   Is that the same, are we talking

4    about the same meters?

5    A    Yes, the same meters.   They are on the same pole

6    outside.   They are over near the road.   There is a road

7    right there that you guys didn't take pictures of, but

8    there is a road, dirt road that goes up.   Well, there

9    is a pole that stands right there on the side of the

10   road that has two meters on it.

11        MR. MURPHY:   I'm sorry, Judge, are you

12   finished?   I didn't want to interrupt you.

13        THE COURT:   No.   That's all right.

14   BY MR. MURPHY:

15   Q    So we are not talking about the meters that are on

16   the side of the house over here.   You're saying there

17   is something on a pole up here?

18   A    Yeah, yeah.

19   Q    Okay.   What's over there; can you tell us?

20   A    I don't know.

21   Q    Without a picture?

22   A    I don't know.   I have no idea.

23   Q    And your testimony is he pointed to the meters and

24   what did he say when he pointed to the meters?

25   A    He said there was two separate meters for the

1    house.  He had one and his mother had one and he had

2    two different light bills.  He had a light bill, his

3    mom had a light bill.

4    Q    And he said this to the --

5    A    Yes, he did.  Right to the lady.  He said --

6    Arthur Giles was standing right there when he said it.

7    Q    And it's your testimony that the agents standing

8    down in the driveway said we want to go up on to the

9    third floor and look in your bedroom, or maybe I

10   misunderstood that.

11   A    No.

12   Q    Well, then why was Matthew -- and I'm trying to

13   understand why this conversation would have occurred in

14   which Matthew Clark was allegedly asserting he had a

15   separate apartment up on the third floor.  What caused

16   that --

17   A    Because they wanted to come in with a warrant.

18   Q    They wanted to come in with a warrant?

19   A    Yes, and Matthew said they weren't allowed to go

20   to his apartment because the warrant was not made out

21   for his apartment.  It was made out for the house.

22   Q    So it's your testimony, as you remember, that they

23   came and had a warrant?

24   A    Yes.

25   Q    But the warrant didn't allow them to go up on the

1   third floor?

2   A     Right.

3   Q     And this was in November of 2006?

4   A     Yes.

5   Q     And they had this warrant in November of 2006 so

6   did they then enter the house, but not go up to his

7   apartment?

8   A     That's right.  Well, no.  I wasn't there in the

9   house at that time.  I think they left because they

10  could not -- he wouldn't allow them in and neither

11  would she.

12  Q     I guess I'm confused if they had a warrant and

13  they said they had a warrant.  You heard her say she

14  had a warrant?

15  A     Yes.  She said she did and after that, she left

16  and I was just like in that room and I really wasn't

17  paying attention of everything that was going on that

18  day.

19  Q     So there was some things you heard and some things

20  you didn't?

21  A     Right, exactly, because I was just there.

22  Q     But one thing you heard was you heard Mr. Clark

23  say something about having a separate apartment?

24  A     Yes.

25  Q     And you're sure about that?

Carpenter-Redirect/Fletcher

1    A     Yes.

2    Q     And you heard that -- her say that she had a

3    warrant?

4    A     Yes.

5    Q     And you're sure about that?

6    A     Yes.

7          MR. MURPHY:  That's all the questions I have,

8    Your Honor.

9          THE COURT:  Redirect, Mr. Fletcher.

10                    REDIRECT EXAMINATION

11   BY MR. MURPHY:

12   Q     Just two questions.  When you were living on the

13   third floor or the top floor, you were living in the

14   bedroom on -- as you come up on the left; yes?

15   A     Yes.  Top of the stairs.

16   Q     And you didn't have occasion to use Matthew's

17   kitchen or other --

18   A     No, no, no.

19   Q     You did use the bathroom?

20   A     I used the bathroom twice.

21   Q     Okay, and when you were upstairs from listening in

22   on this conversation, are you certain or clear that

23   Matthew was pointing to a pole?

24   A     I was pretty sure.

25   Q     And indicating there was separate electric service

1   and went to two different meters; is that what your

2   testimony is?

3   A    Yes.

4   Q    Not that there were necessarily two meters on the

5   pole, but there were two wires that went off and two

6   separate meters?

7   A    Yes.  He pointed to two wires and basically told

8   them that his apartment was separate from his mom's

9   house.

10  Q    And you did hear the word "warrant" mentioned, but

11  you're not --

12  A    I did.

13  Q    But you weren't sure if they had a warrant?

14  A    I wasn't certain they had a warrant because I

15  really wasn't -- I was looking out the window, but

16  while they were all talking, you know, they had -- they

17  were moving around outside so I really wasn't paying

18  attention to a whole lot that was happening.

19              MR. FLETCHER:  I have no further questions.

20              MR. MURPHY:  No further questions, Your Honor.

21              THE COURT:  Thank you, ma'am.  You may step

22  down.  May Ms. Carpenter be excused?

23              MR. FLETCHER:  Yes.

24              MR. MURPHY:  Your Honor, would you please

25  instruct Ms. Carpenter -- and I don't mean to imply

1    this -- she shouldn't discuss her testimony with

2    anybody outside who has not yet testified and is going

3    to testify.

4    A    Is it all right if I leave?  Can I leave?

5              THE COURT:  You can leave and you just

6    shouldn't discuss your testimony.

7              THE WITNESS:  I won't.

8              THE COURT:  Until we are done today.

9              THE WITNESS:  I won't.  I drove myself down

10   here and I have an appointment to be at.

11             THE COURT:  All right.  You may leave.

12             THE WITNESS:  All right.

13             THE COURT:  Yes, ma'am.

14             THE WITNESS:  Thank you.

15             THE DEFENDANT:  May I, Your Honor?

16             MR. FLETCHER:  No, no.  I don't have any

17   questions for you.  I don't know if Mr. Murphy does.

18             THE COURT:  She can go ahead and sit down.

19             THE CLERK:  Ms. Clark.  Please raise your

20   right hand.  Do you solemnly swear that the testimony

21   you will give in the cause now in hearing will be the

22   truth --

23             THE WITNESS:  Would you speak up so I can hear

24   you, please.

25             THE CLERK:  Do you solemnly swear that the

1 testimony you will give in the cause now in hearing

2 will be the truth, the whole truth, and nothing but the

3 truth, so help you God?

4             THE WITNESS:  I do.

5             THE CLERK:  Thank you.  Pull yourself right up

6 to the microphone.  State your name and spell your last

7 for the record.

8             THE WITNESS:  My name is Fern Clark.  What

9 else did you want?

10             THE COURT:  Just spell your last name, Mrs.

11 Clark.

12             THE WITNESS:  C-l-a-r-k.

13             THE COURT:  Thank you.

14             THE WITNESS:  No "e."

15             THE COURT:  Go ahead

16                    DIRECT EXAMINATION

17 BY MR. FLETCHER:

18 Q    I just have a couple of questions for you.  In

19 2005, you were -- you had a number of animals?

20 A    I had -- what I recall, I had 14 --  let's put it

21 this way.  All of the animals I had were not all mine,

22 first of all.  Let me make that clear.  Four of them

23 belonged to my son, two of them belonged to my niece

24 and then I had four that belonged to another friend of

25 mine.  I was taking care of animals.

Fern Clark-Direct/Fletcher

```
 1    Q     You were taking care of a number of animals?

 2    A     I was taking care of probably 12 or 14 animals

 3    that were not mine.  I want that made clear.

 4    Q     I hear you.

 5    A     I hope you don't mind me speaking up because I

 6    can't hear anyway, but anyway, as it was, I had those

 7    animals and I took good care of them.  That morning

 8    before I left --

 9          THE COURT:  Mrs. Clark, why don't you wait for

10    Mr. Fletcher to ask the next question.

11    A     All right.  I want to finish this one question

12    first.

13          MR. FLETCHER:  You've answered the question.

14          THE COURT:  You've answered it.

15    BY MR. FLETCHER:

16    Q     I really want to make this quick.  I don't want to

17    make it longer than we have to.  Matthew Clark, your

18    son here --

19    A     That's right.  He is my son.  He is the oldest

20    one.

21    Q     He lived upstairs in the same structure that you

22    did?

23    A     He lived --  my house, I want to make that clear,

24    he lives in my house upstairs and he has three or four

25    rooms of his own.
```

1    Q     Of his own.  So you consider that a separate

2    apartment?

3    A     No, I do not because it's not completely finished.

4    Q     Okay, but he used the upstairs bath; is that

5    correct?

6    A     He has an upstairs flush.  No bathroom.

7    Q     Okay.  Let me just establish here that you --

8    Matthew did not help you in the business of your --

9    A     No, he did not help me with my business.  Never

10   did and never will because I won't let him.  I'm a very

11   independent old lady.

12   Q     I can tell.  Thank you very much, and so at no

13   time between 2005 and 2008, did he have -- did he take

14   care of any business records or anything?

15   A     No way, no.

16   Q     Okay, and did he ever help you feed these animals?

17   A     Occasionally when I wasn't home, he would feed

18   them, yes, but not very often.

19   Q     And that's the extent of your --  his involvement?

20   A     That's the extent of what he did, yes.

21   Q     Okay.  Was there a separate entrance on the third

22   floor at one time?

23   A     You mean outside?

24   Q     Yes.

25   A     Yes.  At one time, when Marty Fox and a few other

1   people lived up there in the apartment, they come in

2   because they didn't have no place to live, they had an

3   outside stairway and outside entrance on the porch.

4   Q    And Marty Fox lived upstairs?

5   A    Yes, she lived up there and it was not finished

6   either.  She only had the bathroom.

7   Q    But it was a separate residence for Marty?

8   A    No.  There is no separate residence because it's

9   not finished.  I don't consider the place as an

10  apartment unless it's finished.  There is no complete

11  bathroom up there.  There is just a flush up there.

12  Q    Okay, thank you.  You've said all you need to say.

13  Now, when Marty Fox was living up there, did she raise

14  cats?

15  A    Yes, she did.

16  Q    Did she get a visit from an animal control

17  officer?

18  A    Yes, she did.

19  Q    Do you remember what his name was?

20  A    Well, there was one before Thomas Eddy, but Thomas

21  Eddy did afterwards for a while and I can't remember

22  who it was before, but Thomas Eddy did all of the time

23  downstairs.  Not too much upstairs.  I don't remember

24  too much upstairs because he didn't -- I think she

25  didn't have --  I think -- wait a minute, let me

Fern Clark-Direct/Fletcher

1    finish.  Let me get this straight.

2            All her animals were downstairs to begin with

3    at my residence.  She was in my living room and my big

4    living room and then I had a small room on the side.

5    That's where she kept most of her animals when she was

6    there, but she stayed upstairs and then sometime after,

7    she met -- when Thomas Eddy retired -- oh, I can't

8    remember now all of it, but anyway, she had a few

9    animals upstairs.

10   Q    And when did Matthew move into the upstairs part

11   of the house or apartment?

12   A    Matthew moved in about -- it had to be '91, '92.

13   No, it had to be later than that.  I know it was after

14   he got out of the service.  Been about 12 or 14 years

15   anyway.

16   Q    All right, and in addition to that, did you ever

17   use a computer in your business?

18   A    I didn't have no computer.

19   Q    All right.  So let me just make clear on this.

20   You didn't generate sales receipts, you didn't generate

21   any kind of sales documents or anything like this or

22   list of, you know, breeding records or anything like

23   this or medical records on a computer?

24   A    I don't understand what you mean.

25   Q    You didn't use a computer to generate any business

Fern Clark-Cross/Murphy

1   records for your kennel?

2   A    Did I use any?

3   Q    Yes.  Did you use a computer?

4   A    No, I did not work on computers.  He didn't have

5   any computers until 1999, 2000 when he got his

6   computers and I hate computers and I would not want any

7   of them.

8   Q    I understand, that's fine.

9          MR. FLETCHER:  I think I've established all I

10  need to establish.  Hold on a minute, let me just make

11  sure.

12          (Discussion off the record between defendant

13  and his counsel)

14          No questions.

15          THE COURT:  Cross-examination.

16          MR. MURPHY:  Very briefly, Your Honor.

17                CROSS EXAMINATION

18  BY MR. MURPHY:

19  Q    Mrs. Clark, did Matthew come downstairs to shower?

20  A    That's the only place he could go.

21  Q    So he would come down and shower?

22  A    He would come down and use my facilities in the

23  bathroom which is shower, you know, and whatnot.  The

24  only thing he had upstairs was a flush.

25          MR. MURPHY:  That's all of the questions I

1    have.  Thank you.

2            THE COURT:  Thank you.  Anything further?

3            MR. FLETCHER:  Nothing.

4            THE COURT:  All right.  Mrs. Clark, thank you

5    very much.  Maybe somebody will help you to walk out.

6    Mr. Fletcher?

7            MRS. CLARK:  The room upstairs was his anyway.

8    He worked on it.

9            THE COURT:  Right over here.  Yes, sir.  If

10   you would just stay standing.

11           THE CLERK:  Please raise your right hand.  Do

12   you solemnly swear that the testimony you will give in

13   the cause now in hearing will be the truth, the whole

14   truth, and nothing but the truth, so help you God?

15           THE WITNESS:  I do.

16           THE CLERK:  Thank you.  Please be seated.

17   Please speak directly into the microphone.  State your

18   name.

19           THE WITNESS:  My name is David Clark,

20   C-l-a-r-k

21                   DIRECT EXAMINATION

22   BY MR. FLETCHER:

23   Q    Mr. Clark, I just have about two or three

24   questions for you.  You were living with your mother

25   at -- in Somerville on Hewett Road several years ago?

1    A    Yes.

2    Q    And in 2005, do you remember were you living

3    there?

4    A    Um, my brother.

5    Q    Your brother was living there, Matt?

6    A    Yes.

7    Q    And you were living --

8    A    I was down on the bottom floor.

9    Q    Okay.  You were living on the floor where your

10   mother lives?

11   A    Yes.

12   Q    Okay.  And you were helping your mother take care

13   of the pets?

14   A    Yes.

15   Q    And the animals?

16   A    Yes.

17   Q    Do you remember a visit from Thomas Eddy?

18   A    Yes, I do.

19   Q    Okay and that was in 2005?

20   A    Yup.

21   Q    Well, it may have been prior to?

22   A    Yeah, but.

23   Q    And do you remember Mr. Eddy coming in and with

24   Christine, a woman, Christine Fraser?

25   A    Well, he came in with two women.  I did not know

David Clark-Direct/Fletcher

1    the names.

2    Q    Okay, and did he show these women around your

3    mother's kitchen?

4    A    Yes.

5    Q    Did he -- do you recall him telling the two women

6    that there was an upstairs apartment that was separate?

7    A    Yes.

8    Q    And did he say that your brother and Fern lived in

9    the --

10             MR. MURPHY:  Your Honor, I don't want to

11   object to leading, but I mean he is just putting words

12   into the witness's mouth.

13             MR. FLETCHER:  All right.

14             MR. MURPHY:  I think it's a little too leading

15   with the questions.  I would object.

16             MR. FLETCHER:  All right.

17             THE COURT:  All right, you can rephrase.

18   BY MR. FLETCHER:

19   Q    Matthew lived upstairs?

20   A    Yes.

21   Q    How did Mr. Eddy identify the distinction

22   between -- the difference between the floor that you

23   lived on and the floor that your brother lived on?

24   A    Okay, there is a hallway and a stairway goes all

25   of the way up and that's Matthew's apartment.

David Clark-Direct/Fletcher

```
 1    Q    Okay.  So turning to --  let me show you a
 2    picture, Mr. Clark, identified as S5.
 3    A    Yes.
 4    Q    Would you describe that.
 5    A    Um, that's the stairway going up to Matthew's
 6    apartment.
 7    Q    Did Mr. Eddy point that out to the women?
 8    A    Yes.
 9    Q    And when he pointed that out to the women, did he
10    say that Matthew lives in a separate part of the house
11    upstairs?
12    A    Yes.
13    Q    And did he say that there was no need to go
14    upstairs because there were no animals upstairs?
15    A    Right.
16    Q    Did Mr. Eddy walk around the floor that you lived
17    on and point out animals?
18    A    Yes.
19    Q    Did he get beyond the kitchen?
20    A    Um, I can't remember that.
21    Q    Were there animals living outside?
22    A    Oh, yeah.  We have two extra rooms where animals
23    live.  We called it the puppy room.
24         MR. FLETCHER:  No further questions.
25         THE COURT:  Cross-examination.
```

1        MR. MURPHY:  Yes, Your Honor.

2                CROSS EXAMINATION

3    BY MR. MURPHY:

4    Q    Good morning, Mr. Clark.

5    A    Good morning.

6    Q    You testified that you remembered Tom Eddy coming

7    to the house with two women?

8    A    Yes.

9    Q    And one of those women was Dr. --  do you know Dr.

10   Fraser?

11   A    Um, I -- I recognize her, but I don't -- I'm not

12   good with names.

13   Q    Okay.

14   A    But I do remember two women.

15   Q    Two.  So you clearly remember then that Mr. Eddy

16   came on that occasion and he had two women with him?

17   A    Yes.

18   Q    And were the two -- where were the two women from;

19   do you know?

20   A    Um, well, they said they was state workers.

21   Q    State workers, okay.  And you indicated that there

22   was a discussion where Mr. Eddy told the two women that

23   Matthew lived upstairs?

24   A    Yes.

25   Q    And why were they talking about where Matthew

David Clark-Cross/Murphy

1   lived?

2   A   Because they want to know where the two apartments

3   was.

4   Q   The women wanted to know where the apartments

5   were?

6   A   Well, they want to know where they could go.

7   Q   Okay.  So you heard the two women ask where they

8   could go?

9   A   Yes.

10   Q   Who did they ask?

11   A   They asked my brother.

12   Q   Oh, they asked Matthew?

13   A   Yes.

14   Q   So Matthew was there?

15   A   Yup.

16   Q   So you were there and Matthew was there and your

17   mom?

18   A   Mom was there, Mr. Eddy was there.

19   Q   And two women?

20   A   And two women.

21   Q   And you're positive about that?

22   A   Yes.

23   Q   Now, you said you couldn't remember whether Mr.

24   Eddy got out from the kitchen kennel area; right?

25   A   Yes, but they took them to two extra rooms.

David Clark-Cross/Murphy

1   Q    All right.  But if Mr. Eddy never got out from

2   around the kitchen area, he wouldn't have actually been

3   to the --  well, let me ask you this.  There is a

4   stairway that goes up to the second floor right?

5   A    Yes.

6   Q    And that's in the living room?

7   A    Yes.

8   Q    And if you're in the kitchen, you couldn't see the

9   stairway; is that correct?

10  A    That's right, but he came to the doors.  He said

11  we had dogs in one bedroom and he had to check in to

12  see.  We had dogs in the living room.  We had dogs in

13  the kitchen.

14  Q    Okay.  So it's your testimony that you remember

15  Mr. Eddy leaving the kitchen area and going into the

16  living room?

17  A    Yes.

18  Q    And you're sure about that?

19  A    Yes.

20  Q    Had you had any discussions with your brother,

21  Matthew Clark, about testifying here today?

22  A    No because I live in Waterboro now.  I live in

23  Waterboro now.

24  Q    Okay.  All right.

25          MR. MURPHY:  That's all the questions I have,

David Clark-Redirect/Fletcher

1   Your Honor.

2           THE COURT:  Thank you.  Any redirect?

3           MR. FLETCHER:  Briefly.

4                   REDIRECT EXAMINATION

5   BY MR. FLETCHER:

6   Q    Do you -- I want to ask you a question about when

7   Mr. Eddy was there.  You were in the kitchen when he

8   was there?

9   A    Yes.

10  Q    And you were cleaning the cages; is that right?

11  A    I was helping mom cleaning it.

12  Q    You were helping your mother clean it?

13  A    Yes.

14  Q    And so even though Matthew was there and said you

15  cannot go upstairs, did Mr. Eddy say anything?

16  A    Yes.  He told them also.

17  Q    Your mother considers herself the owner of that

18  house?

19  A    Yes.

20          MR. FLETCHER:  No further questions.

21          THE COURT:  Anything further, Mr. Clark?

22          MR. MURPHY:  No, Your Honor.  Thank you.

23          THE COURT:  May the witness be excused?

24          MR. FLETCHER:  Yes.

25          MR. MURPHY:  Yes.  Finally excused, Your

1    Honor.

2         THE COURT:  Thank you.  Mr. Clark, you can

3    step down.  You're excused.  You can leave.

4         THE WITNESS:  Okay.

5         (Discussion off the record between defendant

6    and his counsel)

7         MR. FLETCHER:  Defense rests.

8         THE COURT:  No additional witnesses?  All

9    right, defense rests.  Anything from the Government?

10        MR. MURPHY:  No further witnesses, Your Honor.

11        THE COURT:  All right.  Government rests

12   finally?

13        MR. MURPHY:  We do.

14        THE COURT:  Counsel, what would you like to do

15   in terms of oral argument.  Would you like to go right

16   into oral argument at this point, take a few minutes to

17   collect your thoughts, dispense with oral argument?

18   The Court has read your briefs carefully, but obviously

19   didn't have the benefit of the testimony today so I

20   would find it helpful to have some oral argument.

21        MR. FLETCHER:  I think I would like to take

22   maybe five, ten minutes.  I don't think very much.

23        THE COURT:  Five or ten minutes for argument

24   or to collect your thoughts?

25        MR. FLETCHER:  I need more time than that to

1    collect my thoughts.  If I could have just a couple of

2    minutes.

3              MR. MURPHY:  That would be fine, Your Honor.

4    Why don't --

5              THE COURT:  We will take a five-minute recess

6    and come back in and I'll hear oral argument.

7              MR. MURPHY:  Thank you.

8              (RECESS CALLED).

9              THE COURT:  Good afternoon, counsel.

10             MR. FLETCHER:  Good afternoon, Your Honor.

11   Um --

12             THE COURT:  Counsel, let me just say before we

13   get started on oral argument, obviously feel free to

14   argue whatever you wish, but you can assume I read your

15   briefs very carefully and all of the exhibits attached

16   to the brief.  So what I'm most interested in is how

17   the testimony that came in this morning ties in with

18   the arguments that you've made in the brief.

19             MR. FLETCHER:  Okay, and I'll do the best I

20   can.  First of all, defendant Clark asserts that the

21   initial warrant from the affidavit, that was produced

22   by Christine Fraser that's the nexus for the probable

23   cause which is in the motion, was overbroad and that it

24   was overbroad in several respects.

25        Mostly, it was overbroad because it did not

1    include the automobiles.  It was overbroad because it

2    did not acknowledge that there were separate apartments

3    or distinct living areas in the structure, and that as

4    it relates to this annual welfare issue, that was in

5    Fern's area of the structure and not upstairs on this,

6    what we're terming, the second floor, which is actually

7    the third floor from the photographs.

8         So Stanford holds, and it's cited in the motion,

9    that warrants need to be -- have particularity as to

10   place and in this case, there isn't sufficient

11   particularity.  I note that Justice Singal issued an

12   opinion in a case called Risi where he suppressed

13   evidence in a car even though the warrant -- I believe

14   the warrant included the car, or at least a search on

15   the car, but beyond the scope of the warrant.

16        In this case, Fraser's affidavit and warrant

17   include parts of the structure that relate to Matthew

18   when he wasn't involved.  There was no reason to think

19   he was involved.  Notwithstanding his coming to the

20   door or meeting them in the driveway, there is no

21   reason to think that he was involved in the business,

22   that he was raising animals and so forth.

23        He is there supporting his mother as her son and

24   is, perhaps in great honesty, the true owner of this

25   house.  There is a life estate and the ownership, which

1    was an adjustment to the defense, really isn't before

2    the Court because it really doesn't matter who owns the

3    house.  It could be Donald Trump that owns the house,

4    but it would have to do with whether there was one

5    residence or two residences, and the defense has tried

6    to show this morning that there, in fact, were two

7    distinct residences.

8        Whether we call them apartments or not, you had to

9    go upstairs.  You had to go through a screen door that

10   was not in the third floor, the third floor of this

11   structure where Matthew lived.  It was a different part

12   of the house.  Notably, the bedroom on the left is in a

13   different state.  It's clean.  Also, you heard

14   testimony that there was, in fact, a functioning toilet

15   upstairs and that there was a kitchen area that

16   included a lot of dishes that needed to be washed, so

17   clearly that was being used as a kitchen and that

18   Matthew lived upstairs.

19       Actually, he didn't have anything to do with his

20   mother.  You heard from his mother -- you heard his

21   mother testified that she wouldn't let him have

22   anything to do with the animals, and so clearly there

23   is insufficient nexus to search the upstairs and the

24   warrant is overbroad.

25       Moreover, as they decide to go into that

1    apartment, there were multiple opportunities to stop

2    and based upon what they were looking for and yet they

3    keep going.  After they find Matthew's dog, which was

4    actually determined to be Matthew's dog and Matthew

5    claims that or basically, Your Honor, that that is his

6    pet.  It's a different kind of dog, different age dog,

7    and it's in a totally different location.  It's not

8    milling around where all the other pets are.  The other

9    pets are down on the main floor, we are calling it,

10   where Fern lives and they're Chihuahuas and Shizus for

11   the most part.  I think she did at one time raise

12   Terriers and you heard Dr. Fraser eluded to that saying

13   it looked like it might be one of her breeds, but it

14   was really a distinct dog at the time of the search.

15        You also -- the defense has established that not

16   only is the warrant overbroad, but it has to establish

17   that Christine Fraser had prior knowledge or reason to

18   know, according to Leon, that this is --  that she is

19   going beyond the scope of probable cause to give rise

20   to the warrant and, in fact, in her testimony -- from

21   members of Mr. Clark's family and also from Brenda

22   Carpenter that, in fact, they did know.

23        They were shown, according to Brenda Carpenter,

24   two separate electric lines coming off the pole, two

25   separate meters.  You heard David say that he overheard

1     Tom Eddy, at the very least, buttress or affirm

2     Matthew's statement that he lived in a separate

3     apartment upstairs, and notably, in the 2005 visit,

4     they don't go upstairs and presumably, if they really

5     thought there was an issue for the upstairs, they would

6     have gone up there.  He told them.

7          So in point of fact, they had prior knowledge that

8     there was a good possibility that there were two

9     apartments and they didn't have a basis for searching

10    the upstairs apartment because it doesn't relate to the

11    animals.  It doesn't relate to what gives rise to this

12    search.

13         So that's basically the state's argument --

14    excuse me, that's the defendant's argument and it's a

15    confusing building.  The defendant recognizes that.

16    It's not in great repair, but there was an upstairs

17    doorway there that's visible certainly from the inside

18    of Matthew's apartment.

19         Also, as you look carefully from the outside,

20    there are two meters and there is enough inferential

21    evidence for Fraser to expect there are two apartments.

22    She is aware of the structure, trying to get in there.

23    She had been obstructed by Matthew based on his owning

24    or his relationship with it and Matthew is there

25    reaffirming his mother's statement, you know, I don't

1    want you to come in here, get a warrant.

2        So I don't think that those statements, the

3    defense doesn't believe that those statements per se

4    indicate his relationship with the animals,

5    notwithstanding Dr. Fraser's interpretation of them.

6    There is no reasonable basis to think that he had a lot

7    to do with Fern's -- certainly no business piece of

8    Fern's business, and to the extent that he seems to

9    have knowledge, it's really de minimus.

10       He says kittens -- well, he is having occasionally

11   to feed these animals in Fern's absence so it's

12   possible that he would be aware, but he is no more

13   aware than any of the other people who were involved in

14   this business, including Brenda Carpenter, who at

15   different stages lived there and so forth.

16       So sure, Matthew said there are no kittens, but

17   that doesn't mean he is intimately involved in their

18   care, in the selling of them, with all the rest of it

19   which really gives rise to this warrant.

20       The defense raised the issue that there is a

21   problem with the second warrant and I want to go

22   through that very briefly.  The problem is is that in

23   the second warrant, there is this -- and it's number

24   five and six of Detective McFetridge's warrant and

25   affidavit, that they were still looking for --  still

1    looking for evidence of business records, but that's

2    really not credible.

3         Worley said she was not there long, but she was

4    there a good time.  She had been searching through

5    piles of paper so one would think that if there was a

6    business piece at that point -- admittedly there is a

7    lot of paper around.  There is several piles in the

8    apartment, but needless to say, there is no indication

9    here about a filing cabinet or separate area or even

10   when going through the papers that there are business

11   records or medical records related to animals or any

12   other animal related stuff in the third floor.

13        THE COURT:  Wasn't the second warrant to

14   authorize the search of computers?

15        MR. FLETCHER:  It was.

16        THE COURT:  And what about the argument that I

17   assume would be made that the search was of computers,

18   which had not been searched previously for business

19   records pertaining to the business.

20        MR. FLETCHER:  But there is no indication

21   there was ever a computer used.  There is no --  Fern

22   is a woman at that time in her late 70's.  She is not

23   using a computer, notwithstanding Dr. Fraser's

24   statement that they had these things.

25        You can see from -- it's not into evidence because

1    we chose not to go into the background part of the

2    initial affidavit for the warrant, but when the Salem

3    PD faxes this up, it's not a computerized form.  I mean

4    it's really a store bought form and that's Exhibit 6 in

5    the reply memo attached to the defendant's brief.

6          So okay, but there is no basis for really looking

7    for computer records.

8                THE COURT:  I take it because you would argue

9    because there were no computers downstairs.

10               MR. FLETCHER:  Right.

11               THE COURT:  And the only computers were

12   upstairs.

13               MR. FLETCHER:  Right.

14               THE COURT:  And they were in a separate

15   apartment, you would say.

16               MR. FLETCHER:  Yes, exactly and so she doesn't

17   have any serious basis to think, particularly here,

18   that there are computers used.  She has seen papers.

19   She'd seen records.  She saw records in 2005.  She had

20   been there four times and she is asked to see records.

21         So -- and there are no computer records so there

22   is no reason to think that there is computer records,

23   nor is there any indication that Matthew was taking

24   care of those records.

25               So that would be the defense, that is the defense

1    argument on this and we ask that all the evidence be

2    suppressed, computer records, obviously the videotapes

3    and also his statement to Detective McFetridge.

4            THE COURT:  And what about the testimony

5    regarding the e-mail that was found, the e-mail that

6    had been printed off that was found next to Mrs.

7    Clark's --

8            MR. FLETCHER:  That e-mail, I wasn't able to

9    get it out and I should have asked Mrs. Clark this, but

10   that was sent -- in other words, the e-mail is not in

11   evidence, but it says "to Ruth Ann" with the e-mail

12   address and then "Ruth" is a second address and Fern

13   Clark's name is not Ruth and she doesn't have any

14   e-mail address and in 2006, the e-mail, I believe, in

15   October --

16           THE COURT:  The defense contention is that,

17   just so I understand your argument, you would contend

18   that that e-mail is not evidence that Mrs. Clark was in

19   anyway using a computer.

20           MR. FLETCHER:  Absolutely.

21           THE COURT:  Because it was drafted by and sent

22   to somebody other than Mrs. Clark.

23           MR. FLETCHER:  Yes.  It was sent by somebody

24   else, someone who was in there and concerned about the

25   conditions, but it did not come by computer and there

 1    is no indication that it was, in fact -- I think

 2    Worley, Norma Worley testified that that was the case,

 3    that there was no indication it was computer related,

 4    so --

 5             THE COURT:  All right, thank you, Mr.

 6    Fletcher.  I'll give you a chance for rebuttal.  Mr.

 7    Murphy.

 8             MR. MURPHY:  Thank you.  Let me just start by

 9    addressing the computer matters and then try to come

10    back and make a brief, but cogent summary.

11        I think we are getting off track on the computer

12    records.  The warrant, which is before you as

13    Government's Exhibit S1, permitted the search for

14    evidence of the crime of cruelty to animals, including

15    but not limited to -- and then it recites a number of

16    things that can be sought, and it says "as well as any

17    computers on which such records are maintained."

18        So what the warrant is allowing is for --

19             THE COURT:  Obviously, you're talking about

20    the first warrant.

21             MR. MURPHY:  The first warrant, I'm sorry.

22    What the first warrant is permitting is permitting the

23    animal welfare folks to go in and to look for live or

24    dead animals, hard copy paper records, as well as any

25    records that may be on computers.

1          There is no requirement that they have to, as they

2     work their way through the house, find records that

3     came from the computer in order to then proceed to the

4     computers and look for records there.

5          As Dr. Fraser testified, in this day and age, most

6     people, not all, and we know that now after the fact

7     based on Mrs. Clark's rather firm testimony that she is

8     not a fan or user of computers, that most people do

9     utilize computers in one way or another in the conduct

10    of their daily lives and businesses and, therefore,

11    it's very reasonable, whenever a search for records is

12    permitted, to allow law enforcement to look at and

13    around computers for the existence of records.

14          THE COURT:  But the first warrant did not

15    authorize actual search of the computers, just their

16    seizure; right?

17          MR. MURPHY:  Well, again, we may be --  I

18    would disagree.  As a legal matter, often times the

19    Government --

20          THE COURT:  You don't have to agree with me.

21    I'm just trying to --

22          MR. MURPHY:  I'm trying to be diplomatic.

23    Often times, the Government will obtain a second

24    warrant to actually look into a computer after the

25    computer's been searched.

1        Quite frankly, I believe it is an absolutely

2   correct legal theory that if a warrant permits you

3   to -- as this warrant did -- to search for records and

4   goes on and says "as well as any computers on which

5   such records are maintained," a computer is simply like

6   a file cabinet that can contain records.

7        Probable cause exists to search for records and

8   there's a computer, and we all know that the computer

9   is capable of storing records, and there is probable

10  cause to believe there are records in the premises, you

11  can open the computer.  You can look in the computer.

12  You can search the computer just as you could a file

13  cabinet.

14       We often times will get a second warrant -- belt

15  and suspenders, that's the way we often approach

16  things -- but I would vehemently disagree that this

17  first warrant would not, as a matter of law, have

18  allowed the actual search inside of the computer

19  without a second warrant, but I really don't think

20  that's the issue.

21       I think what Mr. Fletcher has been arguing is

22  simply because when they searched Fern Clark's

23  apartment on the first floor and didn't find any

24  records that looked like they were generated by a

25  computer, that they couldn't then go up into Matthew

1    Clark's bedroom and look around in there.  That warrant

2    authorized the search of the entire premises for

3    records and there were blank papers, as we've heard, in

4    Matthew Clark's bedroom.

5          So really, I guess this circles around to my more

6    general summary and I'll get to that, Judge.  We first

7    stated most of our position, I think, in our memo and I

8    won't burden the Court with repeating that, but

9    obviously the determination of probable cause, which

10   has been challenged with respect to the first warrant,

11   is made on the four corners and within the four corners

12   of the affidavit, and I would suggest that in reviewing

13   that affidavit, while the Government concedes it may

14   not be the strongest probable cause statement that the

15   Court may encounter, but there was adequate probable

16   cause stated in the four corners of Christine Fraser's

17   affidavit to support a probable cause determination and

18   issuance of a warrant.

19             THE COURT:  How much weight should the Court

20   give to the Law Court's suggestion?

21             MR. MURPHY:  You have to make that

22   determination, Judge, you do, and I understand the Law

23   Court, while issuing a precise opinion is not -- it

24   didn't go into great discussion as to why there was or

25   was not probable cause and ultimately concluded that

1    there was.

2        Judge Horton of the Superior Court, again not

3    binding on the Court, but certainly helpful to you in

4    forming your decision, went through a rather detailed

5    analysis and never did find that there was probable

6    cause lacking.  Simply indicated he did not have to

7    reach that issue because good faith was present, and I

8    would suggest that good faith -- that this Court

9    should, if it wish, also find that there was a good

10   faith basis to uphold this first warrant if you don't

11   find there is probable cause.

12       Dr. Fraser testified that she prepared this

13   affidavit, she ran it by an Assistant District Attorney

14   who gave it her okay.  It was presented to a neutral

15   magistrate who looked at it and issued the warrant, and

16   I think that at best, it would be a close call to

17   determine that there wasn't probable cause and that

18   being the case, from some of the testimony you've

19   heard, I think clearly there was a good faith basis for

20   the execution of that warrant and I would urge the

21   Court to make that determination.

22       Now, the only thing that might interfere, I guess,

23   with the good faith basis determination by the Court,

24   if you wish to go that route, is whether or not there

25   was a material omission or misstatement in Ms. Fraser's

1    affidavit and under Leon, as you know, there are four

2    instances in which Leon good faith will not apply and

3    the first and the only one that would be potentially

4    applicable here is when a magistrate issues a warrant

5    based on a deliberately or recklessly false affidavit,

6    and I would suggest that the evidence that this Court

7    has heard establishes that that was not the case.

8        Ms. Fraser testified under oath that she was

9    unaware of the existence of a separate apartment, if

10   one does exist, because she was not informed of that

11   fact by anybody.  You did hear testimony from two

12   individuals, I believe --  well, first of all, Mr.

13   Clark in his affidavit asserted that Mr. Eddy had such

14   a discussion with Ms. Fraser in his presence.  Mr. Eddy

15   said he has no recollection of any such discussion.

16   Ms. Fraser was very adamant she had no such discussion

17   with Mr. Eddy or anybody else.

18        Brenda Carpenter did testify that she

19   overheard bits and pieces of this conversation from a

20   window above where these individuals were talking, but

21   she also clearly and unequivocally remembered Ms.

22   Fraser or Ms. Worley stating that they had a warrant

23   and we know that wasn't the case.

24       I would suggest that Ms. Carpenter was, at least,

25   mistaken as to her recollection, and certainly her

1    testimony, laid up against Mr. Eddy and Dr. Fraser,

2    does not meet the preponderance standard that the

3    defense has to establish to, in essence, find that Ms.

4    Fraser both made a material -- Dr. Fraser made a

5    material omission in her affidavit and material

6    misstatement before this Court.

7        The second was -- the witness was David Clark who

8    came in and testified the best that he could.  David

9    Clark also testified that he overheard this

10   conversation that Mr. Eddy had about a separate

11   apartment, but he also distinctly --

12           THE COURT:  Obviously a different

13   conversation.

14           MR. MURPHY:  A different conversation.  He

15   distinctly remembers two people being there, two women

16   being there with Mr. Eddy and clearly there wasn't.  He

17   misremembered an extremely important fact of that

18   incident, and I would suggest he may well have

19   misremembered the contents of this conversation.

20       You know, it really, it just --  the testimony

21   from those two witnesses, in the context in which it

22   was given, I would suggest doesn't make a lot of sense

23   that that issue about a separate apartment would even

24   have developed, been a topic of discussion in the

25   context in which it allegedly occurred.

1       I would say with respect to even the existence of

2    a separate residence, well, what can I say, I think

3    Fern Clark probably testified most directly on that

4    issue.  I mean she lived in the house for 50 years or

5    so and said there wasn't a separate apartment.

6       We did not hear from any witness that there was

7    any indicia of the existence of a separate apartment

8    other than these two electrical meters on the side of

9    the house which nobody really, based on the testimony

10   of the law enforcement officers who testified, they

11   never even noticed.  Even in and of itself having

12   separate electrical service is like having separate

13   telephone service.  It's, at best, a minimal or minor

14   factor that might point to separate dwellings and there

15   was nothing else.

16       There was nothing else as far as markings, as far

17   as extra secure door, as far as different numberings,

18   different mailboxes, any indicia that you would expect

19   to find of a separate dwelling for separate and

20   distinct Fourth Amendment protection.

21          THE COURT:  What about the signage on the

22   telephone.

23          MR. MURPHY:  The signage on the telephone

24   pole, the signage talked about businesses being

25   conducted within the house, but I don't think that that

1    is an indication that there was separate residential

2    dwellings in the house.

3         So, in any event, and even if the Court finds that

4    there is a separate residence there, under the same

5    Fourth Amendment protections, I think under all the

6    facts, the officers certainly could be forgiven for not

7    immediately recognizing that as being -- trying to,

8    with the benefit of hindsight, reconstruct the

9    different location.

10        So based on that, Judge, I just don't think that

11   the defense has carried its burden and that the

12   evidence should not be suppressed.   Thank you.

13        THE COURT:   Thank you, Mr. Murphy.   Mr.

14   Fletcher, I'll give you the last word.

15        MR. FLETCHER:   Thank you.   I think the

16   Government's legal argument would be better, obviously,

17   if Dr. Fraser hadn't been there so often.   I mean she

18   had been there four times.   She is obviously frustrated

19   trying to get in there, but she's --

20        THE COURT:   She had only been inside the

21   premises once previously; correct?

22        MR. FLETCHER:   I actually believe that she was

23   there twice and she met Fern downstairs in 2005.   2007,

24   she is rebuffed.   2006, Norma Worley is there with her

25   and Brenda --  that's right, I guess only one time

1    before.

2        However, there are indications in her interactions

3    with Fern and Matthew and others, Arthur Giles, that

4    they're considered two separate apartments, that they

5    lived in different sections of the house and, you know,

6    people live in rooming houses arrangements and so it's

7    not as if we all live in Levittown and you can say

8    that's a single family dwelling.  It's not that kind of

9    arrangement.

10       It's true that Matthew and Fern are son and

11   mother, but as you may have gathered from the

12   testimony, there is some tension and they each kept to

13   the separate parts of that house.

14       There is indicia, though it's subtle, that there

15   is -- was an upstairs apartment, that there was a

16   separate door upstairs.  It was in disrepair and so at

17   that point, perhaps for financial reasons, who knows

18   why, they were not using the outside entrance, but

19   there was an outside entrance built for that upstairs,

20   top floor apartment and it was there and it was, in

21   fact, it was visible in one of the Government's

22   exhibits.  I believe it was number 4.

23            THE COURT:  Is there any evidence that it was

24   operable at any relevant time period?

25            MR. FLETCHER:  Yes.  Well, not relevant to

1    before 2005.  It was operable ten years before.

2              THE COURT:  But not from '05 on.

3              MR. FLETCHER:  I don't believe so.

4              THE DEFENDANT:  I don't know.  I don't know

5    exactly when I tore it down.  I thought it was '05.

6              THE COURT:  Well, that's all right.  Mr.

7    Clark, I'm just talking to your lawyer.  You shouldn't

8    talk.  I was just wondering concerning the testimony

9    elicited this morning.

10             MR. FLETCHER:  Right.  In terms of the idea

11   that the computer is just like a file cabinet, it's not

12   just like a file cabinet and I dare say that Fern Clark

13   didn't consider it a file cabinet.

14        She clearly had a visceral reaction to the idea of

15   using a computer.  There's some indication she's using

16   the computer, notwithstanding the e-mail that's mailed

17   to her, and it's not -- the idea that just because

18   everybody uses computers to house their kennel records,

19   in this particular case, where Dr. Fraser had extensive

20   dealings with this person beforehand, she has the

21   records that are sent up from Salem and there is no

22   indication a computer -- there shouldn't be any basis

23   for just putting in a computer and that would violate

24   the needs for particularities in the warrant.

25             THE COURT:  What's the evidence before me that

1    Dr. Fraser knew that Mrs. Clark would not use the

2    computer?

3            MR. FLETCHER:  There are all the things that

4    you would expect a computer to be used for, with the

5    possible exception of maybe a spreadsheet or something,

6    which she may not have had the opportunity to see, but

7    the sales receipts, sales things, the things that came

8    through the fax machine were not generated by a

9    computer and so -- and they could have been and might

10   easily have been, and so I think that if you look at

11   Exhibit 6, you'll see that it's clearly -- pretty

12   clearly not a computer generated receipt that Moolic

13   has and the other records are hand done and she hand

14   writes everything.

15           THE COURT:  I understand what the evidence is

16   in hindsight, but at the time of the warrant --

17           MR. FLETCHER:  Right.

18           THE COURT:  -- was secured, what's the

19   evidence that Fraser knew --

20           MR. FLETCHER:  She does have some records.

21   She does have some records that were faxed from Salem

22   and everything is handwritten by Fern.  So there is

23   no -- she is not typing into a form.  Everything is

24   handwritten by Fern and everything has been handwritten

25   by Fern before and she did see the medical records and

1  she did see other records in 2005, and it's all

2  handwritten and that's strong evidence right there that

3  she is not using a computer, and that she is not

4  generating the form, but generating -- buying a form

5  down, who knows where, WalMart or Petco, wherever she

6  is going to get these kind of things, it's a store

7  bought form that she is filling in and she is

8  handwriting things and the handwriting, most

9  importantly, comes to Christine Fraser, Dr. Fraser,

10 before she signs the affidavit and gets the warrant.

11     She has seen that stuff so she should know that

12 there is no -- there is no computer use by Fern, but

13 also, just as a matter of personality, she has had a

14 lot of bad dealings with Fern.  It's a tense situation,

15 but she knows that this woman is in her late 70's and

16 so based on that, though it's not dispositive, it does

17 add some preponderance that this is not a woman who,

18 given the condition of her house, and given the other

19 indicia of her living style, is not computer savvy or

20 computer friendly.

21     This is not a retired person coming from

22 Massachusetts or New York and deciding to open a

23 kennel.  This is someone whose lived there, as you

24 heard, for 50 years and she's set in her ways and she

25 has her views.

1          That raises one final issue.  Fern, for whatever

2     reason, gave -- kept a life estate and deeded her

3     property to Matt.  I believe she also retained a life

4     estate for her son David, and though the issue of

5     ownership is not particularly before this Court, it

6     does indicate Fern's confusion about who owns the house

7     and emotionally, what her relationship with the house

8     is and her understanding of what's upstairs.

9          In fact, there was an apartment and it was rented

10    out and used by, you heard, Marty Fox.  Marty Fox is

11    not related to Fern and was rented out to other people

12    as a separate residence well before Matthew was there.

13         Marty Fox was there in 1991 and so, in fact, there

14    were people who were not related to the family staying

15    on the third floor or the second floor of this

16    structure with an outside entrance.  It has always

17    been, since the addition had been made, always been

18    considered a separate part of the house, a separate

19    apartment as they would determine it.

20         So there was a history at this place of that and

21    Fraser should have been aware of that because, in fact,

22    there was a -- the department had done an animal

23    welfare inspection on Marty Fox when she raised cats

24    and you heard from Fern on that.

25              THE COURT:  Thank you, Mr. Fletcher.  Does

1  that conclude it?  I saw you writing, Mr. Murphy, and

2  you are all set?

3          MR. MURPHY:  I am, Judge.  Just writing.

4          THE COURT:  All right.  Thanks, counsel.  I'll

5  take the motion to suppress under advisement and we

6  will check and make sure we have all of the exhibits

7  and I'm sure I have one set here and I think the case

8  manager does as well.

9          MR. FLETCHER:  You have your own set and these

10  were for the witnesses.  I think that might be it.

11          THE COURT:  I think you've got your own set.

12          THE CLERK:  I do have a set.

13          MR. MURPHY:  Your Honor, I will check with the

14  case manager and make sure you have everything.

15          THE COURT:  All right.  You know what, I'm

16  going to leave those right there, the originals.

17          (END OF PROCEEDING)

18          **C E R T I F I C A T I O N**

19  I, Dennis R. Ford, Registered Merit Reporter and

20  Official Court Reporter for the United States District

21  Court, District of Maine, certify that the foregoing is

22  a correct transcript from the record of proceedings in

23  the above-entitled matter.

24  Dated:  November 5, 2010

25          /s/ Dennis R. Ford



1                    Official Court Reporter

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25